**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TROY O. ROBINSON and ANTHONY W. SPEARS, on behalf of themselves and all others similarly situated, | Docket No.: |
| Plaintiffs, | |
| v. | |
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2;  NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4, | |
| Defendants. | |

**PLAINTIFFS' COMPLAINT**

# I.
## PRELIMINARY STATEMENT

This case involves a scheme by student loan lenders to avoid state law prohibitions on usury. These lenders, named as Defendants herein, accomplished their scheme by making it appear that their loans were being made by a national bank when they were in fact being made by student loan trusts. This distinction is critical because student loan trusts are subject to state usury law, while national banks are not. Plaintiffs seek damages and injunctive relief for Defendants' violations of state law prohibiting usury.

More specifically, the loans at issue in this action were made (ostensibly) by PNC Bank, N.A., a federally chartered bank subject to the National Bank Act, which Act preempts claims against national banks for violations of state usury laws. But these loans were not in fact made by a national bank. Instead, they were originated by a non-bank lender, The First Marblehead Corporation ("FMC"), which is not a national bank and therefore not subject to the National Bank Act. FMC designed the loan programs, marketed the loans to student borrowers, processed the borrowers' applications, made the decisions whether to advance credit to the borrowers and disbursed the loan proceeds – all functions that an actual lender engages in. FMC then, as it was required to do by the terms of Note Purchase Agreements with the national banks, sold, transferred and assigned the loans to statutory trusts (which are also non-bank lenders – not national banks – that are not subject to the National Bank Act), which securitized them so investors could purchase so-called "asset-backed securities." These statutory trusts have been receiving the loan monies and interest since just after the loans were disbursed to the borrowers. The true, *de facto* lenders are FMC and/or the statutory trusts that it created and sponsored, not PNC Bank, N.A. or other national banks, which simply lent their national bank charters to FMC for purposes of originating the loans, prior to transferring them to the statutory trusts (the true lenders), all to avoid state usury laws.

Plaintiff, Troy O. Robinson, borrowed student loans; the representative loan at issue was co-signed by Plaintiff, Anthony W. Spears. The paperwork for the loan says that the loan was made by PNC Bank, N.A., but the reality was otherwise: the true lender was the non-bank statutory trust that took ownership of the loan immediately after it was funded, National Collegiate Student Loan Trust 2006-2 (the "NCT 2006-2 Trust"), per the terms of a Note Purchase Agreement between PNC Bank, N.A., and FMC. In the process of all of this, and after the loan was funded and transferred to the NCT 2006-2 Trust, Plaintiffs (and the other Class Members) were charged, and have paid, interest in excess of 6%, the maximum amount of interest allowed by Pennsylvania law. The loans, by their explicit language, are governed by Pennsylvania law. The true lender, the NCT 2006-2 Trust (and the other Trust Defendants[1], which are also not protected by the preemptory effect of the National Bank Act), is, therefore, subject to Pennsylvania's prohibition against charging interest in excess of 6%. The documents evidencing the loans incurred by Plaintiffs and the Class Members in fact state that "[i]n no event will the Variable Rate [of interest] exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania," such that the NCT 2006-2 Trust and the other Trust Defendants have not only repeatedly violated Pennsylvania's law prohibiting usury, but have also committed a palpable breach of contract.

Plaintiffs are just two of the many student borrowers who have been subjected to usurious interest rates. The business scheme that the NCT 2006-2 Trust and the other Trust Defendants have engaged in was part of a concerted effort, over at least a seven-year period, to loan money to

---

[1] National Collegiate Student Loan Trust 2004-1; National Collegiate Student Loan Trust 2004-2; National Collegiate Student Loan Trust 2005-1; National Collegiate Student Loan Trust 2005-2; National Collegiate Student Loan Trust 2005-3; National Collegiate Student Loan Trust 2006-1; National Collegiate Student Loan Trust 2006-3; National Collegiate Student Loan Trust 2006-4; National Collegiate Student Loan Trust 2007-1; National Collegiate Student Loan Trust 2007-2; National Collegiate Student Loan Trust 2007-3; and National Collegiate Student Loan Trust 2007-4 (the "Trust Defendants").

hundreds of thousands of student borrowers at high-interest rates, and then immediately bundle their loans into statutory trusts, all designed to give the loans the appearance of having been made by a national bank in order to avoid the application of state usury laws, when in reality the loans, as originated by FMC, were designed to be immediately transferred to and owned by entities that are, in fact, bound by and subject to those state usury laws. Plaintiffs seek to represent a Class of claimants in order to stop these unlawful practices and to recover the illegal interest they have been charged by Defendants.

## II.
## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because this is a class action in which the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interests and costs, and Plaintiffs and other members of the Class are citizens of states different from Defendants. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so related to the claims within the federal jurisdiction pursuant to 28 U.S.C. §1332(d)(2), that they form part of the same case or controversy.

2.      This Court has personal jurisdiction over the NCT 2006-2 Trust and the Trust Defendants because they are subject to service of summons and other processes pursuant to the laws of the Commonwealth of Massachusetts, and therefore are subject to the jurisdiction of the courts of general jurisdiction of the state where this District Court is located.

3.      Venue is proper in this judicial District because the Defendants did and/or do transact business within this judicial District and have availed themselves of the courts of the Commonwealth of Massachusetts, within this judicial District; and a substantial portion of the

events at issue occurred within this judicial District. In particular, FMC originated and securitized the Loans at issue and transferred them to Defendants within this judicial District.

## III.
## PARTIES

4.      Plaintiff, Troy O. Robinson ("Robinson"), is a natural person of the full age of majority who is domiciled and residing in the State of Texas.

5.      Plaintiff, Anthony W. Spears ("Spears"), is a natural person of the full age of majority who is domiciled and residing in the State of Texas.

6.      Defendant, the NCT 2006-2 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the NCT 2006-2 Trust, and Wilmington Trust Company serves as the "owner trustee" for the NCT 2006-2 Trust.

7.      Defendant, the National Collegiate Student Loan Trust 2004-1 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2004-1 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2004-1 trust.

8.      Defendant, the National Collegiate Student Loan Trust 2004-2 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2004-2 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2004-2 trust.

9.      Defendant, the National Collegiate Student Loan Trust 2005-1 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National

Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2005-1 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2005-1 trust.

10.     Defendant, the National Collegiate Student Loan Trust 2005-2 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2005-2 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2005-2 trust.

11.     Defendant, the National Collegiate Student Loan Trust 2005-3 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2005-3 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2005-3 trust.

12.     Defendant, the National Collegiate Student Loan Trust 2006-1 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2006-1 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2006-1 trust.

13.     Defendant, the National Collegiate Student Loan Trust 2006-3 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2006-3 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2006-3 trust.

14.     Defendant, the National Collegiate Student Loan Trust 2006-4 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2006-4 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2006-4 trust.

15.     Defendant, the National Collegiate Student Loan Trust 2007-1 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2007-1 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2007-1 trust.

16.     Defendant, the National Collegiate Student Loan Trust 2007-2 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2007-2 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2007-2 trust.

17.     Defendant, the National Collegiate Student Loan Trust 2007-3 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2007-3 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2007-3 trust.

18.     Defendant, the National Collegiate Student Loan Trust 2007-4 trust, is a statutory trust formed and existing pursuant to the laws of the State of Delaware. U.S. Bank National Association serves as the "indenture trustee" for the National Collegiate Student Loan Trust 2007-

4 trust, and Wilmington Trust Company serves as the "owner trustee" for the National Collegiate Student Loan Trust 2007-4 trust.

## BACKGROUND

### The Background of Interest Rate Caps under State Law

19.     Most states have usury laws going back to the 19th century, some even codified in state constitutions. Usury rates and the state statutes governing remedies for usury vary among the states.

20.     The United States Congress preempted the state laws from applying to nationally chartered banks through the passage of the National Bank Act in 1898.

21.     If not preempted by the National Bank Act or other applicable state exemptions to usury laws, a lender remains subject to the usury prohibitions set forth in state laws.

22.     In the Commonwealth of Pennsylvania, the maximum interest rate available for debts like those at issue, in this case, is 6%. 41 P.S. §201. This maximum interest rate of 6% has been in place since 1974 and has remained in place during all material times relevant to the claims asserted in this case.

23.     The NCT 2006-2 Trust and the Trust Defendants (and FMC) are not nationally chartered banks and are not lenders subject to the National Bank Act.

### The Background of The First Marblehead Corporation

24.     FMC was founded in 1991. Over the years of its existence, it has designed and marketed student loan programs for banks to make loans to student borrowers.

25.     FMC has never lent its own money to student borrowers.

26.     As part of its business of facilitating private student loan programs, FMC developed student loan origination operations, organized servicing for the loans, and developed loan financing and disposition strategies for lenders.

27.     FMC's clients were principally banks that had the capacity to issue many student loans.

28.     Some of FMC's clients were national banks regulated by the National Bank Act, including PNC Bank, N.A. (the "National Banks").

29.     Some of FMC's clients for which it designed loan programs, including PNC Bank, N.A., participated in "make and sell" loan programs by which those banks sold the loans that were originated by FMC to FMC or one of its "designee Purchaser Trusts" (such as the NCT 2006-2 Trust and the other Trust Defendants) immediately after the loans were disbursed.

30.     During the 2000s, FMC wanted to get more involved in the burgeoning private student lending market. But without a national banking charter, FMC was limited in its ability to originate consumer debt across state lines and to charge interest rates that would be profitable.

31.     Thereafter, based upon information and belief, FMC designed a business plan that would enable it to originate high-interest private student loans ostensibly under the name of lenders covered by the National Bank Act, while at the same time hedging its risk (and the National Banks' risk) by immediately securitizing the loans on the secondary market, transferring the loans from the ostensible lender (a bank such as PNC Bank, N.A.) to a Delaware statutory trust (such as the NCT 2006-2 Trust and the other Trust Defendants) immediately after the loans were disbursed.

32.     The first step in this plan was FMC's acquisition of the majority of the operations of The Education Resources Institute, Inc. ("TERI"), which had significant market experience in designing private student loan programs for lenders and providing loan origination, loan disbursement and loan servicing expertise.

33.     In 2001, FMC acquired TERI's loan processing facility and acquired approximately 75% of its employees. TERI outsourced its administrative duties under the loan origination agreements to First Marblehead Education Resources ("FMER"), a subsidiary of FMC.

34.     In addition to its market expertise, TERI had another advantage: because TERI purported to be a non-profit organization, any loan FMC originated that was guaranteed by TERI was arguably non-dischargeable in bankruptcy under 11 U.S.C. 523(a)(8)(i).

35.     FMC used its acquisition of the majority of the operations of TERI to persuade national banks such as PNC Bank, N.A., Bank of America, N.A., Charter One Bank, N.A., KeyBank National Association, JPMorgan Chase Bank, N.A., and Bank One, National Association (some of the National Banks) to enter into various loan programs and loan purchase and sale agreements with FMC.

36.     These loan programs all shared similar features. FMC contracted with the National Banks for TERI to conduct all underwriting, due diligence, loan approval, loan disbursement, and customer service for the private student loans, and for TERI to guarantee those loans. During the origination process, TERI would guarantee the debt against bankruptcy default. Once the loans were disbursed pursuant to a Note Purchase Agreement between the National Banks and FMC, either FMC or a "Purchaser Trust" affiliated with FMC and designated by FMC was obligated to purchase the loans from the National Banks. FMC then securitized them into the various National Collegiate Student Loan Trusts.

37.     The National Banks did not disburse the loan funds to the borrowers.

**PNC Bank, N.A.**

38.     PNC Bank, N.A. is a National Bank governed by the National Bank Act.

39.     FMC and PNC Bank, N.A. entered into a "Note Purchase Agreement" for the TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004. This "Note Purchase Agreement" has terms and provisions that are very similar, and in some cases substantially identical, to the Note Purchase Agreements that FMC executed with other National Banks.

40.     The "Note Purchase Agreement" between FMC and PNC Bank, N.A. has several provisions demonstrating that the true lender is FMC and/or its "Purchaser Trusts," not PNC Bank, N.A.

41.     The "Note Purchase Agreement" requires that PNC Bank, N.A sell to FMC or its "designee Purchaser Trust" every "seasoned loan" owned by PNC Bank, N.A.

42.     The Note Purchase Agreement requires that FMC or its "designee Purchaser Trust" purchase every "seasoned loan" from PNC Bank, N.A.

43.     The "seasoned loans" are those loans that were originated by FMC and underwritten and funded pursuant to the loan programs created pursuant to the "Guaranty Agreement" between TERI and PNC Bank, N.A., also dated April 22, 2004.

44.     The "designee Purchaser Trust(s)" are the special purpose entities that were formed or sponsored by FMC or its affiliate, namely the various National Collegiate Student Loan Trusts, including the NCT 2006-2 Trust and the Trust Defendants.

45.     The National Collegiate Student Loan Trusts were formed by FMC acting in its capacity as an intermediary between the National Banks and the capital markets, which would buy

11

the securities backed by the securitized student loans that were bundled into the National Collegiate Student Loan Trusts.

46.     FMC structured the creation of the National Collegiate Student Loan Trusts, administered the process by which the loans were securitized into the National Collegiate Student Loan Trusts, and provided legal and financial advice to the National Collegiate Student Loan Trusts.

47.     The loans subject to the "Note Purchase Agreement" became "seasoned" depending on whether they were "school channeled" (typically marketed through school financial aid offices, and disbursed directly to the schools) or "direct to consumer" (typically marketed by direct mail, phone, and internet, and disbursed directly to the student borrowers). A "school channeled" loan is "seasoned" thirty days after it is disbursed, and a "direct to consumer" loan is "seasoned" fifteen days after it is disbursed.

48.     In sum, the "Note Purchase Agreement" requires that PNC Bank, N.A. sell to FMC or its "designee Purchaser Trust" (i.e., one of the National Collegiate Student Loan Trusts, here, the NCT 2006-2 Trust and the other Trust Defendants), and requires that FMC or its "designee Purchaser Trust" (here, the NCT 2006-2 Trust and the other Trust Defendants) purchase, all of the loans that were made through the PNC Bank, N.A. TERI-Guaranteed PNC Bank Alternative Loan Program pursuant to the April 22, 2004 Guaranty Agreement, once those loans become seasoned (either fifteen or thirty days after the loans were disbursed).

49.     The totality of the circumstances described above demonstrates that the real nature of the loans was that PNC Bank, N.A. was the lender in name only and that FMC and/or its "designee Purchaser Trusts" were the true, *de facto* non-bank lenders.

50.     The "Note Purchase Agreement" sets specific schedules governing the timing of when FMC or its "designee Purchaser Trust" must buy the loans from the PNC Bank, N.A. It also requires FMC to pay certain liquidated damages to PNC Bank, N.A. if FMC or its "designee Purchaser Trust" does not complete the purchase of the loans within the specified periods for FMC or its "designee Purchaser Trust" to purchase the loans.

51.     The "Note Purchase Agreement" sets specific minimum purchase prices for the loans FMC or its "designee Purchaser Trust" must buy from PNC Bank, N.A.

52.     The "Note Purchase Agreement" states that on the purchase dates, PNC Bank, N.A. shall sell, transfer, assign, set over and otherwise convey to FMC or its "designee Purchaser Trust," without recourse, all right, title and interest in and to the loans.

53.     The "Note Purchase Agreement" states that FMC or its "designee Purchaser Trust" shall receive interest on the purchased "seasoned" loans from and after the date that the loans are purchased.

54.     Pursuant to the "Note Purchase Agreement," PNC Bank, N.A. was to transfer all origination records for the loans to FMC or its "designee Purchaser Trust," including the borrowers' loan applications, the notes evidencing the debts, and all other standardized documentation specified in the loan programs.

**FMC's Role and the Bank's Lack of Risk**

55.     FMC represented its services in one of its Annual Reports as follows:



56.     As it represented, FMC engaged in the foregoing services in order to make loans to student borrowers, including those loans made by FMC pursuant to the loan program agreement TERI had with PNC Bank, N.A.

57.     All the foregoing services that FMC engaged in are loan services typically engaged in by lenders.

58.     FMC was the party that arranged the loans.

59.     FMC marketed the loans to borrowers.

60.     FMC dealt directly with the borrowers.

61.     PNC Bank, N.A. did not have any interactions with the borrowers when the loans were being originated and disbursed.

62.     PNC Bank, N.A. did not originate the loans.

63.     FMC did not charge the lenders for the above services but instead obtained a residual interest in the various National Collegiate Student Loan Trusts that it created to purchase the loans, which FMC reported as being worth billions of dollars by 2007.

64.     PNC Bank, N.A. bore no economic risk for the loans that it sold to FMC or its "designee Purchaser Trust," because the loans were immediately sold pursuant to the "Note

Purchase Agreement" to FMC or its "designee Purchaser Trust." After funding, PNC Bank, N.A. had no ongoing financial interest in the loans and no risk associated with the loans, because of the guarantee that TERI provided and the fact that PNC Bank, N.A., as it was required to do by contract, transferred ownership of the loans very shortly after the loans were funded.

65.     PNC Bank, N.A. did not place its own money at risk when it funded the loans, because it was obligated to sell, and FMC and/or its "designee Purchaser Trusts" were obligated to purchase, the loans after they were originated by FMC and disbursed to the borrowers.

66.     FMC and/or its "designee Purchaser Trusts" are the parties that had the predominant economic interest in the loans when they were originated and disbursed.  Since the loans were disbursed, FMC and/or its "designee Purchaser Trusts" have been the parties that have retained the predominant economic interest in the loans.

67.     Since the loans were disbursed, FMC, and/or its "designee Purchaser Trusts" have maintained the predominant economic interest in the revenues (principal and interest) generated by the loans.

68.     FMC and/or its "designee Purchaser Trusts" bore (and bear) the risk of default by the borrowers of the loans.

69.     FMC and/or its "designee Purchaser Trusts" bore (and bear) all regulatory risks associated with the loans that PNC Bank, N.A. disbursed.

70.     PNC Bank, N.A. (and other of the National Banks) also disclaimed any legal responsibility for violating underwriting criteria because TERI and FMC, and not the National Banks, were responsible for evaluating, approving and disbursing the loans.

71.     In short, the National Banks, including PNC Bank, N.A., acted as nothing more than marketing platforms and shell bank accounts. They were not the true lenders. FMC, as a non-

bank lender, used its name and its national bank charter to underwrite, originate, and fund student loans, and then to transfer the loans to Defendants or the non-bank lender "designee Purchaser Trusts" created by FMC, which also are not lenders afforded the preemptive effect of the National Bank Act against being charged with violating state usury laws.

72.     The Trust Defendants were the *de facto* lenders of the loans.

73.     FMC, which oversaw and managed the processes by which the loans were securitized for investment purposes, warned its investors that it might be engaged in the type of "rent-a-charter" scheme described above. In its Form 10-K filed with the United States Securities and Exchange Commission for its fiscal year ended June 30, 2009, FMC stated:

> ***Recent litigation has sought to re-characterize certain loan marketers and other originators as lenders; if litigation on similar theories were successful against us or any third-party marketer we work with, the education loans that we facilitate would be subject to individual state consumer protection laws.***
>
> A majority of the lenders with which we work are federally-insured banks and credit unions. As a result, they are able to charge the interest rates, fees, and other charges available to the most favored lender in their home state. In addition, our lender clients or prospective lender clients may be chartered by the federal government and enjoy preemption from enforcement of state consumer protection laws. In providing our education loan services to our lender clients, we do not act as a lender, guarantor or loan servicer, and the terms of the education loans that we facilitate are regulated in accordance with the laws and regulations applicable to the lenders.
>
> The association between marketers of high-interest "payday" loans, tax-return anticipation loans, subprime credit cards, and online payment services, on the one hand, and banks, on the other hand, has come under recent scrutiny. Recent litigation asserts that loan marketers use lenders with a bank charter that authorizes the lender to charge the most favored interest rate available in the lender's home state in order to evade usury and interest rate caps, and other consumer protection laws imposed by the states where they do business. Such litigation has sought, successfully in some instances, to re-characterize the loan marketer as the lender for purposes of state consumer protection law restrictions. Similar civil actions have been brought in the context of gift cards. Moreover, federal banking regulators and the FTC have undertaken enforcement actions challenging the activities of certain loan marketers and their bank partners, particularly in the context of subprime credit cards. We believe that our activities, and the activities of third parties whose

16

marketing on behalf of lenders may be coordinated by us, are distinguishable from the activities involved in these cases.

Additional state consumer protection laws would be applicable to the education loans we facilitate if we, or any third-party loan marketer engaged by us, were re-characterized as a lender, and the education loans (or the provisions governing interest rates, fees, and other charges) could be unenforceable unless we or a third-party loan marketer had the requisite licenses or other authority to make such loans. In addition, we could be subject to claims by consumers, as well as enforcement actions by regulators. Even if we were not required to cease doing business with residents of certain states or to change our business practices to comply with applicable laws and regulations, we could be required to register or obtain licenses or regulatory approvals that could impose a substantial delay or cost to us. There have been no actions taken or threatened against us on the theory that we have engaged in unauthorized lending; however, if such actions occurred, they could have a material adverse effect on our business. (Bold type in the original.)

74.    Similarly, the National Collegiate Student Loan Trust 2007-1 made the same

disclosure to its investors, in a Prospectus Supplement dated September 7, 2006, which states:

**Consumer protection laws may affect enforceability of the trust student loans**

Numerous federal and state consumer protection laws and related regulations impose substantial requirements upon lenders and servicers involved in consumer finance. These requirements may apply to assignees such as the trust and may result in both liability for penalties for violations and a material adverse effect upon the enforceability of the trust student loans. For example, federal law, such as the Truth-in-Lending Act can create punitive damage liability for assignees and defenses to enforcement of the trust student loans, if errors were made in disclosures that must be made to borrowers. Certain state disclosure laws, such as those protecting co-signers, may also affect the enforceability of the trust student loans if appropriate disclosures were not given or records of those disclosures were not retained. If the interest rate on the loans in question exceeds applicable usury laws, that violation can materially adversely affect the enforceability of the loans.

If the loans were marketed or serviced in a manner that is unfair or deceptive, or if marketing, origination or servicing violated any applicable law, then state unfair and deceptive practices acts may impose liability on the loan holder, as well as creating defenses to enforcement. Under certain circumstances, the holder of a trust student loan is subject to all claims and defenses that the borrower on that loan could have asserted against the educational institution that received the proceeds of the loan. Many of the trust student loans have been priced by lenders using a so-called "risk-based pricing" methodology in which borrowers with lower creditworthiness are charged higher prices. If pricing has an adverse impact on classes of protected persons under the federal Equal Credit Opportunity Act and other similar laws,

claims under those acts may be asserted against the originator and, possibly, the loan holder. (bold type in the original)

75.    In addition, as further evidence that FMC and/or the National Collegiate Student Loan Trusts are the true lenders, FMC stated in its Annual Reports that it (rather than the National Banks) handled every aspect of making and originating loans, including disbursing funds, prior to the loans being immediately sold, transferred and assigned to the various National Collegiate Student Loan Trusts:

- For our private label loan programs, once a loan application is approved, we generate a promissory note, a legal contract between the borrower and lender which contains the terms and conditions of the loan;

- For our private label loan programs, once we obtain all applicant data, including the signed note, evidence of enrollment and any income verification, we disburse the loan funds on behalf of TERI, with funds made available to TERI by the lenders;

- Pursuant to the master servicing agreement, TERI engages us to provide loan origination, pre-claims, claims, and default management services.

76.    And, FMC promoted that it did communicate directly with borrowers:

- FMER [a wholly-owned subsidiary of FMC] provides to TERI, under a Master Servicing Agreement, underwriting, documentation and other origination services, technical support, disbursements, customer service, collections, accounting services, guarantee claims management and administrative services, in support of TERI's loan guarantee function.

77.    Again, the services that FMC provided included all services that a true lender would normally render, including designing the loan programs, processing and approving the borrowers' applications for credit, originating the loans, and disbursing the loans.

**FMC Goes Public, and TERI Collapses**

78.    In 2003, FMC went public, and its stock price soared.

79.    At all times, FMC's financial success was directly tied to its ability to continue to originate and securitize more loans into the National Collegiate Student Loan Trusts, which were purportedly guaranteed by TERI.

80.     Shortly after going public, FMC was determined to originate more debt so it could engage in more securitizations, and so it restructured its underwriting guidelines. It also began loosening the underwriting criteria that it had agreed to honor with the National Banks.

81.     Owing in part to FMC loosening the underwriting criteria, default rates on the loans increased in 2007 and into 2008.

82.     Owing to rising default rates and TERI being forced to pay its guarantees, TERI declared bankruptcy in 2008, which effectively halted FMC's ability to continue its lending programs with the National Banks as designed.

83.     Immediately after TERI declared bankruptcy, FMC's stock price dropped precipitously.

84.     The National Collegiate Student Loan Trusts then began to experience serious default rates. In addition to default rates of 50%, the National Collegiate Student Loan Trusts lost most of the loan documentation and were sued by the federal government for illegally seeking to collect on loans they could not prove they owned, and for filing misleading and fraudulent affidavits in courts across the country.

85.     The National Collegiate Student Loan Trusts have no employees and no offices. They have operated through a servicing entity designated in the "Note Purchase Agreements" and other unnamed third parties, including National Collegiate Lending, LLC, which is a subsidiary of FMC.

**Robinson and Spears' Experience**

86.     Robinson incurred several separate private student loans.

87.     One of the loans was (ostensibly) made by PNC Bank, N.A., which was disbursed on March 29, 2006 (the "Loan"). The disbursed amount of the Loan was $21,000.00, but the total

original balance of the Loan was $22,459.89 owing to origination fees and other charges (which were capitalized into the principal of the Loan such that the origination fees and other charges accrued interest in addition to the principal accruing interest).

88.     Robinson borrowed the Loan pursuant to a loan program agreement between FMC and PNC Bank, N.A. This loan program was designed and implemented by FMC. Robinson's Loan was part of the PNC Bank, N.A., and FMC "TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004."

89.     FMC was the entity that performed the market research and analysis for the "TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004;" set the program's credit standards and loan terms; ensured the program's regulatory and legal compliance; and trained personnel to implement the "TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004."

90.     FMC was the entity that marketed the "TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004" to prospective borrowers.

91.     Robinson incurred the Loan to attend University of Phoenix.

92.     Spears co-signed the Loan, and as such, was jointly liable with Robinson for the Loan.

93.     The Loan is memorialized in a "Credit Agreement" between Robinson and Spears, on the one hand, and PNC Bank, N.A., on the other hand.

94.     The Credit Agreements for the "TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004" all state: "I [Robinson and Spears, in this case] understand that you [PNC Bank, N.A.] are located in Pennsylvania and that this Credit Agreement will be entered into in the same state. CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT

AGREEMENT WILL BE GOVERNED BY FEDERAL LAW AND THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO CONFLICT OF LAW RULES" (capitalization in the original).

95.    The terms of the Credit Agreement governing the Loan are the same for all the members of the Class that Robinson and Spears seek to represent, and the Class Members' Credit Agreements contain the same choice of law language.

96.    This choice of law provision is binding upon the NCT 2006-2 Trust and the other Trust Defendants.

97.    After the Loan to Robinson and Spears was disbursed, the Loan was immediately transferred to the NCT 2006-2 Trust.

98.    PNC Bank, N.A., had and has no economic interest in the Loan. Instead, it received an origination fee for allowing its name and national bank charter to be used in connection with the origination of the Loan.

99.    The Loan was originated by FMC.

100.    As with other borrowers who are members of the Class defined herein, FMC was the entity that determined whether to make the loans to Robinson and Spears.

101.    FMC supplied to Robinson and Spears all the forms needed for them to apply for the credit.

102.    FMC reviewed and screened Robinson and Spears' application for credit.

103.    FMC processed Robinson and Spears' application for credit.

104.    FMC performed the credit underwriting and credit checks that were done as part of Robinson and Spears' application for credit.

105.   FMC was the entity that decided whether to approve Robinson and Spears' application for credit.

106.   FMC supplied to Robinson and Spears all the forms for them to sign documenting the Loan, including delivering to them the Credit Agreement.

107.   FMC disbursed the proceeds of the Loan to Robinson.

108.   FMC staffed and managed the call center for student loan borrowers who had loans which were part of the "TERI-Guaranteed PNC Bank Alternative Loan Program effective as of April 22, 2004."

109.   The Loan had a variable interest rate.

110.   The Loan's variable interest rate applied during two separate periods of the Loan: first, during a period when repayment of the Loan was deferred, and second, during the period after deferment when the Loan was being repaid in monthly installments.

111.   During the period when Loan repayment was deferred, interest that was accruing was capitalized and was added to the principal of the debt.

112.   During both periods of the Loan, the interest rate for the Loan was 4.65% <u>plus</u> the one-month London Interbank Offered Rate of Interest, as published in the Money Rates section of the Wall Street Journal on the first business day of the preceding calendar month.

113.   During periods of time during the term of the Loan, interest has accrued and has been paid by Robinson and Spears at rates exceeding the maximum amount of 6% allowed by Pennsylvania law. For example, between September 2018 and June 2019, Robinson and Spears were charged and paid, variable interest rates of 6.580%, 6.750%, 6.950%, and 7.160%. During the early periods of the loan, particularly between 2006 and 2008, Robinson and Spears were charged, and paid, variable rates of interest that were over 8% and 9%.

114.    Robinson received periodic statements from the agency servicing his Loan on behalf of the NCT 2006-2 Trust, which statements contained the varied rates of interest over the life of the Loan, including rates of interest in excess of 6%, the Commonwealth of Pennsylvania's maximum rate of interest.

115.    Upon origination, the Loan was immediately sold, transferred, and assigned to FMC's "designee Purchaser Trust" (the NCT 2006-2 Trust), and the Loan was then bundled with other loans (i.e., securitized) into the NCT 2006-2 Trust.

116.    The NCT 2006-2 Trust is the assignee of the Loan.

117.    The NCT 2006-2 Trust has owned the Loan since it was transferred to that trust immediately after it was originated and funded.

118.    After the Loan was transferred and assigned to the NCT 2006-2 Trust, PNC Bank, N.A. retained no monetary interest in the Loan and retained no other cognizable, substantive or beneficial interest in the Loan.

119.    PNC Bank, N.A. never had the predominant economic interest in the Loan.

120.    FMC and/or the 2006-2 Trust had the predominant economic interest in the Loan at all times.

121.    FMC retained a residual ownership interest in the NCT 2006-2 Trust.

122.    After the Loan was sold, transferred, and assigned to the NCT 2006-2 Trust, PNC Bank, N.A. was entirely uninvolved with the Loan. It had no role servicing or collecting the Loan.

123.    After the Loan was sold, transferred, and assigned to the NCT 2006-2 Trust, the NCT 2006-2 Trust acted solely on its own behalf and did not act on behalf of PNC Bank, N.A.

124.    The NCT 2006-2 Trust is not a national bank and is not governed by the National Bank Act.

125.    The NCT 2006-2 Trust is not an agent or subsidiary, nor an affiliated entity, of any national bank, and is not an agent, affiliate or subsidiary of PNC Bank, N.A.

126.    The NCT 2006-2 Trust, does not act, and never has acted, on behalf of a national bank, and does not act, and never has acted, on behalf of PNC Bank, N.A.

127.    The NCT 2006-2 Trust is not entitled to the protections afforded to national banks pursuant to the National Bank Act.

**The Trust Defendants**

128.    As noted above, the NCT 2006-2 Trust (to which Plaintiffs' Loan was transferred and assigned) is one of many National Collegiate Student Loan Trusts that were created by FMC.

129.    The Trust Defendants (namely The National Collegiate Student Loan Trusts 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-3, 2006-4, 2007-1, 2007-1, 2007-3 and 2007-4) were also during the applicable time frame assigned and transferred and became the owners of, loans made to other student borrowers that were ostensibly made by PNC Bank, N.A., pursuant to the same loan program and same Note Purchase Agreement that applied to and covered Plaintiffs' Loan.

130.    The Trust Defendants are the owners of loans that were made to Class Members ostensibly by PNC Bank, N.A., and which are memorialized by the same Credit Agreement as Plaintiffs' Credit Agreement.  The loans to the Class Members that are now held by the Trust Defendants have the same terms and conditions as Plaintiffs' Loan.

131.    The loans to the Class Members that are now held by the Trust Defendants were: arranged by FMC pursuant to the same loan program and the same Note Purchase Agreement that applied to and covered Plaintiffs' Loan; originated by FMC pursuant to the same loan program and the same Note Purchase Agreement that applied to and covered Plaintiffs' Loan; underwritten

by FMC pursuant to the same loan program and the same Note Purchase Agreement that applied to and covered Plaintiffs' Loan; applied for pursuant to the same loan program and the same Note Purchase Agreement that applied to and covered Plaintiffs' Loan; and were otherwise processed, and then transferred and assigned, in the same manner as Plaintiffs' Loan, the only difference being the identity of the trust to which they were transferred.  The facts as recited above as they pertain to the NCT 2006-2 Trust apply identically to the Trust Defendants.

132.   The loans to the Class Members that are held by the Trust Defendants were all guaranteed by TERI, just as all of the loans held by the NCT 2006-2 Trust were guaranteed by TERI.

133.   The loans to the Class Members that are held by the Trust Defendants were and are serviced by the same servicing agency that services the loans held by the NCT 2006-2 trust.  All of the National Collegiate Student Loan Trusts that are the subject of this action have the same servicer.

134.   The prospectuses for the Trust Defendants have the same, or substantially the same, disclosures as does the NCT 2006-2 Trust.

135.   All of the National Collegiate Student Loan Trusts that are the subject of this action have the same "indenture trustee" and the same "owner trustee."

136.   The policies and procedures that FMC employed creating all National Collegiate Student Loan Trusts were the same.

137.   The policies and procedures that FMC employed transferring all loans ostensibly made by PNC Bank, N.A, to the various National Collegiate Student Loan Trusts were the same.

138.   Each National Collegiate Student Loan Trust employs the same policies and procedures related to the collection of interest.

139.    The Trust Defendants have collected interest in excess of 6% in the same manner as has the NCT 2006-2 Trust.

140.    All Trust Defendants have behaved in the same manner as the NCT 2006-2 Trust. The behavior among all National Collegiate Student Loan Trusts when it comes to their ownership of the loans ostensibly made by PNC Bank, N.A., and how they received ownership of those loans, and their collection of interest on those loans, is identical.

141.    All of the National Collegiate Student Loan Trusts share common beneficial ownership.

142.    Establishing liability on the part of the NCT 2006-2 Trust will necessarily establish the liability of the Trust Defendants.

143.    The prospectuses for the Trust Defendants have the same, or substantially the same, disclosures as does the NCT 2006-2 Trust.

144.    The Class Members whose loans are held by the Trust Defendants have suffered the same injuries as Plaintiffs.

145.    The Class Members whose loans are held by the Trust Defendants have the same legal claims and causes of action as Plaintiffs have against the NCT 2006-2 Trust.

146.    The issues raised by Plaintiffs' claims against the NCT 2006-2 Trust are identical to the issues raised by the Class Members' claims against the Trust Defendants.

## IV.
## CLASS ACTION ALLEGATIONS

147.    Pursuant to Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure, Robinson and Spears bring this action on behalf of themselves and all other persons similarly situated, as a representative of the following Class (collectively, the "Class Members"):

148.    Those citizens of the various states who:

26

a.      obtained private education loans of less than $50,000.00, which were originated

and disbursed by FMC, and then transferred and assigned to and securitized into the NCT

2006-2 Trust or any of the Trust Defendants;

b.      have or had a Credit Agreement that states or stated that it is or was governed by

federal law and the laws of the Commonwealth of Pennsylvania, without regard to conflict

of law rules; and

c.      were charged and paid interest rates in excess of the maximum amount allowed by

the laws of the Commonwealth of Pennsylvania.

149.    Robinson and Spears reserve the right to amend the definition of the Class and/or

add subclasses to include or exclude members.

150.    As described below, this action satisfies the numerosity, commonality, typicality,

and adequacy of representation requirements of Rule 23(a) of the Federal Rules of Civil Procedure,

and may also be maintained as a class action pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the

Federal Rules of Civil Procedure.

## Rule 23(a)

### A.  Numerosity

151.    The Class Members are so numerous that joinder of all members is impracticable.

152.    In the interest of judicial economy, this dispute should be resolved through a class

action.

153.    Upon information and belief, the number of Class Members will likely exceed

100,000, based upon the number of student loans that were made by FMC and which have been

securitized into the NCT 2006-2 Trust and the Trust Defendants. The quantity, identity, and

location of Class Members are ascertainable through appropriate discovery and may be identified

by the records maintained and possessed by the NCT 2006-2 Trust, the Trust Defendants, or the agency that services the loans on their behalves.

154.    Some of the Class Members have defaulted on consumer debt over the last ten years, and therefore likely lack the resources to bring an individual action. Upon information and belief, the individual members of the Class, or at least a large portion thereof, lack the means to pursue these claims individually and severally.

### B.  **Commonality**

155.    There are common questions of law and fact affecting the entirety of the Class Members. Specifically, predominant common questions include without limitation:

a.      whether the NCT 2006-2 Trust and the Trust Defendants were and are the true, *de facto* lender of the Class Members' loans;

b.      what roles FMC and PNC Bank, N.A. had in the marketing, origination, underwriting, disbursement, and servicing of the Class Members' loans;

c.      who had and has the predominant economic interest in the Class Members' loans;

d.      whether the interest rates charged to those Class Members were illegal and usurious under the laws of the Commonwealth of Pennsylvania;

e.      whether the NCT 2006-2 Trust and the Trust Defendants breached the contract and agreement between it and the Class Members;

f.      whether the NCT 2006-2 Trust and the Trust Defendants should be enjoined from further violations of Pennsylvania law;

g.       whether the Class Members are entitled to an adjustment of

h.      whether they are entitled to have all historical interest paid in excess of 6% applied to the principal amount of their loans or returned to them.

i.      Answers to these common questions will drive the resolution of the damages shared by each member of the Class.

**C.  Typicality**

156.   Robinson and Spears' claims against the NCT 2006-2 Trust are typical and representative of those of all Class Members, including the Class Members' Claims against the Trust Defendants. Specifically, their Loan is a debt for a student loan, as with the other Class Members, and is based upon loan documents that are substantially the same, if not identical, to the other Class Members' loan documents. Their claims, like the other Class Members' claims, are governed by the same laws as provided for in the Credit Agreement that governs the debt, and the terms of their Credit Agreement are substantially the same, if not identical, to the terms of the Class Members' Credit Agreements. Robinson's and Spears' experiences applying for the loan through FMC are typical of the other Class Members, as is their experience having been subjected to collection efforts. The NCT 2006-2 Trust's actions involving Robinson and Spears are typical of the NCT 2006-2 Trust's actions involving the other Class Members and are typical of the Trust Defendants' actions involving other Class Members.

**D.  Adequacy of Representation**

157.   Robinson and Spears will fairly and adequately represent and protect the interests of the members of the Class. Their interests are squarely aligned with those of the Class Members, and they have no conflicts with the Class Members. Their legal counsel, Smith Law Group; Jones, Swanson, Huddell & Garrison, LLC; and Fishman Haygood, LLP, are experienced in class action lawsuits, complex commercial litigation, and student loan litigation. Robinson, Spears, and their counsel are committed to responding to discovery and motions, participating in all hearings and trials, and prosecuting this case to its conclusion.

**Rule 23(b)(2)**

158.   This case is appropriate for class certification under Rule 23(b)(2) of the Federal Rules of Civil Procedure because the NCT 2006-2 Trust and the Trust Defendants have acted on grounds generally applicable to Robinson, Spears, and all other Class Members, such that final injunctive relief is appropriate respecting the Class as a whole.

159.   The NCT 2006-2 Trust and the Trust Defendants, as lenders, received and collected interest in excess of the amount permitted by the laws of the Commonwealth of Pennsylvania (and in violation of the contracts and agreements they have with the Class Members), which is the law governing the debts of Robinson and Spears and the other Class Members, and therefore, final injunctive relief against the NCT 2006-2 Trust and the Trust Defendants is appropriate and applicable to all Class Members in order to stop their continuing violations of laws and their continuing breach of contract.

**Rule 23(b)(3)**

160.   This case is also appropriate for certification under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law and fact common to the Class Members predominate over individual issues, and class treatment is superior to other available methods for fairly and efficiently adjudicating the controversy.

161.   There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. The questions include, but are not limited to:

a.   whether the loans were originated, made and owned by PNC Bank, N.A., FMC, the NCT 2006-2 Trust, or the Trust Defendants;

b.   which entity is the true lender of the loans;

c.   which entity has the predominant economic interest in the loans;

d.      whether the Class Members' rates of interest in their private education loans were limited by the maximum interest rate allowed by the Commonwealth of Pennsylvania;

e.      whether the Class Members were charged rates of interest in excess of the maximum interest rate allowed by the Commonwealth of Pennsylvania;

f.      whether the NCT 2006-2 Trust and the Trust Defendants' conduct violates Pennsylvania law regarding the maximum amount of interest that can be collected from a debtor;

g.      whether the NCT 2006-2 Trust and the Trust Defendants' conduct breaches the contract and agreement they have with the Class Members; and

h.      whether the Class Members should be awarded injunctive relief and/or damages.

162.    This action should be maintained as a class action because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members, which would establish incomplete standards of conduct for the parties opposing the Class, as well as a practical matter be dispositive of interests of other members not parties to the adjudications, or substantially impair or impede those other members' ability to protect their interests. Furthermore, individual actions are not economically feasible, the Class Members are likely, not aware of their rights, and the Class Members are not likely to pursue individual actions to enforce their rights given the relatively small individual loan amounts at issue with respect to each Class Member.

163.    A class action is a superior method for the fair and efficient adjudication of this controversy. Management of the Class claims is likely to present significantly fewer difficulties than those presented in many individual claims. The identities of the Class Members may be obtained from the NCT 2006-2 Trust and the Trust Defendants' records.

**V.**
**CAUSES OF ACTION**

**Count One: Unlawful Interest in Violation of Pennsylvania Law, 41 P.S. §201**

164.    Robinson and Spears repeat and re-allege the allegations set forth in Paragraphs 1 through 164 above as if those allegations are set forth in this Count.

165.    41 P.S. §201 states:

Except as provided in Article III of this act, the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate shall be six percent per annum.

166.    None of the exceptions contained in the Article concerning the maximum rate of interest in Pennsylvania law apply to Robinson, Spears, or the Class Members' loans.

167.    The NCT 2006-2 Trust and the Trust Defendants violated 41 P.S. §201 by contracting for and collecting usurious rates of interest in excess of 6%.

**Count Two: Breach of Contract**

168.    Robinson and Spears repeat and re-allege the allegations set forth in Paragraphs 1 through 168 above as if those allegations are set forth in this Count.

169.    A binding contract and agreement, namely the "Credit Agreement," exists between Robinson, Spears, and the Class Members, on the one hand, and the NCT 2006-2 Trust and/or the Trust Defendants, on the other hand.

170.    That binding contract and agreement states: "In no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania."

171.    The NCT 2006-2 Trust and the Trust Defendants breached the contract and agreement by collecting interest in excess of the maximum rate of interest allowed by the laws of the Commonwealth of Pennsylvania.

## Count Three: Breach of Duty of Good Faith and Fair Dealing

172.   Robinson and Spears repeat and re-allege the allegations set forth in Paragraphs 1 through 172 above as if those allegations are set forth in this Count.

173.   A binding contract and agreement, namely the "Credit Agreement," exists between Robinson and Spears, on the one hand, and the NCT 2006-2 Trust and/or the Trust Defendants, on the other hand.

174.   The contract and agreement has an implied duty that the parties will act in good faith and deal fairly with each other.

175.   The NCT 2006-2 Trust and the Trust Defendants violated that implied duty of good faith and fair dealing by collecting interest in excess of the maximum rate of interest authorized by the laws of the Commonwealth of Pennsylvania.

## Count Four: Violation of Pennsylvania's
## Unfair Trade Practices and Consumer Protection Law

176.   Robinson and Spears repeat and re-allege the allegations set forth in Paragraphs 1 through 176 above as if those allegations are set forth in this Count.

177.   The NCT 2006-2 Trust and the Trust Defendants have engaged in unfair and deceptive acts and practices in the conduct of trade or commerce prohibited by the Pennsylvania Unfair Trade Practices and Consumer Protection Law,73 P.S. §§201-1, *et seq*.

## Count Five: Injunctive and Declaratory Relief

178.   Robinson and Spears repeat and re-allege the allegations set forth in Paragraphs 1 through 178 above as if those allegations are set forth in this Count.

179.   As outlined throughout this Complaint and in Counts One through Four, the NCT 2006-2 Trust and the Trust Defendants' collection of interest in excess of 6% is a violation of 41

P.S. §201, the Class Members' contracts, the NCT 2006-2 Trust and the Trust Defendants' duties of good faith and fair dealing, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§201-1, *et seq*.

180.    Pursuant to the Declaratory Judgment Act, Plaintiffs, on behalf of a Class, seek a declaratory judgment that the maximum allowable interest for the Class Members' loans is 6%.

181.    Robinson and Spears also request a preliminary and permanent injunction barring the NCT 2006-2 Trust and the Trust Defendants from collecting interest on the Loans in excess of 6%.

## VI.
## JURY DEMAND

182.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Robinson and Spears hereby request a trial by jury on all issues so triable.

## VIII.
## PRAYER

183.    In light of the foregoing, Robinson and Spears request that the NCT 2006-2 Trust and the Trust Defendants be cited to appear, and judgment be entered in their favor and in favor of the Class Members, awarding:

a.    Preliminary and permanent injunctive relief barring the NCT 2006-2 Trust and the Trust Defendants from their continuing violations of 41 P.S. §201, the Pennsylvania Unfair Trade Practices and Consumer Protection Law, the Class Members' contracts, and the duty of good faith and fair dealing;

b.    A declaratory judgment that the interest rate on the Class Members' debts should be adjusted so that it does not exceed 6%;

c.    Rescission of the debts;

d.    Restitution in the form of the return of interest they have collected in excess of 6%;

e.      Damages, including treble damages pursuant to 41 P.S. §502 and 73 P.S. §201-9.2;

f.      Attorneys' fees and costs of this suit pursuant to 41 P.S. §503 and 73 P.S. §201-9.2; and

g.      Such other and further relief as the Court deems just and proper.

Dated: February 3, 2020

Respectfully submitted,

By: /s/ Richard D. Gaudreau
Richard D. Gaudreau (Bar Number 187070)
395 Main Street
Salem, New Hampshire 03079
Telephone:  603) 893-4300

Lynn E. Swanson (to be admitted *pro hac vice*)
Peter N. Freiberg (to be admitted *pro hac vice*)
Jones, Swanson, Huddell & Garrison, LLC
601 Poydras Street
Suite 601
New Orleans, Louisiana 70130
Telephone:  504-523-2500

Austin C. Smith (to be admitted *pro hac vice*)
Smith Law Group
3 Mitchell Place, Suite 5
New York, New York 10017
Telephone:  917-992-2121

Jason W. Burge (to be admitted *pro hac vice*)
Fishman Haygood L.L.P.
201 St Charles Avenue
46th Floor
New Orleans, Louisiana 70170
Telephone:  504-586-5252

**ATTORNEYS FOR PLAINTIFFS
TROY O. ROBINSON AND
ANTHONY W. SPEARS**