# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

TROY O. ROBINSON and ANTHONY W. )
SPEARS, on behalf of themselves and all )
others similarly situated, )
                                  )
                     Plaintiffs, )
                                  )
             v. )
                                  )
NATIONAL COLLEGIATE STUDENT )
LOAN TRUST 2006-2, *et al.*, )
                                  )
                     Defendants. )

Case No. 1:20-cv-10203-ADB

## ORAL ARGUMENT REQUESTED

(Motion for Enlargement of Page Limit
granted April 10, 2020, ECF No. 30)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 2

ARGUMENT ................................................................................................. 5

I.     PLAINTIFFS LACK STANDING TO SUE ALL BUT ONE
TRUST DEFENDANT ......................................................................... 5

II.    FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS ................................. 10

     A.     Federal Law Permits The Trusts To Charge The Same Interest
Rate As PNC ...................................................................................... 10

     B.     Plaintiffs' "True Lender" Theory Has No Basis In, And Actually
Contravenes Federal Law ................................................................. 14

          1.     Federal Law Preempts the Application Of Plaintiffs' True
Lender Theory Because The Theory Would Directly Restrict
PNC's Express Powers ......................................................... 14

          2.     Even If The True Lender Theory Is Not A Direct Restriction On
PNC's NBA Powers, It Impermissibly Impairs PNC's Ability
To Exercise Those Powers ...................................................... 17

     C.     Even If The True Lender Theory Applies, Plaintiffs' Allegations Are
Insufficient ......................................................................................... 20

     D.     The Balance of Plaintiffs' Claims Are Preempted ................................. 22

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT .............. 22

IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF AN IMPLIED
DUTY OF GOOD FAITH AND FAIR DEALING ......................................... 23

V.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE
UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ................. 24

VI.     PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE
        RELIEF MUST BE DISMISSED ........................................................................26

VII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RESCISSION ....................................27

VIII.   TIME-BARRED CLAIMS MUST BE DISMISSED........................................................29

IX.     PLAINTIFFS FAIL TO STATE A CLAIM FOR TREBLE DAMAGES ........................30

CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**CASE**                                                                     **Page(s)**

*Abraham v. Ocwen Loan Servicing, LLC*,
    321 F.R.D. 125 (E.D. Pa. 2017) ..........................................................................27

*Akins v. Penobscot Nation*,
    130 F.3d 482 (1st Cir. 1997) .............................................................................27

*Allee v. Medrano*,
    416 U.S. 802 (1974) ............................................................................................6

*Allen v. Wright*,
    468 U.S. 737 (1984) .........................................................................................5, 6

*Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    267 F.3d 30 (1st Cir. 2001) ................................................................................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................................25

*Baptista v. JPMorgan Chase Bank, N.A.*,
    640 F.3d 1194 (11th Cir. 2011) ........................................................................22

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
    517 U.S. 25 (1996) ................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................5

*Belmont v. MB Inv. Partners, Inc.*,
    708 F.3d 470 (3d Cir. 2013) .............................................................................24

*Beneficial Nat'l Bank v. Anderson*,
    539 U.S. 1 (2003) ..............................................................................................10

*Blum v. Yaretsky*,
    457 U.S. 991 (1982) ............................................................................................6

*Blyden v. Navient Corp.*,
    2015 WL 4508069 (C.D. Cal. July 23, 2015) ....................................................7

*Carulli v. N. Versailles Twp. Sanitary Auth.*,
    216 A.3d 564 (Pa. Commw. 2019) ......................................................................29

*Castle v. Cohen*,
    676 F. Supp. 620 (E.D. Pa. 1987) .....................................................................28

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed*
    *Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007).................................................................................6

*CFPB v. CashCall, Inc.*,
    2018 WL 485963 (C.D. Cal. Jan. 19, 2018) .......................................................16

*Christopher v. First Mut. Corp.*,
    2007 WL 2972561 (E.D. Pa. Oct. 10, 2007)........................................................29

*Clorox Co. v. Proctor & Gamble Commercial Co.*,
    228 F.3d 24 (1st Cir. 2000)................................................................................20

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)..............................................................................................6

*Doherty v. Allstate Indem. Co.*,
    2016 WL 5390638 (E.D. Pa. Sept. 27, 2016) .....................................................25

*Easter v. Am. W. Fin.*,
    381 F.3d 948 (9th Cir 2004) ................................................................................7

*Fallick v. Nationwide Mut. Ins. Co.*,
    162 F.3d 410 (6th Cir. 1998) ............................................................................7, 8

*FDIC v. Lattimore Land Corp.*,
    656 F.2d 139 (5th Cir. 1981) .........................................................................12, 13

*Forsythe v. Sun Life Fin., Inc.*,
    417 F. Supp. 2d 100 (D. Mass. 2006) ..................................................................8

*Gabriel v. O'Hara*,
    534 A.2d 488 (Pa. Super. Ct. 1987)....................................................................29

*Gaither v. Farmers & Mechs. Bank of Georgetown*,
    26 U.S. 37 (1828).........................................................................................12, 13

*Garczynski v. Countrywide Home Loans, Inc.*,
    656 F. Supp. 2d 505 (E.D. Pa. 2009) ...................................................................25

*Glass Dimensions, Inc. v. State St. Bank & Trust Co.*,
    285 F.R.D. 169 (D. Mass. 2012) ...........................................................................6

*Goldenstein v. Repossessors Inc.*,
    815 F.3d 142 (3d Cir. 2016) .................................................................................27

*Hamilton v. Partners Healthcare Sys., Inc.*,
    209 F. Supp. 3d 379 (D. Mass. 2016) ...................................................................5

*Harold ex rel. Harold v. McGann*,
    406 F. Supp. 2d 562 (E.D. Pa. 2005) ...................................................................28

*Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*,
    761 F.3d 1027 (9th Cir. 2014) .............................................................................22

*Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank*,
    801 A.2d 1248 (Pa. Super. Ct. 2002) ...................................................................24

*Hochendoner v. Genzyme Corp.*,
    823 F.3d 724 (1st Cir. 2016) .................................................................................5

*Hudson v. Ace Cash Express, Inc.*,
    2002 WL 1205060 (S.D. Ind. May 30, 2002) ...............................................15, 20

*Hunt v. U.S. Tobacco Co.*,
    538 F.3d 217 (3d Cir. 2008) .................................................................................26

*In re Bridgeport Fire Litig.*,
    8 A.3d 1270 (Pa. Super. Ct. 2010) .......................................................................28

*In re Eaton Vance Corp. Sec. Litig.*,
    220 F.R.D. 162 (D. Mass. 2004) ........................................................................7, 8

*In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*,
    919 F.3d 121 (1st Cir. 2019) ................................................................................13

*In re New England Confectionary Co.*,
    2020 WL 520894 (D. Mass. Jan. 31, 2020) .........................................................12

*In re Soto*,
    221 B.R. 343 (Bankr. E.D. Pa. 1998) ..................................................................27

*In re Williams*,
 276 B.R. 394 (Bankr. E.D. Pa. 2002) ..................................................................27

*John B. Conomos, Inc. v. Sun Co. (R&M)*,
 831 A.2d 696 (Pa. Super. Ct. 2003) ..................................................................23

*Johnson v. Chase Manhattan Bank, USA N.A.*,
 2007 WL 2033833 (E.D. Pa. July 11, 2007)......................................................25

*Krispin v. May Dep't Stores Co.*,
 218 F.3d 919 (8th Cir. 2000) ......................................................................15, 16

*La Mar v. H&B Novelty & Loan Co.*,
 489 F.2d 461 (9th Cir. 1973) ...............................................................................8

*Lewis v. Casey*,
 518 U.S. 343 (1996)..............................................................................................6

*LSI Title Agency, Inc. v. Evaluation Servs., Inc.*,
 951 A.2d 384 (Pa. Super. Ct. 2008) ..................................................................23

*Mackachinis v. McCosar Minerals, Inc.*,
 2013 WL 1752472 (M.D. Pa. Apr. 23, 2013) ....................................................28

*Madden v. Midland Funding, LLC*,
 786 F.3d 246 (2d Cir. 2015)........................................................................18, 19

*Mahon v. Ticor Title Ins. Co.*,
 683 F.3d 59 (2d Cir. 2012)...................................................................................9

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*,
 439 U.S. 299 (1978)..................................................................................... *passim*

*Murphy v. FDIC*,
 408 F. App'x 609 (3d Cir. 2010) ........................................................................26

*Nichols v. Fearson*,
 32 U.S. 103 (1833)..............................................................................12, 13, 17

*Northview Motors, Inc. v. Chrysler Motors Corp.*,
 227 F.3d 78 (3d Cir. 2000)..................................................................................24

*O'Shea v. Littleton*,
 414 U.S. 488 (1974)..............................................................................................6

*Olvera v. Blitt & Gaines, P.C.*,
　431 F.3d 285 (7th Cir. 2005) ......................................................................15, 17

*Pa. Dep't of Banking v. NCAS of Del., LLC*,
　995 A.2d 422 (Pa. Commw. Ct. 2010) ................................................................26

*Payton v. Cty. of Kane*,
　308 F.3d 673 (7th Cir. 2002) ......................................................................8, 9, 10

*PBS Coal, Inc. v. Hardhat Mining, Inc.*,
　632 A.2d 903 (Pa. Super. Ct. 1993)....................................................................23

*Peitzman v. Seidman*,
　427 A.2d 196 (Pa. Super. Ct. 1981) ...................................................................27

*Pennsylvania v. Eisenberg*,
　454 A.2d 513 (Pa. 1982) ....................................................................................27

*Pennsylvania v. Think Finance, Inc.*,
　2016 WL 183289 (E.D. Pa. Jan. 14, 2016).........................................................16

*Petersen v. Chase Card Funding, LLC*,
　2020 WL 613531 (W.D.N.Y. Jan. 22, 2020)......................................................17

*Planters' Bank of Miss. v. Sharp*,
　47 U.S. 301 (1848)..............................................................................................11

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*,
　632 F.3d 762 (1st Cir. 2011)..............................................................................7, 8

*PNC Bank, N.A. v. Chi. Title Land Tr. Co.*,
　2016 WL 3854625 (N.D. Ill. July 15, 2016).......................................................12

*Purcell v. State Farm Mut. Auto. Ins. Co.*,
　2012 WL 425005 (E.D. Pa. Feb. 10, 2012) ........................................................25

*Roche v. Sparkle City Realty*,
　2009 WL 1674417 (E.D. Pa. June 12, 2009).......................................................26

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
　401 F.3d 123 (3d Cir. 2005)................................................................................24

*Santiago v. Canon U.S.A., Inc.*,
　138 F.3d 1 (1st Cir. 1998).....................................................................................5

*Sawyer v. Bill Me Later, Inc.*,
   23 F. Supp. 3d 1359 (D. Utah 2014) .......................................................................15

*Schwartz v. Rockey*,
   932 A.2d 885 (Pa. 2007) ...............................................................................28, 30

*Smiley v. Citibank (S.D.), N.A.*,
   517 U.S. 735 (1996) .............................................................................11, 15, 16

*Step Plan Servs., Inc. v. Koresko*,
   12 A.3d 401 (Pa. Super. Ct. 2010) ......................................................................28

*Teva Pharms. USA, Inc. v. Sandhu*,
   291 F. Supp. 3d 659 (E.D. Pa. 2018) ...................................................................27

*Trombetta v. Raymond James Fin. Servs., Inc.*,
   907 A.2d 550 (Pa. Super. Ct. 2006) ...................................................................23

*USX Corp. v. Prime Leasing, Inc.*,
   988 F.2d 433 (3d Cir. 1993) ...............................................................................23

*Warth v. Seldin*,
   422 U.S. 490 (1975) ...........................................................................................5, 6

*Williams v. Nat'l Sch. of Health Tech., Inc.*,
   836 F. Supp. 273 (E.D. Pa. 1993), *aff'd*, 37 F.3d 1491 (3d Cir. 1994) ..................26

*Winne v. Nat'l Collegiate Student Loan Tr. 2005-1*,
   2017 WL 3573813 (D. Me. Aug. 17, 2017) ........................................................9, 10

*Wong v. Wells Fargo Bank N.A.*,
   789 F.3d 889 (8th Cir. 2015) ................................................................................7

*Yenchi v. Ameriprise Fin., Inc.*,
   161 A.3d 811 (Pa. 2017) ...............................................................................29, 30

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
   854 A.2d 425 (Pa. 2004) .....................................................................................24

**RULES**

Fed. R. Civ. P. 23 ...........................................................................................................8, 9

Fed. R. Civ. P. 82 .............................................................................................................9

STATUTES

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-
    203, § 1044(f), 124 Stat. 2017 (codified at 12 U.S.C. § 25b(f)).............................13

12 U.S.C. § 24.................................................................................10, 11, 13, 14, 17

12 U.S.C. § 85.........................................................................11, 12, 13, 14, 15, 22

28 U.S.C. § 2072...........................................................................................................9

Ga. Code Ann. § 16-17-2(b)(4)...............................................................................16

42 Pa. Cons. Stat. § 5525(a)(8)................................................................................29

41 Pa. Stat. § 502 ...............................................................................................29, 30

41 Pa. Stat. § 504 .......................................................................................................27

41 Pa. Stat. § 506 .......................................................................................................27

73 Pa. Stat. § 201-2(4) ...............................................................................................24

73 Pa. Stat. § 201-7 ....................................................................................................28

73 Pa. Stat. § 201-9.2 .................................................................................................24

OTHER AUTHORITIES

12 C.F.R. § 7.4008 ...........................................................................................11, 13, 14

OCC, Preemption Determination and Order,
    68 Fed. Reg. 46,264 (Aug. 5, 2003)..................................................................17

OCC, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise
    Transferred, 84 Fed. Reg. 64,229 (Nov. 21, 2019).................................10, 18, 19

Colleen Honigsberg et al., *How Does Legal Enforceability Affect Consumer
    Lending? Evidence from a Natural Experiment*, 60 J.L. & Econ. (forthcoming
    Nov. 2017), *available at* https://ssrn.com/abstract=2780215 .................................19

## INTRODUCTION

In March 2006, Plaintiffs signed a Credit Agreement with PNC Bank, N.A. for a student loan in the amount of $21,000.00. The Credit Agreement provided that Plaintiffs would pay interest on the loan, calculated using a margin rate plus a variable index rate, and specifically stated an initial rate of 9.369%. The Agreement also disclosed that this rate could increase during the life of the loan depending on any increases in the index rate. As is common practice in the industry, PNC then sold the loan through the securitization process.

Fourteen years later, Plaintiffs now bring a variety of claims against the securitization trust that holds their loan (in addition to twelve other securitization trusts), based on the allegation that the interest they agreed to pay exceeds Pennsylvania's 6% usury cap. But Plaintiffs lack Article III standing to sue the twelve additional trusts because those trusts have no relationship to Plaintiffs and have not caused them any injury.

Jurisdiction aside, Plaintiffs' claims against *every* trust fail on the merits. Plaintiffs acknowledge that the National Bank Act preempts state usury laws as applied to national banks and that PNC was therefore permitted to charge Plaintiffs' interest rate. Nor do they contest the well-established rule that a loan valid at its inception does not become usurious upon assignment. They attempt to sidestep these hurdles by claiming that PNC was not, in fact, the "true lender" because it allegedly contracted with other entities to perform certain origination-related functions and then sold the loan. In relying on this theory, however, Plaintiffs seek to vastly expand the holdings of a few limited payday-lending cases to govern the lending industry as a whole, where national banks have had the power to contract with others for origination services and sell loans for decades. Indeed, Plaintiffs' theory, applied here, would substantially limit the ability of national banks to conduct business within their express and incidental powers, and is therefore expressly preempted by the National Bank Act. Plaintiffs' usury claim fails for this reason.

But that is not all. Plaintiffs attempt to shoehorn their usury claim into additional theories of liability like breach of contract, breach of an implied good-faith duty, and breach of Pennsylvania's Unfair Trade Practices and Consumer Protection Law. Because these claims all hinge on the same allegation as the usury claim—that the trusts charged above 6% interest in violation of Pennsylvania law—they, too, are preempted. And preemption is not Plaintiffs' only problem; they have also failed to plead the requisite elements for those additional causes of action. Accordingly, Plaintiffs' complaint must be dismissed in its entirety.

## BACKGROUND

The defendants are thirteen Delaware statutory trusts (the "Trusts") created between 2004 and 2007. The Trusts were formed for the limited purpose of acquiring student loans, which they financed through the issuance of securities. Various national banks, including PNC, originated the student loans ultimately purchased by the Trusts.

To facilitate its origination and sale of student loans, PNC entered into a Note Purchase Agreement, dated April 22, 2004, with The First Marblehead Corporation ("FMC"). *See* Ex. A, Note Purchase Agreement, at 1; Ex. B, PNC Pool Supplement.[1] Pursuant to the Note Purchase Agreement and PNC Pool Supplement, PNC agreed to originate student loans satisfying certain origination and servicing criteria (the "Program Guidelines") developed by The Education Resources Institute ("TERI"), which acted as guarantor for the loans.

In the Note Purchase Agreement, PNC also made a number of representations and warranties regarding the origination of the loans, including, but not limited to the following:

---

[1] Citation to "Ex." refers to the exhibits attached to the Declaration of Anthony Masero, submitted herewith. As argued *infra*, Plaintiffs lack standing to sue any defendant other than NCSLT 2006-2. Accordingly, this brief addresses only contracts applicable to that Trust. Nevertheless, the same Note Purchase Agreement governs PNC's sale of student loans to other Trusts and the Pool Supplements are all substantially similar (even though the individual Credit Agreements differ).

(a) Program Lender [*i.e.*, PNC] is, and shall continue to be, a national banking association duly organized . . . under the laws of the United States of America, and has the requisite authority to . . . consummate all transactions contemplated by [the Note Purchase Agreement]. . . .

(e) Each PNC Bank Alternative Conforming Loan was originated . . . by Program Lender [*i.e.*, PNC], or its agents, in the ordinary course of its business. . . .

(f) Each PNC Bank Alternative Conforming Loan . . . is in compliance with any applicable usury laws at the time made and as of the time of its sale and assignment . . . .

(h) Each and every PNC Bank Alternative Conforming Loan sold pursuant to this Agreement is owned by Program Lender [*i.e.*, PNC] free and clear of any liens, clams or demands . . . .

Ex. A, Note Purchase Agreement § 5.02. If PNC breached any such representation or warranty, it was obligated to repurchase the affected loan. *Id.* § 5.04. PNC itself funded and owned the loans until they were purchased. *See id.* § 5.02(d)(iii) (each loan "is a Seasoned Loan, fully disbursed with no further requirement for future advances"); *id.* § 1 (defining a "Seasoned Loan" as one held by the bank for a certain period); *see also id.* § 3.07 ("neither FMC nor any Purchaser Trust" assumes any obligation "with respect to any disbursements or reimbursements that are due and owing" on the loans); *Id.* at 87 ("Program Overview") (PNC to provide the loan funding "and own the loans until they are purchased"). The Note Purchase Agreement and PNC Pool Supplement also provide that PNC warranted that the "origination" was conducted in accordance with the underwriting criteria set forth in the Program Guidelines. *Id.* § 5.02(e); *see also id.* § 3.01(b)(5) (establishing as a condition precedent to FMC's purchase that the loans were originated in conformity with the Program Guidelines). The Program Guidelines themselves provide that PNC agreed to "be the legal entity who approves credit criteria and makes program loans in accordance with TERI underwriting guidelines." *Id.* at 87 ("Program Overview").

Having originated the loans and attested to the underwriting process, the Note Purchase Agreement then allowed PNC to sell student loans after the loans were "seasoned," *i.e.*, after PNC owned and held the loans for at least thirty days (for loans disbursed to educational institutions) or

fifteen days (for loans disbursed to borrowers directly) following disbursement. *Id.* § 2.01; *see also id.* § 1 (defining Seasoned Loan). FMC agreed to endeavor to purchase these loans from PNC within two hundred forty days after the loans become "seasoned" (the "Purchase Period"). *Id.* § 2.02(b). Moreover, FMC could further extend the Purchase Period in one hundred eighty day increments. *Id.* § 2.02(d). As consideration, PNC agreed it would not offer the loans to any other party during the Purchase Period. *Id.* § 2.02(b). FMC was free to not purchase the loans, subject to paying 1% liquidated damages. *Id.* § 2.02(e). If FMC did not purchase a loan within the Purchase Period for any reason, PNC could retain ownership or sell the loan to any third party. *Id.*

In March 2006, Plaintiffs entered into a Credit Agreement with PNC, "governed by Federal Law and the Laws of the Commonwealth of Pennsylvania, without regard to conflict of law rules." Ex. C, Credit Agreement § L.1. The Credit Agreement expressly authorizes PNC to assign Plaintiffs' loan at any time, *id.* § L.4, and makes additional references to the rights of "any subsequent holder," *see, e.g.*, *id.* §§ J.1, L.14. Interest on the loan is calculated monthly based on a 4.65% margin plus a variable index rate. *Id.* § D.2; *id.* ("Information Page"). The Credit Agreement disclosed an initial rate of 9.368% and stated that this rate "may increase during the term of the loan if the index rate increases." *Id.* ("Note Disclosure Statement").

As contemplated by the Credit Agreement, PNC assigned its rights in Plaintiffs' loan to an FMC affiliate, which subsequently transferred the loan to NCSLT 2006-2.

Nearly fourteen years after they entered into the Credit Agreement, Plaintiffs now bring a variety of putative class claims against NCSLT 2006-2 and twelve other National Collegiate Student Loan Trusts, stemming from the fact that Plaintiffs have been charged interest above 6%. They allege that the Trusts violated Pennsylvania's usury statute (Count One), breached the Credit Agreement (Count Two), breached a duty of good faith and fair dealing (Count Three), violated

Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count Four), and they seek injunctive and declaratory relief based on these claims (Count Five).

## ARGUMENT

To withstand a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 570 (2007). "Only factual allegations, not conclusory statements regarding the applicability of law, may be considered in assessing whether the Plaintiff has satisfied the pleading standard." *Hamilton v. Partners Healthcare Sys., Inc.*, 209 F. Supp. 3d 379, 387 (D. Mass. 2016). The court may consider "official public records," "documents central to plaintiffs' claim," or "documents sufficiently referred to in the complaint." *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001); *see also Santiago v. Canon U.S.A., Inc.*, 138 F.3d 1, 4 n.5 (1st Cir. 1998) ("[D]ocuments integral to complaint—like contracts—are not considered 'matters outside the pleadings.'"). Additionally, "the plaintiff bears the burden of establishing sufficient factual matter to plausibly demonstrate his standing to bring the action." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016).

## I. PLAINTIFFS LACK STANDING TO SUE ALL BUT ONE TRUST DEFENDANT.

Plaintiffs admit that only one named defendant, NCSLT 2006-2, ever had any connection to their loan. Compl. ¶¶ 86–127. That means Plaintiffs lack standing to sue the other twelve Trusts ("Non-Holding Trusts"), and all claims against those Trusts must be dismissed.

"[W]hether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III"—*i.e.*, constitutional standing—is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To plead constitutional standing, "[a] plaintiff must allege personal injury fairly traceable to *the defendant's* allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S.

737, 751 (1984) (emphasis added); *see also Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) (plaintiff must show "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct *of the defendant*"—"It is not enough that the conduct of which the plaintiff complains will injure *someone*." (first emphasis added)).  A plaintiff "must demonstrate standing for each claim he seeks to press . . . [and] separately for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

A lawsuit's status as a potential class action does not vitiate this standing requirement.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing."); *Warth*, 422 U.S. at 502 ("Unless these petitioners can thus demonstrate the requisite case or controversy *between themselves personally and respondents*, 'none may seek relief on behalf of himself or any other member of the class.'" (emphasis added) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974))); *Allee v. Medrano*, 416 U.S. 802, 829 (1974) (Burger, C.J., concurring in part) ("Standing cannot be acquired through the back door of a class action.").

It follows that, "[t]o establish Article III standing in a class action, . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007); *see also Glass Dimensions, Inc. v. State St. Bank & Trust Co.*, 285 F.R.D. 169, 175 (D. Mass. 2012) ("[A] potential class representative is . . . required to establish constitutional standing with respect to each defendant.").  A contrary rule would eviscerate the "fairly traceable" standing requirement, *Wright*, 468 U.S. at 751, by allowing "any plaintiff [to] sue a defendant against whom the plaintiff has no claim in a putative class action, on the theory that some member of the hypothetical class, if a class were certified, might have a

claim." *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 164, 169 (D. Mass. 2004) (holding that named plaintiffs lacked standing to "sue [] two mutual funds with which they had no contact").

Indeed, the First Circuit, in a securities putative class action, has affirmed dismissal of claims "against trusts whose certificates [the named plaintiffs] did not purchase." *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768, 771 (1st Cir. 2011). The court followed binding precedent holding that named plaintiffs lack standing to bring claims against non-injurious defendants—*i.e.*, "defendants not implicated in any of the wrongs done to the named plaintiffs." *Id.* at 769. And courts in other circuits have refused to find standing under facts identical to those here. *See Easter v. Am. W. Fin.*, 381 F.3d 948, 961–62 (9th Cir 2004) (dismissing, for lack of standing, the named plaintiff's usury claims against trusts that never held the plaintiff's loan); *Blyden v. Navient Corp.*, 2015 WL 4508069, at *7 (C.D. Cal. July 23, 2015) (same); *see also Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889, 895–96 (8th Cir. 2015) (dismissing, for lack of standing, the named plaintiff's claims for "charging or collecting improper fees" against defendants who "never personally serviced or were assigned the named borrowers' loans"). As in those cases, the named Plaintiffs here allege that their loan was only ever held by one of the Trust defendants (NCSLT 2006-2)—they make no allegations that any of the Non-Holding Trusts ever held their loan or injured Plaintiffs in any way. Plaintiffs therefore simply cannot show that they have standing to sue the Non-Holding Trusts.

Plaintiffs might advance an argument based on *dicta* from the *Plumbers* decision. That court mentioned an exception, recognized by two out-of-circuit opinions, where the named plaintiffs had "essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members." *Plumbers*, 632 F.3d at 770 (citing *Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d

410, 423 (6th Cir. 1998) and *Payton v. Cty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002)). Notably, one of those out-of-circuit cases, *Fallick v. Nationwide*, did not involve a non-injurious defendant. *See* 162 F.3d at 421 (holding that a named plaintiff could "represent participants in benefit plans other than his own" against a *common* defendant, who was also the fiduciary of his own plan). The second case, *Payton v. City of Kane*, held that the so-called "juridical link" doctrine—which originated in the Rule 23 context[2]—allowed named plaintiffs to bring putative class claims against 19 counties challenging the constitutionality of a bail bond fee, even though named plaintiffs paid such fees to only two of those counties. 308 F.3d at 680. The court based its holding on concerns of reasonableness and expediency—"the bail bond fee is imposed pursuant to a state statute, and . . . county sheriffs are for this purpose an arm of the state, [so] it is reasonable for the putative plaintiff class to try to hold all counties accountable within one suit." *Id.*

Importantly, the *Plumbers* court *did not* adopt *Payton* or hold that the juridical-link doctrine actually applies, let alone outside of the Rule 23 context. Instead, it specifically "reserve[ed] judgment" on the issue. *Plumbers*, 632 F.3d at 770. And the First Circuit would not likely adopt such an approach in the future. Courts in this very district have refused to import the juridical-link doctrine into the constitutional standing analysis, recognizing that Article III "tend[s] to be 'inflexible and without exception'" and "does not often bend to expediency." *In re Eaton Vance*, 220 F.R.D. at 170 (citing cases); *see also Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 119 n.19 (D. Mass. 2006) (holding that the "juridical links" doctrine, "developed in the context of class

---

[2] The "juridical link" doctrine stems from *dicta* in *La Mar v. H&B Novelty & Loan Co.*, where the Ninth Circuit suggested that an exception to Rule 23's adequacy requirement might lie where "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." 489 F.2d 461, 466 (9th Cir. 1973). The court there expressly declined to address Article III standing. *Id.*

certification analysis under Fed. R. Civ. P. 23, should properly remain in the analysis of adequacy and typicality of plaintiffs for which it was originally conceived. In the separate and distinct inquiry into a plaintiff's standing . . . , the juridical links doctrine is not relevant").

And, more recently, the Second Circuit squarely addressed the issue in a thorough and well-reasoned opinion, holding that Article III does not "permit[] suits against non-injurious defendants" even in putative class actions where "one of the defendants in the suit injured the [named] plaintiff." *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012). The court explained that "whether or not Rule 23 would permit a plaintiff to represent a class against non-injurious defendants cannot affect the plaintiff's Article III standing to sue [such] defendants" because "[a] federal rule cannot alter a constitutional requirement." *Id.* at 64. And "[d]emonstrating that the defendant's allegedly unlawful conduct caused injury to the plaintiff herself is . . . an essential component of Article III standing." *Id.*; *see also* Fed. R. Civ. P. 82 ("These rules do not extend or limit the jurisdiction of the district courts."); 28 U.S.C. § 2072 ("[R]ules [of procedure] shall not abridge, enlarge or modify any substantive right.").

Even if the juridical-link doctrine had any application to the Article III inquiry (it does not), it still would not confer standing on Plaintiffs. Unlike in *Payton*, Plaintiffs here are not suing "arm[s] of the state" for enforcing a single unconstitutional state statute. 308 F.3d at 680. They instead sue various securitization trusts—legally distinct entities created at different times and holding different loans—for breaching different contracts that impose different base interest rates. Not only that, the various defendants had separate servicing interactions with the different borrowers, interactions that could bear on issues in Plaintiffs' claims like contractual intent, fraud, and/or deception. Indeed, at least one court has refused to apply *Payton* in a lawsuit against some of the exact same defendants here. *See Winne v. Nat'l Collegiate Student Loan Tr. 2005-1*, 2017

WL 3573813, at *6 (D. Me. Aug. 17, 2017) (distinguishing *Payton* and dismissing, for lack of standing, claims against National Collegiate Student Loan Trusts because the Trusts were "distinct entities made up of different assets that did not necessarily act in a manner identical to" each other). This is simply not a case that fits into the *Payton* exception, even if it were valid and binding.

All claims against the Non-Holding Trusts must be dismissed for lack of standing.

## II. FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS.

Plaintiffs' claims do no better on the merits. Federal law, which governs the Credit Agreement, permits the Trusts, as the assignees of PNC, to charge a rate in excess of six percent for three independent reasons. *First*, the National Bank Act (the "NBA") and long-established federal common law plainly permitted PNC to originate the loan and sell the loan on the same terms. *Second*, Plaintiffs' theory that PNC is not the "true lender" because it lacked a "predominant economic interest" in the loan cannot be reconciled with the applicable federal law and would substantially interfere with PNC's ability to exercise its powers under the NBA. *Third*, PNC *was* the true lender because it had a sufficient economic interest in the loan. And Plaintiffs' remaining claims are also preempted because they rely on identical facts as the usury claim.

### A. Federal Law Permits The Trusts To Charge The Same Interest Rate As PNC

Congress enacted the NBA to create "an integrated Federal scheme that permits national banks . . . to operate across state lines without being hindered by differing state laws." OCC, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64,229, 64,230 (Nov. 21, 2019) (hereinafter "Permissible Interest"). Thus, the NBA confers upon national banks certain express powers, which national banks may exercise notwithstanding the operation of any contrary state laws. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003) (national banking system designed to protect banks from "possible unfriendly State legislation"); *see also* 12 U.S.C. §§ 24, 85. National banks have long been recognized as "[n]ational favorites,"

with significant competitive advantages. *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 314 (1978).

The NBA grants national banks two express powers relevant to this case. First, 12 U.S.C. § 85 ("Section 85") "plainly provides that" national banks may charge "on any loan" the interest rate permitted in the state in which it is "located." *Marquette*, 439 U.S. at 308–09, 314. In other words, a national bank may "export" the maximum interest rate permitted in its home state and charge that rate anywhere in the United States, notwithstanding the fact that this power "significantly impair[s] the ability of States to enact effective usury laws." *Id.* at 314, 318; *see also Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 (1996) (same). Second, 12 U.S.C. § 24 ("Section 24") permits national banks to conduct the business of banking by "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt," including the power to sell loan contracts in accordance with federal law. 12 U.S.C. § 24(Seventh); *see also* 12 C.F.R. § 7.4008 ("A national bank may make, sell, purchase, participate in, or otherwise deal in loans . . . subject to such terms, conditions, and limitations . . . [of] other applicable Federal law.").

At the same time, federal common law has long recognized that a bank's authority to originate loans includes the "necessarily implied" power to sell them. *See Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322–23 (1848) ("[I]n discounting notes and managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes."). No federal law limits the terms on which a national bank may sell loans for which it has used its home-state rate. *See Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 33–35 (1996) (NBA preempted state law because the provision at issue "contain[ed] no 'indication' that Congress intended to subject that power to local restriction," while other NBA provisions "accompany a grant of an explicit power with an explicit statement that the exercise of that power is subject to state law").

Moreover, federal law recognizes the "cardinal rule[] in the doctrine of usury" that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction." *Nichols v. Fearson*, 32 U.S. 103, 109 (1833); *see also Gaither v. Farmers & Mechs. Bank of Georgetown*, 26 U.S. 37, 43 (1828) ("[T]he rule cannot be doubted, that if the note be free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury."); *FDIC v. Lattimore Land Corp.*, 656 F.2d 139, 148–49 (5th Cir. 1981) ("The non-usurious character of a note should not change when the note changes hands.").

Under this rubric, the facts as pled demonstrate that federal law preempts Plaintiffs' usury claim. The foregoing principles of federal law work harmoniously to establish that (i) a national bank may charge an interest rate on any loan in excess of a state's usury law, so long as the rate is permitted pursuant to Section 85, (ii) a national bank may freely assign such a loan, including to a nonbank purchaser, in accordance with federal law, and (iii) such a loan remains non-usurious as between the borrower and the national bank's assignee. This is precisely what happened in this case. Plaintiffs do not dispute that PNC, as a national bank, was authorized to charge interest in excess of Pennsylvania's usury limit.[3] *See* Compl. at 2. Plaintiffs assert that, after PNC provided the funds for the loan, PNC sold the loan, which of course PNC could not have done if it did not own the loan. *See id.* ¶¶ 64–65. Federal law expressly permits such sales and exempts them from

---

[3] Although PNC's ability to charge interest in excess of Pennsylvania law is not in dispute, based on publicly available information, both Delaware and Pennsylvania are identified on PNC's 1316 federal charter. *Institution Search*, OCC, https://www.occ.treas.gov/institution-search-final/index-results.html?query=pnc%20bank [last accessed on Apr. 28, 2020). This authorizes PNC to charge any interest rate permitted under Delaware law. *Marquette*, 439 U.S. at 310, 313 (a bank is "located" in the state named in the bank's organization certificate); *see also PNC Bank, N.A. v. Chi. Title Land Tr. Co.*, 2016 WL 3854625, at *1 (N.D. Ill. July 15, 2016) ("PNC Bank is a national banking association with its principal place of business located in the State of Pennsylvania and the State designated on its organization certificate is Delaware."). This court may take judicial notice of where PNC is located. *See, e.g.*, *In re New England Confectionary Co.*, 2020 WL 520894, at *1 n.2 (D. Mass. Jan. 31, 2020).

state regulation. *See* 12 C.F.R. § 7.4008; *see also Barnett*, 517 U.S. at 33–35. And it provides that a loan does not become usurious simply by virtue of assignment. *See Nichols*, 32 U.S. at 109; *Gaither*, 26 U.S. at 43; *Lattimore*, 656 F.2d at 148–49. Accordingly, the Trusts are permitted to charge interest in excess of Pennsylvania's usury limit.

Of course, Congress could have limited a national bank's ability to use its home-state rate or sell such loans, or expressly subjected a national bank's exercise of such powers to state regulation, as it did for other national bank powers. *See Barnett*, 517 U.S. at 33–35 (referencing NBA provisions expressly subject to state restrictions). Instead, a national bank's powers to use its home-state rate on any loan and sell such loans have remained substantively unchanged in the roughly forty-two years that have elapsed since *Marquette* acknowledged that Section 85 largely precludes states from enacting effective usury laws as applied to national banks. *See* Ex. D, Brief for the United States as Amicus Curiae, at 13, *Midland Funding, LLC v. Madden*, No. 15-610 (hereinafter, the "Solicitor General's Brief") ("Because the federal power conferred by Section 85 (reinforced by Section 24(Seventh)) includes the power to convey to an assignee the right to charge the maximum interest rate allowed by the national bank's home State, a state law that precludes the national bank from fully exercising that power is similarly preempted."); *see also id.* at 11 n.4 (noting that Congress reaffirmed the preemptive effect of Section 85 in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1044(f), 124 Stat. 2017 (codified at 12 U.S.C. § 25b(f))). This Court should not read limitations into the statute that do not exist. *See In re Fin. Oversight and Mgmt. Bd. for Puerto Rico*, 919 F.3d 121, 128–29 (1st Cir. 2019) ("the sole function of the court[]" in interpreting an unambiguous statute is "to enforce it according to its terms"). Plaintiffs' usury claim must be dismissed.

**B.    Plaintiffs' "True Lender" Theory Has No Basis In, And Actually Contravenes, Federal Law**

In an effort to end-run around the NBA's plain language and federal common law, Plaintiffs insist that PNC is not the "true lender" because it lacked a "predominant economic interest" in the loans it sold.  Compl. ¶¶ 119–20.  Although Plaintiffs do not identify the state law under which the asserted "true lender" theory purportedly arises, its application is precluded in any event.  Such a test cannot be reconciled with federal law discussed *supra*, and, at minimum, would "significantly impair" the exercise of PNC's powers under the NBA.

**1.    Federal Law Preempts the Application Of Plaintiffs' True Lender Theory Because The Theory Would Directly Restrict PNC's Express Powers.**

When federal law "explicitly grants a national bank an authorization, permission or power," and does not "explicit[ly] state[] that the exercise of that power is subject to state law," a state law restricting that power is preempted, without regard to the degree of encroachment.  *Barnett*, 517 U.S. at 34; *Marquette*, 439 U.S. at 314–15.

Here, application of the true lender theory would directly restrict PNC's express powers to charge its home-state interest rate on any loan and to sell such loan on its terms.  *Barnett*, 517 U.S. at 33–35; *see also* Ex. D, Solicitor General's Brief, at 13.  As set forth above, federal law does not restrict a national bank's ability to sell loans for which it has used its home-state interest rate, or subject such sales to state regulation.  Accordingly, federal law does not preclude a national bank from using its home-state rate for loans in which it lacks a "predominant economic interest"; for which it has partnered with a nonbank to perform typical origination services; or for which it plans, or is even contractually obligated, to sell after origination.  *See* 12 U.S.C. § 85.  Instead, Section 24 and the accompanying regulations broadly authorize PNC, as a national bank, to sell loans, as part of the necessary conduct of the business of banking.  *See id.* § 24(Seventh); 12 C.F.R. § 7.4008.  In the absence of some "'indication' that Congress intended to subject that power to local

14

restriction" of these powers, no state law, including through the imposition of a true-lender framework, can impose such limitations. *See Barnett*, 517 U.S. at 33–35. Moreover, as the Supreme Court recognized, "the protection of state usury law is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court." *Marquette*, 439 U.S. at 318–19; *Smiley*, 517 U.S. at 744 (same).

With these principles in mind, courts following *Marquette* have rejected similar true-lender theories. For example, in *Hudson v. Ace Cash Express, Inc*., the court rejected the application of the true-lender theory to a nonbank lender who purchased loans from a national bank shortly after origination. 2002 WL 1205060, at *4–6 (S.D. Ind. May 30, 2002). It concluded that it would be "uncertain and unpredictable" to "draw boundaries between federal and state bank regulation depending upon the subjective purpose of those engaged in the transaction and/or the precise extent of financial risk accepted by the national bank." *Id.* at *6. Because *Marquette* acknowledged that Section 85 "will significantly impair the ability of States to enact effective usury laws," *id.* at *4, the court concluded that the nonbank lender stepped into the shoes of the national bank, even where the structure may have been devised to "evad[e] state usury laws," *id.* at *6. The court explained that "concerns about [the] protection of state usury laws present questions of legislative policy." *Id.* (citing *Marquette*, 439 U.S. at 319); *accord Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359, 1367 (D. Utah 2014) (parallel rate exportation statute in the Federal Deposit Insurance Act required court to "defer[] to the same prudential analysis followed in *Marquette*"); *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286, 289 (7th Cir. 2005) (Posner, J.) ("[T]he assignee of a debt . . . is free to charge the same interest rate that the assignor . . . charged the debtor . . . even if the assignee does not have a license that expressly permits the charging of a higher rate."); *Krispin v. May Dep't*

15

*Stores Co.*, 218 F.3d 919, 923–24 (8th Cir. 2000) (for purposes of federal preemption, the court "look[ed] to the originating entity" and "not the ongoing assignee").

While some courts have declined to apply NBA preemption to loans for which it determined the national bank did not have the "predominant economic interest," these cases are distinguishable and, in any event, wrong. None involved a federal choice-of-law provision like the one in Plaintiffs' Credit Agreement. *See, e.g.*, *CFPB v. CashCall, Inc.*, 2018 WL 485963, at *5 (C.D. Cal. Jan. 19, 2018) (tribal law); *Pennsylvania v. Think Finance, Inc.*, 2016 WL 183289, at *15 n.19 (E.D. Pa. Jan. 14, 2016) (Delaware and tribal law). Because Federal law expressly controls in this case, PNC was plainly authorized to use its home-state interest rate to charge Plaintiffs in excess of 6% and sell that loan to a nonbank purchaser, without that loan becoming usurious. *See supra* § II.A. Moreover, these cases arose in the context of "payday" lenders partnering with national or federally insured banks to charge high-interest loans. *See CashCall*, 2018 WL 485963, at *5 (interest rates at issue ranged between 89% and 169%); *Think Finance, Inc.*, 2016 WL 183289, at *11 (alleged interest rates between 200% and 300%). Indeed, Plaintiffs' "true lender" analysis appears to have originated with a Georgia statute designed specifically to regulate payday lenders. *See* Ga. Code Ann. § 16-17-2(b)(4). These cases did not address the sale of loans for purposes of securitizing them, a critical tool upon which national banks rely extensively in order to manage their risk profiles and provide access to credit. *See infra* § II.B.2. And none of these cases even reference *Marquette* or *Smiley*, or the Supreme Court's corresponding determinations that the impairment of state usury laws is simply not a basis to dispense with NBA preemption. *Marquette*, 439 U.S. at 318; *Smiley*, 517 U.S. at 744.

Plaintiffs' "true lender" argument fails for the additional reason that it boils down to nothing more than an assertion that PNC's assignment of the loan to FMC rendered it usurious.

The Note Purchase Agreement expressly contemplates that at least some loans originated by PNC in compliance with the Program Guidelines will *not* be sold to FMC.  *See supra* ("Background").  So, even if it is true, as Plaintiffs allege, that FMC marketed, underwrote, and disbursed funds on behalf of PNC, adopting Plaintiffs' theory leads to an untenable result: a loan retained by PNC is entitled to NBA preemption, while one sold to a non-bank is not, notwithstanding FMC's equivalent alleged involvement in each.  Under federal law, however, the mere fact of sale cannot render the loan usurious.  *E.g.*, *Nichols*, 32 U.S. at 109.

> **2.    Even If The True Lender Theory Is Not A Direct Restriction On PNC's NBA Powers, It Impermissibly Impairs PNC's Ability To Exercise Those Powers.**

Plaintiffs' proposed application of the true lender theory would also significantly impair PNC's ability to exercise its express powers and to undertake the "incidental powers . . . necessary to carry on the business of banking."  12 U.S.C. §§ 24(Seventh).  For the reasons set forth above, states cannot directly restrict a national bank's ability to exercise its federally conferred powers. Additionally, however, states are foreclosed from imposing requirements that would "significantly impair" the exercise of those powers.  *Barnett*, 517 U.S. at 33.  Adoption of the true-lender theory here would do just that by, among other things, limiting banks' ability to partner with nonbank service providers and manage the credit and interest rate risk in their portfolio through the sale of loans, both generally and in the securitization process.  *See Olvera*,  431 F.3d at 288 (rejecting argument that assignee could not charge same interest rate as assignor, because "the only effect of [such interpretation] would be to make the credit market operate less efficiently"); *Petersen v. Chase Card Funding, LLC*, 2020 WL 613531, at *4 (W.D.N.Y. Jan. 22, 2020) (state usury laws preempted where they interfered with bank's "ability to sell or assign" receivables); OCC, Preemption Determination and Order, 68 Fed. Reg. 46,264, 46,278–79 (Aug. 5, 2003) (finding that application of a Georgia lending statute to national banks was preempted by the NBA because

it would "stand as an obstacle to the exercise of national banks' real estate lending powers, including the power to sell real estate loans into the secondary market or to securitize these loans").

In *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), the Second Circuit reached a contrary, and incorrect, conclusion, in large part due to "the parties' failure to present the full range of preemption arguments." Ex. D, Solicitor General's Brief, at 17–18. The court concluded that New York's usury statute applied to a nonbank debt collector that purchased a delinquent loan from a national bank. *Madden*, 786 F.3d at 251. The court acknowledged that its ruling "might decrease the amount a national bank could charge for its consumer debt." *Id.* But, because the "state usury laws would not prevent consumer debt sales by national banks to third parties," the court concluded that the application of state usury statute "would not 'significantly interfere' with the exercise of a national bank power." *Id.* But this incorrectly suggests that NBA preemption applies only if the state law "prevent[ed]" national banks from exercising their power. *See* Ex. D, Solicitor General's Brief at 12–13. That is not correct. *See Barnett*, 517 U.S. at 33–35 (the NBA preempts state laws that "*significantly impair*" the exercise of national bank powers (emphasis added)). The Solicitor General and the OCC have expressed their disagreement with *Madden*, and the OCC has even commenced rulemaking efforts to codify the "longstanding" valid-when-made rule. *See* Permissible Interest, 84 Fed. Reg. at 64,231.

Additionally, *Madden* involved the sale of charged-off credit card debt. 786 F.3d at 248. The court therefore did not address whether its ruling would impair the ability of national banks to sell loans for purposes of securitizing them. National banks, consumers, and financial markets all rely on the ability of national banks to assign loans for purposes of securitization without affecting the permissible interest rate:

> [B]anks of all sizes continue to routinely rely on loan assignments and securitization to access alternative funding sources, manage concentrations, improve financial

> performance ratios, and more efficiently meet consumer needs. This risk management tool would be significantly weakened if the permissible interest on assigned loans were uncertain or if assignment of the permissible interest were limited only to third parties that would be subject to the same or higher usury caps.

Permissible Interest, 84 Fed. Reg. at 64,231; *see also id.* ("[A]mong the essential rights normally associated with the power to contract is the ability to subsequently assign some *or all* of the benefits of a contract to a third party." (emphasis added)). Securitization also plays a crucial role in providing consumers access to credit. *Id.* By selling loans for purposes of securitization, banks get access to immediate liquidity that allows them to fund more loans. *Id.* Additionally, in order for the loan-backed securities to appeal to investors, the interest rate on the loan must both be certain and be commensurate with the level of risk. Permissible Interest, 84 Fed. Reg. at 64,231. If usury caps operate to misalign the risk and return, investors will not purchase securities backed by such loans, and the market for such loans could tighten significantly.

This is not some hypothetical parade of horribles. A study regarding *Madden*'s impact in Connecticut and New York concluded that "*Madden* reduced the price of notes backed by above-usury loans to borrowers" on the secondary market. Colleen Honigsberg et al., *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J.L. & Econ. (forthcoming Nov. 2017) (manuscript at 23–24).[4] The study further found "clear evidence" that *Madden* "reduced the flow of credit, especially to higher-risk borrowers," as lenders in Connecticut and New York made "relatively fewer loans to higher-risk borrowers . . . and the loans they did make were smaller." *Id.* at 24–25. Adopting *Madden* to govern the entire trillion-dollar securitization industry will therefore have serious consequences for banks and consumers alike.[5]

---

[4] *Available at* https://ssrn.com/abstract=2780215.

[5] According to S&P Global Ratings, $1.85 *trillion* worth of securities supported by underlying loans, including student loans, were issued between 2015 and 2018. Tom Schopflocher et al,

In short, if the long-standing "valid-when-made" doctrine is replaced by an ad-hoc test as Plaintiffs advocate here, banks will be severely restricted in their ability to engage nonbank service providers and sell loans, which generates the liquidity necessary to satisfy the credit needs of consumers and the demands of the financial markets. The true-lender theory thus significantly interferes with a national bank's exercise of its powers and is therefore preempted.

### C. Even If The True Lender Theory Applies, Plaintiffs' Allegations Are Insufficient.

Even if the Court adopts a true-lender framework, the allegations in the Complaint do not suffice to support its application. Where a pleading references or relies on a contract, the language of the agreement "trumps the allegations." *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000). In this case, a number of Plaintiffs' allegations cannot be reconciled with the plain language of the relevant documents.

*First*, Plaintiffs allege that PNC "did not place its own money at risk when it funded the loans." Compl. ¶ 65. As explained above, however, PNC funded the loans, and the Note Purchase Agreement directly contemplates that some loans would *not* be sold to FMC. Additionally, even when the loans were sold, PNC could remain the sole owner of the loan for more than two hundred forty days, or longer, if FMC extended the Purchase Period. *See* Ex. A, Note Purchase Agreement, § 2.02(b). And PNC was obligated to repurchase the loans in the event PNC breached any of its representations and warranties. *Id.* § 5.04. Thus, PNC's funds were at risk. *See also Hudson,* 2002 WL 1205060, at *4–6 (it would be "uncertain and unpredictable" to "draw boundaries" depending upon "the precise extent of financial risk accepted by the national bank").

*Global Structured Finance 2019 Securitization Energized with $1T In Volume*, S&P Global Ratings (Jan. 7, 2019), https://www.spglobal.com/en/research-insights/articles/global-structured-finance-outlook-2019-securitization-continues-to-be-energized-with-potential-1-trillion-in-volume-expected-ag.

*Second*, Plaintiffs assert that PNC "did not have any interactions with the borrowers when the loans were being originated and disbursed." Compl. ¶ 61. But the Credit Agreement itself is between Plaintiffs and PNC, demonstrating at least one "interaction" between the borrower and PNC. *See* Ex. C, Credit Agreement. Further, the Note Purchase Agreement, Program Guidelines, and Credit Agreement expressly provide that PNC or its agents originated the loans, owned the loans, and provided the funds. *See supra* ("Background"); Ex. C, Credit Agreement § B.1.

*Third*, Plaintiffs claim that FMC performed all of the underwriting associated with their loan. While PNC may have used FMC for some, or much, of the underwriting responsibilities, it nonetheless agreed to be "the legal entity who approves credit criteria and makes program loans in accordance with TERI underwriting guidelines." Ex. A, Note Purchase Agreement, at 87 ("Program Overview § A"). It also represented and warranted that underwriting criteria set forth in the Program Guidelines had been satisfied. *See id.* § 5.02. Satisfaction of the Program Guidelines was also among the multiple prerequisites to FMC's purchase. *Id.* § 3.01(b)(5). In all events, PNC accepted contractual liability for the origination and underwriting of the loans.

*Fourth*, Plaintiffs assert that the table replicated at paragraph 55 of the complaint reflects the services offered by FMC. But the document from which this table originates—a Securities And Exchange Commission Filing from FMC—describes the table as reflecting only the "lifecycle of a private student loan." FMC's 10-K, at 2–3.[6] The table simply captures the process involved in origination of a loan all the way through securitization and servicing. It does not, as Plaintiffs suggest, reflect the services FMC actually provided for Plaintiffs' loan. Further, FMC's 10-K makes clear that FMC "do[es] not act as a lender . . . or loan servicer." *Id.* at 44.

---

[6] *Available at*
https://www.sec.gov/Archives/edgar/data/1262279/000104746908009754/a2187675z10-k.htm.

In the end, PNC bore sufficient economic interest and exposure to risk on loans originated in its name to qualify as the "true lender," even if such a theory applies. Because PNC is a national bank entitled to charge interest in excess of 6%, Plaintiffs' usury claim is preempted.

### D.  The Balance of Plaintiffs' Claims Are Preempted.

Because all of Plaintiffs' claims rely solely on the fact that the Trusts charged above 6% interest, the NBA preempts those claims as well. *See Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1198 (11th Cir. 2011) (where an unjust enrichment claim "relie[d] on identical facts as" the usury claim, "it too [was] preempted"); *Hawaii ex rel. Louie v. HSBC Bank Nevada, N.A.*, 761 F.3d 1027, 1036 (9th Cir. 2014) ("[W]hen a plaintiff alleges that a national bank charged 'a rate of interest greater than is allowed,' the claim falls within the scope of §§ 85 and 86, regardless of the state law term invoked").

## III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.

Preemption aside, Plaintiffs' breach-of-contract claim falls short for additional reasons. Plaintiffs contend that, because the Credit Agreement between Plaintiffs and PNC states that "[i]n no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania," the Trusts breached the agreement by charging above 6% interest. Compl. ¶¶ 170–71. They are wrong. The Credit Agreement is "governed *by Federal Law* and the Laws of the Commonwealth of Pennsylvania." Ex. C, Credit Agreement § L.1 (emphasis added). As shown above, federal law preempts Pennsylvania's usury statute, meaning the law applicable to the parties' agreement permitted the Trusts to charge above 6% interest.

Dispelling any ambiguity about the parties' intent, the agreement *itself* sets a "Variable Rate" above 6%. The Credit Agreement fully incorporates the Disclosure Statement, which states that Plaintiffs will be charged an interest rate of 9.368% (made up of an index plus a margin) and advises that this rate "may increase during the term of the loan." *Id.* § B.2; *id.* ("Note Disclosure

Statement"); *see also Trombetta v. Raymond James Fin. Servs., Inc.*, 907 A.2d 550, 560 (Pa. Super. Ct. 2006) ("[W]here a contract refers to and incorporates the provisions of another, both shall be construed together."). This provision reveals that the parties certainly *did not* intend for the contract to include a 6% interest cap. *See id.* ("[T]he specific controls the general when interpreting a contract."); *PBS Coal, Inc. v. Hardhat Mining, Inc.*, 632 A.2d 903, 906 (Pa. Super. Ct. 1993) ("[W]here specific or exact terms seem to conflict with broader or more general terms, the former is more likely to express the meaning of the parties with respect to the situation than the general language."). The Trusts therefore could not have breached the agreement by charging interest above 6%, and so Plaintiffs' contract claim must be dismissed.

## IV. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF AN IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.

Plaintiffs' claim for breach of an implied good-faith duty is doubly flawed.

*First*, Pennsylvania courts do not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing, which compels dismissal. *See LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 391 (Pa. Super. Ct. 2008) ("[A] party is generally precluded from maintaining a claim for the breach of the implied duty of good faith and fair dealing separate and distinct from the underlying breach of contract claim." (citation omitted)).

*Second*, even if Plaintiffs invoked the implied covenant as part of their contract claim, that claim would fail in any event. "The duty of good faith . . . appl[ies] only in limited circumstances" and "cannot trump the express provisions in the contract." *John B. Conomos, Inc. v. Sun Co. (R&M)*, 831 A.2d 696, 706 (Pa. Super. Ct. 2003). In other words, "[t]here can be no implied covenant as to any matter specifically covered by the written contract between the parties." *USX Corp. v. Prime Leasing, Inc.*, 988 F.2d 433, 438–39 (3d Cir. 1993). These principles are grounded in the fact that the "good faith duty" is simply "an interpretive tool to determine the parties'

justifiable expectations in the context of a breach of contract action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000).

Here, Plaintiffs copy and paste the allegation from their contract claim—they say the Trusts violated an implied good-faith duty by "collecting interest in excess of the maximum [allowable] rate." Compl. ¶ 175. But, as explained above, the parties' agreement expressly states that Plaintiffs would be charged an interest rate of 9.368% or higher. Implying a term that prohibits the Trusts from charging an interest rate above 6% is therefore foreclosed by the express terms of the contract. *See also Heritage Surveyors & Eng'rs, Inc. v. Nat'l Penn Bank*, 801 A.2d 1248, 1253 (Pa. Super. Ct. 2002) ("[A] lending institution does not violate a separate duty of good faith by adhering to its agreements with a borrower."). Plaintiffs' implied-covenant theory thus has no merit.

## V. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW.

Plaintiffs' UTPCPL claim fares no better. That statute prohibits certain "unfair or deceptive acts or practices," defined in 21 different provisions. 73 Pa. Stat. §§ 201-2(4), 201-9.2. For all provisions, a private plaintiff "must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004); *see also Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir. 2005) (plaintiff must prove "common law fraud elements of reliance and causation with respect to all subsections of the UTPCPL."). The defendant must have had "knowledge of the falsity of [its] statements or the misleading quality of [its] conduct." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 498 (3d Cir. 2013).

Plaintiffs here do not clarify which of the 21 UTPCPL sections the Trusts allegedly violated. Nor do they even identify any deceptive, misleading, or fraudulent act committed by the Trusts, not to mention how Plaintiffs relied on and were damaged by such conduct. Their sole

allegation is that "Defendants have engaged in unfair and deceptive acts and practices," Compl. ¶ 177, but such an "unadorned, the-defendant-unlawfully-harmed-me accusation" is plainly insufficient to plead a UTPCPL claim under Rule 8, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Doherty v. Allstate Indem. Co.*, 2016 WL 5390638, at \*6 (E.D. Pa. Sept. 27, 2016) ("General allegations that defendant engaged in deceptive conduct without specifying what that deceptive conduct actually was are insufficient; a plaintiff must identify the specific act, omission or misrepresentation 'in order to demonstrate that such confusion or misunderstanding was caused by certain acts or omissions on the part of the Defendants.'"); *Garczynski v. Countrywide Home Loans, Inc.*, 656 F. Supp. 2d 505, 513 (E.D. Pa. 2009) ("Plaintiffs cannot adequately plead that Countrywide violated the UTPCPL simply by pasting the language of the statute into their Amended Complaint."); *Purcell v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 425005, at \*6 (E.D. Pa. Feb. 10, 2012) ("Plaintiffs['] generalized, boiler-plate allegations of Defendant allegedly engaging in 'unfair methods of competition and/or deceptive acts or practices' and engaging 'in improper conduct which has created a likelihood of confusion or of misunderstanding' simply do not sufficiently allege the malfeasance necessary to state a claim under the UTPCPL.").

Even if Plaintiffs had alleged the requisite fraud or deception (they haven't), they still fail to plead a UTPCPL claim. The complaint's allegations concern actions taken by non-parties PNC and/or FMC. Noticeably absent are facts demonstrating actionable conduct committed *by the Trusts*, the only defendants here. *See Garczynski*, 656 F. Supp. 2d at 512 (dismissing UTPCPL claim where the plaintiffs failed to allege that the defendant "made any representations to them"); *Johnson v. Chase Manhattan Bank, USA N.A.*, 2007 WL 2033833, at \*7 (E.D. Pa. July 11, 2007) (same). And Plaintiffs do not allege, for example, that PNC or FMC made any representations to them on behalf of, and as agents for, the Trusts (to the extent such an agency relationship could

even create UTPCPL liability). At most, Plaintiffs allege that PNC and/or FMC assigned the loans to the Trusts. But assignor liability is not imputed to an assignee for purposes of the UTPCPL. *See Murphy v. FDIC*, 408 F. App'x 609, 611 (3d Cir. 2010) ("The UTPCPL . . . does not impose liability on assignees."); *Williams v. Nat'l Sch. of Health Tech., Inc.*, 836 F. Supp. 273, 283 (E.D. Pa. 1993) ("The U[T]PCPL . . . does not impose liability on parties who have not themselves committed any wrongdoing. Nor does it preserve defenses against subsequent holders of a loan."), *aff'd*, 37 F.3d 1491 (3d Cir. 1994); *Roche v. Sparkle City Realty*, 2009 WL 1674417, at *4 (E.D. Pa. June 12, 2009) ("[N]umerous courts have found that loan assignees cannot be held liable under the UTPCPL without allegations that they specifically committed wrongdoing." (citing cases)).

Nor can Plaintiffs rely on Pennsylvania's usury statute to state a claim under the UTPCPL. For one, Plaintiffs have failed to state a claim under that statute as well. *See supra* § II. And, in any event, Pennsylvania's "General Assembly did not intend for a violation of . . . the LIPL [the usury statute] to constitute a *per se* violation of the UTPCPL." *Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 441 (Pa. Commw. Ct. 2010) (explaining that "numerous statutes . . . specifically provide that a violation of a certain statute amounts to a violation of the UTPCPL" but that the usury statute is not one of them).[7] In short, then, Plaintiffs fail to state a UTPCPL claim.

## VI. PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF MUST BE DISMISSED.

Plaintiffs' request for declaratory and injunctive relief rests on "Counts One through Four." Compl. ¶¶ 179–81. Because those counts fail, the request for declaratory and injunctive relief

---

[7] Though the court in *NCAS* ultimately allowed the UTPCPL claim to proceed, that was because the Attorney General had alleged that the defendant charged "sham" interest in the form of a "phony monthly participation fee," which constituted "deceptive" conduct. 995 A.2d at 444 & n.29. Here, Plaintiffs do not allege any type of similar deceptive conduct committed by the Trusts—the contracts themselves told the Plaintiffs that they would be charged interest above 6%. And, unlike the Attorney General, the Plaintiffs here must allege justifiable reliance and causation. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222, 225 (3d Cir. 2008).

must also be dismissed. *See Akins v. Penobscot Nation*, 130 F.3d 482, 490 n.9 (1st Cir. 1997) ("Declaratory Judgment Act" does not, "in itself, create[] a substantive cause of action"); *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 681 (E.D. Pa. 2018) ("An injunction is a remedy rather than a cause of action.").

Regardless, declaratory and injunctive relief are not even available for Plaintiffs' statutory claims. "[T]he UTPCPL does not provide for injunctive or declaratory relief" to private litigants. *Abraham v. Ocwen Loan Servicing, LLC*, 321 F.R.D. 125, 168 (E.D. Pa. 2017). The same is true for the usury statute—the act gives the Attorney General the right to seek injunctive relief, 41 Pa. Stat. § 506, but does not accord that right to private plaintiffs, 41 Pa. Stat. § 504. Though private plaintiffs may seek "other relief which such person may be entitled *under law*," *id.* (emphasis added), "[i]njunctions are distinctly equitable," not legal, remedies, *Pennsylvania v. Eisenberg*, 454 A.2d 513, 514 n.5 (Pa. 1982); *see also Peitzman v. Seidman*, 427 A.2d 196, 198 (Pa. Super. Ct. 1981) ("[W]here a remedy is provided by statute, the jurisdiction of a court of equity may not be invoked."). Thus, even if Plaintiffs had pled a cause of action under those statutes, they still would not be entitled to declaratory and injunctive relief for those purported violations.

## VII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RESCISSION.

Plaintiffs' request for "rescission of the debts," Compl. ¶ 183, must also be dismissed. The usury statute does not "void the entire loan or the legal interest, nor does it make it illegal for a lender to collect an unpaid debt." *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 147 (3d Cir. 2016). Instead, it "only makes voidable 'the interest specified beyond the lawful rate.'" *Id.*; *see also In re Williams*, 276 B.R. 394, 397 (Bankr. E.D. Pa. 2002) (explaining that the usury statute does not provide "rescission rights to the borrower"). Nor can Plaintiffs ground their request for rescission in the UTPCPL. *See In re Soto*, 221 B.R. 343, 357 (Bankr. E.D. Pa. 1998) ("[E]ven if the Debtor succeeded on her UTPCPL claim, she would not be entitled to have the Mortgage

declared void."). The UTPCPL provides for rescission only where goods or services are sold "as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone," and only where the buyer seeks rescission "within three full business days following the day on which the contract or sale was made." 73 Pa. Stat. § 201-7. Plaintiffs do not even attempt to allege that these circumstances apply here.

Plaintiffs' contract claim, even if it were viable, also would not supply a right to rescission. "Contract rescission is permitted only in limited circumstances." *In re Bridgeport Fire Litig.*, 8 A.3d 1270, 1282 (Pa. Super. Ct. 2010). Plaintiffs come nowhere near pleading these circumstances—they do not, for example, allege (1) the contract was procured by fraud; (2) a mistake of fact that materially affects the parties' performance; or (3) a breach that is of such a fundamental and material nature that it defeats the very objective of the agreement. *See Harold ex rel. Harold v. McGann*, 406 F. Supp. 2d 562, 574 (E.D. Pa. 2005) (explaining doctrine of fraudulent inducement); *Step Plan Servs., Inc. v. Koresko*, 12 A.3d 401, 410 (Pa. Super. Ct. 2010) (explaining doctrine of mistake); *Castle v. Cohen*, 676 F. Supp. 620, 627 (E.D. Pa. 1987) (explaining doctrine of material breach).

Plaintiffs' claim for contract rescission fails for other reasons as well. "[T]he requirement of prompt action . . . is a prerequisite to the remedy of rescission." *Schwartz v. Rockey*, 932 A.2d 885, 894 (Pa. 2007). By waiting *fourteen years*—Plaintiffs knew in 2006 that they would be charged above 6% interest—they have waived any right to rescind the loan. *See Mackachinis v. McCosar Minerals, Inc.*, 2013 WL 1752472, at *4 (M.D. Pa. Apr. 23, 2013) (plaintiffs "failed to state a claim for rescission" where they "waited more than three years after they entered into the agreement at issue to bring this action"). And finally, a remedy at law is not "[in]adequate," which independently defeats Plaintiffs' claim for rescission. *Harold*, 406 F. Supp. 2d at 576.

**VIII. TIME-BARRED CLAIMS MUST BE DISMISSED.**

To the extent any of the above claims survive, many of them must be dismissed as untimely.

*Usury Claim*.  The usury statute provides that a recovery action must be filed within four years of the allegedly usurious payment.  41 Pa. Stat. § 502.  Plaintiffs state that they "were charged and paid" usurious rates going back to 2006, Compl. ¶ 113, and yet Plaintiffs waited to bring their claims until February 3, 2020.  Pursuant to the statute, then, any claims for interest paid prior to February 3, 2016 must be dismissed.  *See Christopher v. First Mut. Corp.*, 2007 WL 2972561, at *5 (E.D. Pa. Oct. 10, 2007) (dismissing claims for interest paid outside limitations period).

*Contract Claim*.  The statute of limitations for breach-of-contract claims is also four years, 42 Pa. Cons. Stat. § 5525(a)(8), and begins to run "on the date that the contract is breached," *Carulli v. N. Versailles Twp. Sanitary Auth.*, 216 A.3d 564, 578 (Pa. Commw. 2019).  Again, Plaintiffs say the Trusts breached the contract by "collecting interest in excess of the maximum rate of interest allowed by the laws of the Commonwealth of Pennsylvania."  Compl. ¶ 171.  Plaintiffs allege that this breach occurred back in 2006, when they "were charged, and paid, variable rates of interest that were over 8% and 9%."  *Id.* ¶ 113.  Plaintiffs' contract claim is therefore time-barred.  At the very least, Plaintiffs cannot recover damages for monthly interest payments incurred prior to February 3, 2016.[8]

*UTPCPL Claim*.  A claim under the UTPCPL is subject to a six-year statute of limitations.  *Gabriel v. O'Hara*, 534 A.2d 488, 496 (Pa. Super. Ct. 1987).  Plaintiffs do not allege any fraudulent or deceptive act by the Trusts, which on its own merits dismissal of the UTPCPL claim.  *See supra* § V.  But to the extent Plaintiffs assert that the contract they signed in 2006 contained some type of misrepresentation, that claim would be time-barred in all events.  *See Yenchi v. Ameriprise Fin.*,

---

[8] Because the implied-covenant claim is itself a breach-of-contract claim, *see supra* § IV, the same arguments apply to that claim.

*Inc.*, 161 A.3d 811, 816 n.4 (Pa. 2017) (UTPCPL claim "accrued" on the date the plaintiff purchased a life insurance policy that turned out to be underfunded and destined to lapse).

## IX.     PLAINTIFFS FAIL TO STATE A CLAIM FOR TREBLE DAMAGES.

Plaintiffs seek "treble damages" under the usury statute and the UTPCPL, Compl. ¶ 183, but that request must be dismissed as well.  As explained above, the usury statute permits a plaintiff to recover "excess" interest collected above the usury cap "within four years from and after the time of such payment."  41 Pa. Stat. § 502.  A separate time limit, however, applies to treble damages.  *Id.*  A plaintiff can recover "triple the amount of such excess interest" only if that interest was paid during the "four-year period of the contract"—*i.e.*, within four years after the contract was signed.  *Id.*  Here, the only excess interest that Plaintiffs can potentially recover is the excess interest paid since February 3, 2016.  *See supra* § VIII.  They cannot, however, treble those amounts, as those payments were not made within the four-year contract period.  *See* Ex. C, Credit Agreement ("Signature Page") (contract signed in March 2006).

Plaintiffs also fail to plead a right to treble damages under the UTPCPL.  To award such damages, a court must find that the defendant committed "wrongful conduct" that is "intentional or reckless."  *Schwartz*, 932 A.2d at 898.  Plaintiffs fail to plead facts showing "wrongful conduct" under the UTPCPL, *see supra* § V, let alone that the conduct was "intentional or reckless."  Their request for treble damages therefore must be dismissed.

## <u>CONCLUSION</u>

For the above reasons, the Court should dismiss Plaintiffs' Complaint in its entirety.

Dated: April 30, 2020

Respectfully submitted,

/s/ Anthony M. Masero
Anthony M. Masero (BBO #694276)
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
Telephone: (617) 960-3939
Facsimile: (617) 449-6999
amasero@jonesday.com

Albert J. Rota (*pro hac vice*)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
ajrota@jonesday.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Anthony M. Masero, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing on April 30, 2020.

Dated: April 30, 2020

*/s/ Anthony M. Masero*
Anthony M. Masero