## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TROY O. ROBINSON and ANTHONY W. SPEARS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3; and NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4,<br><br>        Defendants. | Case No. 1:20-cv-10203-ADB<br><br>ORAL ARGUMENT REQUESTED<br><br>(Motion for Enlargement of Page Limit granted on April 10, 2020, ECF No. 30) |

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

Table Of Authorities ................................................................................................ ii

Introduction ................................................................................................................1

Argument ....................................................................................................................2

I.     Plaintiffs Have Standing To Sue All Trust Defendants ...............................2

II.    Plaintiffs' Claims Are Not Preempted ......................................................... 10

      A.  The Trusts Are The De Facto, True Lenders ................................. 12
      B.  Plaintiffs' Claims Are Not Preempted In These Circumstances .................. 16
      C.  Allowing Plaintiffs' Claims To Proceed Will Not Impair PNC's
            Ability To Charge Lawful Interest ................................................. 18

III.    Plaintiffs Validly State A Breach of Contract Claim ......................... 21

IV.    The Complaint States A Cause of Action For Defendants' Violation Of
       The Unfair Trade Practices and Consumer Protection Law ............................... 23

V.    Plaintiffs Are Entitled To Claim For Declaratory Judgment
       And Injunctive Relief ............................................................................ 25

VI.    Defendants' Statute Of Limitations Arguments Should Be Denied ................... 28

VII.   Plaintiffs Can Recover Treble Damages ........................................................ 30

Conclusion ...............................................................................................................30

## TABLE OF AUTHORITIES

*Cases*

*Bank of N.Y., N.A. v. Franklin Advisors, Inc.*, 522 F.Supp.2d 632 (S.D.N.Y. 2007) .................. 23

*Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996) ......................................... 19

*Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3 (1st Cir. 1977),
*aff'd*, 439 U.S. 531 (1978) ...........................................................................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................................................1

*Belleville v. David Cutler Grp.*, 118 A.3d 1184 (Pa. Commw. Ct. 2015) ................................... 23

*Blyden v. Navient Corp.*, 2015 WL 4508069 (C.D. Calif. 7/23/2015) ..........................................8

*Bontempo v. Wolpoff & Abramson, L.L.P.*, 2006 WL 3040905 (W.D. Pa. 10/24/ 2006) ............ 22

*CFPB v. Cashcall, Inc.*, 2016 WL 4820635 (C.D. Calif. 8/31/2016) ........................................... 17

*Clairton Slag, Inc. v. Dep't of General Servs.*, 2 A.3d 765 (Pa. Cmwlth.2010),
*appeal denied*, 612 Pa. 700, 30 A.3d 489 (2011) ........................................................................ 23

*Commonwealth v. Think Finance, Inc.*, 2016 WL 183289 (E.D. Pa. 1/14/2016) ....................... 17

*Christopher v. First Mut. Corp.*, 2007 WL 2972561 (E.D. Pa. 10/10/2007) ............................... 29

*Crispo v. Crispo*, 909 A.2d 308 (Pa. Super. 2006) ...................................................................... 29

*Danganan v. Guardian Prot. Servs.*, 179 A.3d 9 (2018) ............................................................. 24

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020) ..................................................................................................... 2,10

*Drelles v. Mfrs. Life Ins. Co.*, 881 A.2d 822 (Pa. Super. 2005) ................................................. 29

*Easter v. American West Financial*, 381 F.3d 948 (9th Cir. 2004) ...............................................8

*Egan v. Wachovia Bank, N.A.*, 2006 WL 8459849 (E.D. Pa. 6/28/2006) ................................... 28

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998) ...........................................3, 7

*Feeney v. Disston Manor Pers. Care Home, Inc.*,
849 A.2d 590 (2004) ................................................................................................................. 24

*Fogle v. THORN Americas, Inc.*, 95 F.3d 645 (8th Cir. 1996) ...................................... 26

*Gabriel v. O'Hara*, 368 Pa. Super. 383 (1987) ........................................................... 24

*Gratz v. Bollinger,* 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) .............................. 10

*Grimes v. Enterprise Leasing Co. of Philadelphia*, 66 A.3d 330 (2013) ..................................... 26

*Hymes v. Bank of America, N.A.*, 408 F.Supp.3d 171 (S.D.N.Y. 9/30/2019) ...................... 19, 21

*In re Dukes*, 1998 WL 124220 (Bankr. E.D. Pa. 1998) ................................................. 30

*In re Grigsby*, 127 B.R. 759, 763 (E.D. Pa. 1991) ...................................................... 30

*In re Kenderdine*, 118 B.R. 258 (E.D. Pa. 1990) ................................................... 28, 29

*Jodek Cheritable Trust, R.A. v. Vertical Net, Inc.*, 412 F. Supp. 2d 469 (E.D. Pa. 2006) ........... 29

*Kaluza v. PNC Bank*, 2013 WL 183093 (W.D. Pa. 3/11/2013) .................................................... 12

*Kaur v. World Business Lenders, LLC*, 2020 WL 888015 (D. Mass. 2/24/2020) ...................... 17

*Krispin v. May Dep't Stores, Co.*, 218 F.3d 919 (8th Cir. 2000) .................................................. 18

*Kyle v. Linden Care, LLC*, 2020 WL 1853508 (D.N.H. 4/13/2020) ........................................... 28

*La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973) .............................................7

*Lee v. Conagra Brands, Inc.*, 958 F.3d 70 (1st Cir. 2020) ............................................. 10

*Lieberman v. MacMaster*, 2013 WL 4500573 (D. Me. 8/21/2013) ............................................. 27

*Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) .................................... 16, 19, 20

*Mahon v. Ticor Title Insurance Company*, 683 F.3d 59 (2d Cir. 2012) .........................................8

*Marquette National Bank of Minneapolis v. First Omaha Service Corp.*,
439 U.S. 299 (1978) ..................................................................................... 11

*MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*,
220 F. Supp. 3d 450 (S.D.N.Y. 2016) ................................................................... 23

*Meade v. Marlette Funding, LLC*, 2018 WL 1417706 (D. Colo. 3/21/2018) ............................. 18

*Natt v. White Sands Condo.*, 943 N.Y.S.2d 231 (2012) .............................................. 22

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
693 F.3d 145 (2d Cir. 2012) ...................................................................................9, 10

*Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78 (3d Cir. 2000) ...........................21

*Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005) ........................................................18

*Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002),
cert. denied, 540 U.S. 812 (2003) ...........................................................................3, 7, 9

*Pena v. Gonzalez*, 397 B.R. 566 (1st Cir. B.A.P. 2008) ..................................................................24

*Pennsylvania Department of Banking v. NCAS of Delaware*, LLC, 995 A.2d 422 (2010) .........24

*People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.,*
846 N.Y.S.2d 436 (2007) .........................................................................................................17

*Petersen v. Chase Card Funding, LLC*, 2020 WL 613531 (W.D. N.Y. 1/22/2020) ...................18

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
632 F.3d 762 (1st Cir. 2011) .............................................................................................*passim*

*PNC Bank, N.A. v. Janiga*, 2013 WL 1787499 (N.D. Ill. 4/24/2013) .........................................12

*PNCEF, LLC v. Divinity Group, LLC*, 2010 WL 4702294 (W.D. Wisc. 11/9/2010) ..................12

*Roberts v. Islam*, 2015 WL 13286824 (D. Mass. 5/20/2015) ........................................................28

*Rodi v. S. New England Sch. of Law*, 389 F.3d 5 (1st Cir. 2004) .................................................28

*Roethlein v. Portnoff Law Assocs., Ltd.*, 24 A.3d 1274 (2011) ....................................................26

*Safeguard Investment Corp. v Commonwealth*, 44 Pa. Cmwlth. 417 (1979) ..............................24

*Snyder v. Bong Thi Ngo*, No. 1389 EDA 2012,
2013 WL 11282816 (Pa. Super. Ct. 3/20/2013) .........................................................26

*Somes v. United Airlines, Inc.*, 33 F. Supp. 2d 78 (D. Mass. 1999) ............................................10

*SPGGC, LLC v. Blumenthal*, 505 F.3d 183 (2d Cir. 2007) ..........................................................19

*Spokeo, Inc. v. Robins*, ____ U.S. ____, 136 S. Ct. 1540,
L. Ed. 2d 635 (2016), *as revised* (May 24, 2016) .........................................................10

*Trent Fin. Corp. v. Church*, 1978 WL 299 (Pa. Cmwlth. Ct. 6/21/1978) ...................................29

iv

*Ubaldi v. SLM Corp.*, 852 F.Supp.2d 1190 (N.D. Calif. 2/13/2012) ...................................... 17, 18

*Varela v. E\*Trade Bank*, 2010 WL 8228829 (D. Mass. 10/22/2010) ......................................... 10

*Wachovia Bank v. Schmidt*, 564 U.S. 303 (2006) ......................................................... 12

*West Virginia v. Cashcall, Inc.*, 605 F.Supp. 2d 781 (S.D.W.Va. 2009) ............................... 17, 20

*Winne v National Collegiate Student Loan Trust 2005-1*,
2017 WL 3573813 (D. Me. 8/17/2017) ..................................................................... 9

*Wong v. Wells Fargo Bank, N.A.*, 789 F.3d 889 (8th Cir. 2015) ....................................... 9

**Statutes**

12 U.S.C. §85 ............................................................................................... 11, 12

28 U.S.C. §2201 ............................................................................................ 27

Fed. R. Civ. P. 12 ........................................................................................*passim*

Fed. R. Civ. P. 23...................................................................................3, 7

Fed. R. Civ. P. 57 .......................................................................................... 27

Fed. R. Civ. P. 65 .......................................................................................... 26

7  Pa. Stat.  §6218 ........................................................................................ 26

41 Pa. Stat.. §502 ......................................................................................... 30

41 Pa. Stat. §504 .......................................................................................... 26

41 Pa. Stat. §507 .......................................................................................... 24

73 Pa. Stat. §§201-1 to 201-9.2 ........................................................................ 23

73 Pa. Stat. §201-2(4)(v) and (xxi) ................................................................... 23

73 Pa. Stat. §201-3 ....................................................................................... 23

**Other Authorities**

John Hannon, *The True Lender Doctrine: Function over Form as a Reasonable Constraint on the Exportation of Interest Rates*, 67 Duke L.J. 1261, 1264–65 (2018) ..........................12, 13

OCC, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64,229 (Nov. 21, 2019) ..............................................................................................18, 19

## INTRODUCTION

The Complaint pleads numerous detailed, non-conclusory factual allegations. Read in its entirety, the Complaint shows that all of Plaintiffs' claims for relief are plausible on their face, and the Motion to Dismiss therefore should be denied. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 570 (2007). In particular, the allegations easily overcome Defendants' preemption arguments and establish that Plaintiffs can sue all of the trusts engaged in this concerted scheme to skirt state usury laws.[1]

Plaintiffs obtained a student loan. The named lender is PNC Bank, N.A. ("PNC"). The loan was originated through The First Marblehead Corporation ("FMC"), and pursuant to a pre-arranged set of transactions, days after funding, the loan was transferred to the National Collegiate Student Loan Trust 2006-2 (the "NCT 2006-2 Trust"), a nonbank Delaware statutory trust formed by FMC to securitize thousands of separate student loans to enable "asset backed securities" secured by the student loan assets contained in the trust to be sold to institutional investors. Since it acquired the loan (and thousands like it), the Trust has collected interest exceeding the maximum amount allowed by Pennsylvania law, despite the legal prohibitions contained in Pennsylvania and federal law against doing so, and despite the very clear terms of the promissory note that "in no event" shall the interest rate exceed that allowed by Pennsylvania law.

This case implicates the "rent-a-bank" doctrine, in which parties initially attach a national bank's name to a loan in order to imbue it with the protections of the National Bank Act ("NBA"), but then immediately transfer the loan to a nonbank entity, which thereafter holds the loan and collects principal and interest payments in its own name, not as an agent or subsidiary of the national bank. As alleged in detail, the NCT 2006-2 Trust (and the other twelve trusts similarly

---

[1] Plaintiffs concede to the dismissal of their claim for rescission of the loan.

1

created by FMC to own other loans, including other PNC loans, (the "Trust Defendants")) are the true lenders, and are therefore subject to Pennsylvania's usury statutes, which prohibit interest rates in excess of 6% on loans of these types. Simply stated, the scheme in which PNC ostensibly originated the loans, with the intent (and contractual requirement) to immediately sell the loans to the securitization trusts organized by FMC, does not abrogate the application of state usury laws, because the Trusts have no protections under the NBA.

## ARGUMENT

### I.   Plaintiffs Have Standing To Sue All Trust Defendants.

In examining standing at the pleading stage, the Court will "take[] all well-pleaded facts in the complaint as true and indulge all reasonable inferences in [Plaintiffs'] favor to determine whether [they] plausibly pleaded facts necessary to demonstrate standing to bring the action." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 46-47 (1st Cir. 2020) (internal quotation marks and citations omitted). Plaintiffs' standing is supported by the First Circuit's decision *in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011). While the result in *Plumbers' Union* was a holding of no standing against certain defendants, the Court put forth an analytical framework within which Plaintiffs here clearly fit, and which supports a finding of standing as to all Trust Defendants.

In *Plumbers' Union*, three union pension and welfare funds brought a putative class action against eight securitization trusts, the "depositor" that organized the trusts, the trusts' underwriters, and five trust officers. The plaintiffs were the institutional investors that purchased the asset-backed securities, one transaction further removed than Plaintiffs here, who are the borrowers whose loans were securitized into the trusts and comprise the assets that backed the securities. Also, in *Plumbers' Union* the collateralized loans were from "a different mix of banks," *id.*, at 771,

2

whereas the loans at issue here all ostensibly originated with one bank, PNC. Although the alignment of the parties was more remote, the *Plumbers' Union* Court addressed whether the plaintiffs could pursue claims based on securities offerings in which they did not participate and against trusts whose certificates they did not purchase, noting that "[t]he issue looks straightforward and one would expect it to be well settled; neither assumption is true." *Id.*, at 768.

The Court noted that, in a properly certified class action, the named plaintiffs "regularly litigate not only their own claims but also claims of other class members based on transactions in which the named plaintiffs played no part," *id.* at 769, discussing the decision in *Barry v. St. Paul Fire & Marine Insurance Co.*, 555 F.2d 3 (1st Cir. 1977), *aff'd*, 439 U.S. 531 (1978) (disallowing claims by patients and physicians against two of four named defendant insurers because none of the named plaintiffs bought a policy from those two companies). The *Plumbers' Union* Court cautioned that "[h]ow far *Barry* extends today may be debatable," and that since *Barry*, the Supreme Court has "refus[ed] to permit class claims to extend to those suffering injuries ***materially different*** than those suffered by the named plaintiffs." *Id.* (emphasis added):

> Further, several circuits have cut themselves loose from a strict requirement that, in a plaintiff class action, no defendant may be sued unless a named plaintiff has a counterpart claim against that defendant. Arguing that the class action should be a flexible instrument, these courts conclude that the class action should embrace defendants against whom no named plaintiff has a claim ***so long as the claims are essentially of the same character as the claim against a properly named defendant***, and that the sorting out of this issue should be left to Rule 23 criteria rather than by use of standing concepts focusing on named plaintiffs.

*Id.* at 770 (emphasis added) (citing *Payton v. Cnty. of Kane*, 308 F.3d 673 (7th Cir. 2002); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998)). The court ultimately found that the plaintiff investors lacked Article III standing to assert claims involving the sales of certificates in six of the eight trust defendants from which no named plaintiff made purchases, following the ruling from *Barry*, but with "a qualification:"

3

> The qualification, on which we reserve judgment, is one where the claims of the named plaintiffs necessarily give them—not just their lawyers—essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members. The matter is one of identity of issues not in the abstract but at a ground floor level.

*Id.*

Plaintiffs' allegations as to all Trust Defendants must therefore be evaluated within this legal framework. Their detailed allegations establish that the named plaintiffs' claims against the NCT 2006-2 Trust have the same character as the putative class members' claims against the other Trust Defendants, and that proving the named plaintiffs' claims will necessarily establish those of the class members vis-à-vis all trusts. Plaintiffs allege that the NCT 2006-2 Trust (to which Plaintiffs' loan was sold) is one of many National Collegiate Student Loan Trusts that were created by FMC (Complaint, ¶ 128), and that "other" Trust Defendants (namely The National Collegiate Student Loan Trusts 2004-1, 2004-2, 2005-1, 2005-2, 2005-3, 2006-1, 2006-3, 2006-4, 2007-1, 2007-2, 2007-3 and 2007-4) also became the owners of loans made to other student borrowers that were ostensibly made by PNC, pursuant to the same loan program orchestrated by FMC and the same Note Purchase Agreement that applied to and covered Plaintiffs' loan (Complaint, ¶ 129); that the other Trust Defendants are the owners of loans that were made to class members ostensibly by PNC, and which are memorialized by the same Credit Agreement as Plaintiffs' Credit Agreement, and that those loans to the class members that are now held by the other Trust Defendants have the same terms and conditions as Plaintiffs' loan (Complaint, ¶ 130); and that the loans to the class members that are now held by the other Trust Defendants were arranged by FMC pursuant to the same loan program and the same Note Purchase Agreement that applied to and covered Plaintiffs' loan, originated by FMC pursuant to the same loan program and the same Note Purchase Agreement, underwritten by FMC pursuant to the same loan program and the same Note

4

Purchase Agreement, applied for pursuant to the same loan program and the same Note Purchase Agreement, and were otherwise processed, and then transferred and assigned, in the same manner as Plaintiffs' loan, the only difference being the identity of the trust to which they were transferred. (Complaint, ¶ 131). The facts as recited above as they pertain to the NCT 2006-2 Trust apply identically to the other Trust Defendants. *Id.*

The Complaint further alleges that the loans to the class members that are held by the other Trust Defendants were all guaranteed by The Education Resources Institute ("TERI"), just as Plaintiffs' loan was guaranteed by TERI; that the other Trust Defendants' loans were and are serviced by the same servicing agency that services Plaintiffs' loans; that the securities prospectuses for the other Trust Defendants have the same or substantially the same disclosures as the trust that holds Plaintiffs' loan; and that all of the trusts have the same indenture trustee and the same owner trustee. (Complaint, ¶¶ 132-135). It also alleges that the policies and procedures FMC used to create all of the trusts were the same, that the policies and procedures FMC employed transferring all the loans to the various trusts were the same, and, importantly, that each trust employs the same policies and procedures related to the collection of interest, and that each trust has collected interest in excess of 6%. (Complaint, ¶¶ 136-139). It alleges that all trusts have behaved in the same manner and share common beneficial ownership, and that the class members have suffered the same injuries as Plaintiffs, who have the same legal claims and causes of action as all class members. (Complaint, ¶¶ 140-141, 144-145). The facts alleged confirm the allegations that "[e]stablishing liability on the part of the NCT 2006-2 Trust will necessarily establish the liability of the Trust Defendants" (all trusts), and that the "issues raised by Plaintiffs' claims against the NCT 2006-2 Trust are identical to the issues raised by the class members' Claims against the [other] Trust Defendants." (Complaint, ¶¶ 142, 146).

This case precisely fits the exception outlined by the First Circuit in *Plumbers' Union*. Plaintiffs' detailed allegations demonstrate that the class members' claims (and the underlying factual basis for those claims) are materially identical to Plaintiffs'. All of the loans were originated in the same manner, and have the same terms and conditions in their promissory notes. All were made ostensibly in the name of PNC, unlike in *Plumbers' Union* where the loans in the trusts came "from a different mix of banks." *Plumbers' Union*, 632 F.3d at 771. All of the loans passed through FMC's securitization process and were sold to trusts that FMC created, all of which have the same trustees and same beneficial ownership. All of the trusts are very much related by virtue of how they were created, who serves as their trustees, and the nature of the loans that were collateralized into them. The only real difference between Plaintiffs' claims against the NCT 2006-2 Trust and the class members' claims against the other Trust Defendants is a matter of time and numbering: loans that were collateralized earlier than Plaintiffs' went to a lower numbered trust, and loans that were collateralized later than Plaintiffs' went to a higher numbered trust, but the mechanism of the creation and transfer of the loans has an identical source and was implemented in an identical manner. This is definitively the case where the named Plaintiffs have a significant interest in establishing the wrongdoing of all trusts by reference to their experience with the NCT 2006-2 Trust, because it is all the same. Essentially, Defendants' argument seeks to package what would be a weak class certification argument regarding typicality as an argument about standing. But the total overlap in facts grounding the claims against all the Trust Defendants bolsters rejection of the argument in either context.

Importantly, given that the underlying facts of the loan programs are identical, a finding that the NCT 2006-2 Trust was collecting interest at a usurious rate will necessarily demonstrate that the other sequential trusts were doing so as well. The purposes of the class action vehicle and

judicial economy are best served by resolving all claims as to all related trusts in a single case, rather than allowing for separate and perhaps inconsistent legal standards to apply to other borrowers in other trusts. *See, e.g.*, Fed. R. Civ. P. 23(B)(1)(a) & (b).

In *Fallick, supra*, the Sixth Circuit found the named plaintiff to have standing in an ERISA class action to represent members of a putative class against numerous ERISA-governed benefit plans even though he was a member of only one of those plans: "The foregoing analysis supports our conclusion that once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." 162 F.3d at 423. In *Payton, supra*, the Seventh Circuit allowed named plaintiffs to bring class action claims against 19 counties challenging the constitutionality of a bail bond fee, even though the named plaintiffs paid the fees only to two counties: "[I]t is reasonable for the putative plaintiff class to try to hold all counties accountable within one suit. The constitutionality of a bond fee (whether it is $1 or $45) should not differ from one county to the next, when such a fee is imposed pursuant to the same statute." 308 F.3d at 679 (citation omitted). The court in *Payton* discussed the "juridical link" doctrine set forth in the Ninth Circuit's decision in *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir. 1973):

> *La Mar* held that **a plaintiff** without a cause of action against a specific defendant cannot "'fairly and adequately' protect the interests of those who do have such causes of action," for purposes of Rule 23(a). *Id.* at 466 (citations omitted). Nevertheless, and relevantly to our case, the court went on to hold that **if the plaintiffs as a group**—named and unnamed—have suffered an identical injury at the hands of several parties related by way of a conspiracy or **concerted scheme**, or otherwise "juridically related in a manner that suggests a single resolution of the dispute would be expeditious," the claim could go forward. *Id.*

*Payton,* 308 F.3d at 678 (emphasis added). Here, two separate bases show a juridical link. First, all of the Trust Defendants, "as a group," are part of the same concerted scheme, orchestrated

7

through FMC, to bundle the same types of loans ostensibly made by the same bank, sharing common policies and common contractual agreements (the borrowers' promissory notes and the Note Purchase Agreement between PNC and FMC). All Trust Defendants are the same creature, having been created with the same loans made pursuant to the same concerted business plan. Second, the plaintiffs "as a group" have suffered the same injury, namely the payment of interest in excess of that allowed by Pennsylvania law. The Complaint alleges more than sufficient facts to establish standing, and this matter will be resolved more expeditiously by way of a single proceeding. In the words of the First Circuit in *Plumbers' Union*, the claims against all Trust Defendants are not "materially different," and in fact are identical. 632 F.3d at 769.

The cases Defendants rely on are largely inapposite or easily distinguishable. In *Easter v. American West Financial*, 381 F.3d 948 (9th Cir. 2004), the court found that trust defendants were not juridically linked, specifically finding the claimed injuries were not "the result of a conspiracy or concerted scheme between the Trust Defendants," noting that those trust defendants were, to the contrary, ***competitors*** for the purchase of secured loans in the same marketplace, and that the case did not concern a common rule. *Id.* at 962. That is a completely different situation than here, where the allegations are that all Trust Defendants were created by FMC and are governed by the same policies and procedures (including the collection of usurious interest), engaging in a concerted scheme arising from the same loan program and same contractual arrangements. In *Mahon v. Ticor Title Insurance Company*, 683 F.3d 59 (2d Cir. 2012), the named plaintiff sought, unsuccessfully, to represent a class against Chicago Title (which sold the title insurance policy to plaintiff) and other entities that simply had a corporate relationship with Chicago Title through the same parent company. *Blyden v. Navient Corp.*, 2015 WL 4508069 (C.D. Calif. 7/23/2015) was dismissed, but the court appears to have been swayed by what it called Plaintiffs' "misstatements

8

and mischaracterizations of law" in her standing arguments. *Id.* *12. *Winne v. National Collegiate Student Loan Trust 2005-1*, 2017 WL 3573813 (D. Me. 8/17/2017) found no standing because "[i]t is not clear from the Complaint, however, that such an identity of issues necessarily exist in this case," at *5; the court stated:

> This case is dissimilar to *Payton*, where each county's bail fee was imposed pursuant to the identical statute. Especially in light of the fact-dependent nature of the claims in the Complaint, Plaintiffs have not demonstrated that there is a single policy or methodology that was necessarily employed by each Trust in its collection efforts, such that if the named plaintiffs are successful on the claims against the four Trusts with whom they have a relationship, they would necessarily establish liability on the part of the other 13 Trusts.

*Id.* at *6. Here, in contrast, numerous allegations show that there were many commonly employed methodologies and policies in this concerted scheme, and that resulting violations of law as to all class members can be constitutionally remedied in this single proceeding. And, in *Wong v. Wells Fargo Bank, N.A.*, 789 F.3d 889 (8th Cir. 2015), the named plaintiffs obtained second mortgage loans through a mortgage company, which then sold and assigned the loans to *various* bank purchasers through the marketplace, the defendants in the case. There was no suggestion that the defendants obtained the loans by way of a concerted scheme amongst related entities, as here.

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012), is particularly helpful. The institutional fund investor sued 17 separate securitization trusts for securities violations arising from "shelf registrations." The Second Circuit found that the named plaintiffs had "**class standing**" (*id*. at 168, emphasis added) to assert claims of purchasers of the trusts' certificates that were backed by mortgages originated by the same lender that originated the mortgages backing the plaintiffs' securities, but lacked standing for those trust certificates backed by mortgages *from different lenders* than those that originated the mortgages backing the plaintiffs' certificates. The alignment of parties is not identical to that here, because the plaintiffs were the purchasers of the trusts' certificates rather than the borrowers on the

9

underlying securitized loans, but the "same lender" concept applies here, as all of the loans were

ostensibly originated by PNC, through FMC, and sold to a Trust Defendant. The court held:

> We hold that plaintiff has class standing to assert the claims of purchasers of
> certificates backed by mortgages originated **by the same lenders that originated**
> **the mortgages backing plaintiff's certificates, because such claims implicate**
> **'the same set of concerns' as plaintiff's claims.** *Gratz v. Bollinger*, 539 U.S. 244,
> 267, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003).

*Id.* at 149-150 (emphasis added).

"Our cases have established that the 'irreducible constitutional minimum' of standing

consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision." *Spokeo, Inc. v. Robins*, ____ U.S. ____, 136 S. Ct. 1540, 1547 (2016)

(citations omitted). Defendants do not argue that Plaintiffs fail to plead the first and third elements,

arguing only that the injury is not fairly traceable to the other Trust Defendants. But Plaintiffs'

Complaint is rife with allegations showing that all injuries of all class members are traceable to

the same unlawful conduct.  Taking these allegations as true and making all reasonable inferences

in Plaintiffs' favor, *Dantzler*, 958 F.3d at 46-47, the Rule 12(b)(1) Motion should be denied.

## II.     Plaintiffs' Claims Are Not Preempted.

On a Rule 12(b)(6) motion to dismiss, the Court must "accept as true all well-pleaded facts

alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Lee*

*v. Conagra Brands, Inc.*, 958 F.3d 70, 74 (1st Cir. 2020). "[T]he law imposes the burden to show

preemption on the Defendants, not the Plaintiffs." *Varela v. E\*Trade Bank*, 2010 WL 8228829,

\*8 n.11 (D. Mass. 10/22/2010) (citing *Somes v. United Airlines, Inc.*, 33 F. Supp. 2d 78, 83 (D.

Mass. 1999)). Before addressing the merits of Defendants' preemption arguments, Plaintiffs note

two important factors.

First, Plaintiffs do in fact challenge the applicability of the rule that a loan valid at its inception does not become usurious upon assignment, because the loan at issue here was not "valid when made." As Defendants admit, the loan at its inception had an interest rate of 9.369%. (Defendants' Memorandum, p. 1). The loan was therefore "invalid when made," because its initial interest rate was greater than that allowed by Pennsylvania law (6%). The "valid when made" doctrine simply does not apply.

Second, Defendants repeatedly insist that federal law governs the loan, and in doing so gloss over the choice of law provision, which states: "CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE GOVERNED BY FEDERAL LAW *AND* THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, WITHOUT REGARD TO THE CONFLICT OF LAW RULES."[2] (Capitalization in original, emphasis added). Defendants never address the fact that federal law *AND* Pennsylvania law control. But that does not really matter, because under either law, the loan was usurious because (a) it exceeded the 6% limit established by Pennsylvania law, and (b) it "exported" an interest rate that was greater than that allowed by Pennsylvania law and therefore is not protected by the NBA.

In *Marquette National Bank of Minneapolis v. First Omaha Service Corp.*, 439 U.S. 299 (1978), the Supreme Court held that the NBA provision codified at 12 U.S.C. § 85, which permits national banks to charge "interest at the rate allowed by the laws of the state … where the bank is located," allows a national bank to "export" the allowable interest rate from the state where it is located to the states of its non-resident customers, even if the borrower's state's law sets a lower maximum interest rate. The problem for Defendants here is that PNC has been exporting interest

---

[2] The Credit Agreement also states that, "[i]n no event will the Variable Rate exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania," as discussed more fully below in connection with the breach of contract claim.

rates that are in excess of that allowed by the law of the state where it is "located." In *Wachovia Bank v. Schmidt*, 564 U.S. 303 (2006), the Supreme Court observed that "the term 'located,' as it appears in the [NBA], has no fixed, plain meaning." *Id.* at 313. The *Schmidt* Court held that, "[i]n some provisions [of the NBA], the word ***unquestionably refers to a single place:*** the site of the banking association's designated ***main office***," and recognized the interest-exportation provision of § 85 as one of those provisions. *Id.* It is beyond dispute that PNC's "main office" is located in Pennsylvania. *See, e.g., PNC Bank, N.A. v. Janiga*, 2013 WL 1797499, *1 (N.D. Ill. 4/24/2013) (noting that PNC "main office [is] located in Pennsylvania"); *Kaluza v. PNC Bank*, 2013 WL 1830933, *1 (W.D. Pa. 3/11/2013) (observing that PNC's "headquarters [are] located in Pittsburgh, Pennsylvania"); *PNCEF, LLC v. Divinity Group, LLC*, 2010 WL 4702294, *1 (W.D. Wisc. 11/9/2010) ("PNC Bank's main offices are located at 249 Fifth Avenue, Pittsburgh, Pennsylvania."). As Defendants admit, the initial rate was 9.369%, and thus at its inception (and at times thereafter), the exported rate violated Pennsylvania law and, by proxy, 12 U.S.C. § 85.[3]

This leads to the "true lender" doctrine, because as pled, PNC was never the lender for the loans. Issues related to a national bank assigning a loan, and the interest rate legally following that assignment, are irrelevant because PNC was not the de facto lender: the Trust Defendants are. The Trust Defendants are nonbank entities, and are not protected by the preemptive effect of the NBA.

### A.    The Trusts Are The De Facto, True Lenders.[4]

---

[3] Defendants suggest in footnote 3 of their Memorandum that PNC is authorized to charge interest permitted by Delaware law, which is simply not accurate.  Unquestionably, PNC is located in Pennsylvania, because its single place, main office is located in Pittsburgh.  The rate of interest it may export is set by Pennsylvania law, not Delaware law.

[4] The "true-lender doctrine is succinctly stated as follows: "In this model, a nonbank entity solicits borrowers, makes all the credit decisions, and directs a partner bank to originate its loans—only to purchase them from the bank within days. This use of a chartered bank as a conduit to originate loans thereby confers on the loans the full preemptive shield of the exportation doctrine. However, a series of courts have recently begun applying a more exacting level of scrutiny to these arrangements. Courts applying the true lender test disregard the form of the lending configuration in favor of a searching examination of its substance, considering a variety of factors designed to determine which entity

The loans at issue were "make and sell" loans, in which PNC was required to sell, and the Trusts were required to purchase, the loans days after they were funded. The intermediary between PNC and the Trust was FMC, which organized the Trusts and facilitated the immediate purchase and assignment of the loans to the Trusts. As alleged in the Complaint:

FMC and PNC entered into a "Note Purchase Agreement" for the TERI-Guaranteed PNC Alternative Loan Program effective as of April 22, 2004. (Complaint, ¶ 39). The agreement requires that PNC sell to FMC or its "designee Purchaser Trust" every "seasoned loan"[5] owned by PNC. (Complaint, ¶ 41). It also requires that FMC or its "designee Purchaser Trust" purchase every seasoned loan from PNC. (Complaint, ¶ 42). The "designee Purchaser Trust(s)" are the special purpose entities formed or sponsored by FMC or its affiliate, namely the various "National Collegiate Student Loan Trusts" named in this lawsuit. (Complaint, ¶ 44). The National Collegiate Student Loan Trusts were formed by FMC acting in its capacity as an intermediary between the national banks (such as PNC) and the capital markets (the institutional investors), which would buy the securities backed by the securitized student loans that were bundled into the National Collegiate Student Loan Trusts. (Complaint, ¶ 45).

The Note Purchase Agreement itself has several provisions showing the intent was never to have PNC retain the loans. It sets specific schedules governing the timing of when FMC or its "designee Purchaser Trust" must buy the loans from the PNC; requires FMC to pay certain liquidated damages to PNC if FMC or its designee trust does not complete the purchase of the

---

is the actual lender. Only after making that determination will the courts decide whether the actual lender is entitled to the broad protections granted to chartered insured depository institutions." John Hannon, *The True Lender Doctrine: Function over Form As A Reasonable Constraint on the Exportation of Interest Rates*, 67 Duke L.J. 1261, 1264–65 (2018).

[5] The loans became "seasoned" depending on whether they were disbursed directly to the schools (in which case they became seasoned thirty days after disbursement), or disbursed directly to the borrower (in which case they became seasoned 15 days after disbursement). (Complaint, ¶ 47).

loans within the specified periods; sets specific minimum purchase prices for the loans FMC or its designee trust must buy from PNC; states that on the purchase dates, PNC shall transfer to FMC or its designee trust, without recourse, all interest in the loans; states that FMC or its trust shall receive interest on the purchased "seasoned" loans from and after the date that the loans are purchased; and requires that PNC transfer all origination records for the loans to FMC or its designee trust, including the borrowers' loan applications, the notes evidencing the debts, and all other standardized documentation specified in the loan programs. (Complaint, ¶¶ 50-54).

The Complaint alleges in detail FMC's role in this scheme, because its role (as intermediary) demonstrates again that PNC was never intended to own the loans. This is so because FMC performed all of the services that a true lender would perform when the loans were originated, from loan program design and management, borrower inquiry and application, loan origination and disbursement, and loan servicing and portfolio management. (Complaint, ¶ 55). As alleged: all the foregoing services FMC engaged in are loan services typically engaged in by lenders; FMC was the party that arranged the loans; FMC marketed the loans to borrowers; FMC dealt directly with the borrowers, and PNC did not have any interactions with the borrowers when the loans were being originated and disbursed; and PNC did not originate the loans. (Complaint, ¶¶ 56-62).[6] Again, these facts show that PNC was never involved in the loan origination process: FMC was doing all the work so the loans could be immediately transferred to its "designee" Trusts. As FMC disclosed in one of its Annual Reports, it (rather than the banks) handled every aspect of making and originating the loans immediately prior to them being sold to the Trusts. (Complaint, ¶ 75).

---

[6] FMC did not charge the lenders for the above services, but instead obtained a residual interest in the various National Collegiate Student Loan Trusts that it created to purchase the loans, which FMC reported as being worth billions of dollars by 2007. (Complaint, ¶63).

14

Perhaps more significantly, the Complaint alleges that PNC never had any financial risk for the loans. It states that PNC did not place its own money at risk when it funded the loans, because it was obligated to sell, and FMC and/or its "designee Purchaser Trusts" were obligated to purchase, the loans just after they were originated by FMC and disbursed to the borrowers; that FMC and/or its designee Trusts are the parties that had the predominant economic interest in the loans when they were originated and disbursed, and that since the loans were disbursed, FMC and/or its designee Trusts have been the parties that have retained the predominant economic interest in the loans; that since the loans were disbursed, FMC and/or its trusts have maintained the predominant economic interest in the revenues (principal and interest) generated by the loans; that FMC and/or its trusts bore (and bear) the risk of default by the borrowers of the loans; and that FMC and/or its Trusts bore (and bear) all regulatory risks associated with the loans that PNC purportedly originated. (Complaint, ¶¶ 65-69).[7] In fact, as alleged, contrary to Defendants' arguments, PNC also disclaimed any legal responsibility for violating underwriting criteria because FMC, and not the National Banks, was responsible for evaluating, approving and disbursing the loans. (Complaint, ¶ 70).[8]

---

[7] In addition, PNC never had any real economic risk because the loans were guaranteed against default by The Education Resources Institute. (Complaint, ¶¶ 34-35).

[8] The foregoing allegations describe the generalities of the concerted scheme between PNC, FMC, and the Trusts. The Complaint alleges the same specifics as to Plaintiffs' loan: after the loan was disbursed, it was immediately transferred to the NCT 2006-2 Trust; PNC had and has no economic interest in the loan; the loan was originated by FMC, FMC supplied all the forms needed for Plaintiffs to apply for the credit, reviewed and screened their application for credit, processed the application for credit, performed the credit underwriting and credit checks, and was the entity that decided whether to approve the credit; further, FMC supplied all the forms for the loan, delivered the Credit Agreement, and disbursed the loan proceeds. (Complaint, ¶¶ 97-107). The Complaint also alleges PNC's lack of financial interest in the loan: the NCT 2006-2 Trust has owned the loan since it was transferred to that trust immediately after it was originated and funded; after the loan was transferred to the NCT 2006-2 Trust, PNC retained no monetary interest in the Loan, and retained no other cognizable, substantive, or beneficial interest in the Loan; PNC never had the predominant economic interest in the loan, but rather the Trust does; and, after the loan was transferred to the Trust, PNC was entirely uninvolved with the loan, and had no role servicing or collecting it. (Complaint, ¶¶ 117-122). Finally, the Complaint dispels any agency relationship between PNC and the Trusts: After the loan was transferred, the NCT 2006-2 Trust acted solely on its own behalf, and did not act on behalf of PNC; and the Trust is not an agent or subsidiary, nor an affiliated entity, of any national bank, and is not an agent, affiliate, or subsidiary of PNC. (Complaint, ¶¶ 125-126).

15

**B.      Plaintiffs' Claims Are Not Preempted In These Circumstances.**

*Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), involved a credit card customer of a national bank (Bank of America, N.A.) that brought usury claims against Midland Funding, which had purchased the plaintiffs' "bad debt" from Bank of America. The Second Circuit held the NBA did not preempt the claims, because neither defendant was a national bank nor a subsidiary or agent of a national bank, or was otherwise acting on behalf of a national bank, and because application of the state law on which the plaintiffs' claims relied would not significantly interfere with any national bank's ability to exercise its powers under the NBA. *Id.* at 249. The court focused on the fact that operating subsidiaries or agents of national banks can benefit from preemption, but that was not the case there (and it is not the case here):

> In most cases in which NBA preemption has been applied to a non-national bank entity, the entity has exercised the powers of a national bank—i.e., has acted on behalf of a national bank in carrying out the national bank's business. This is not the case here. The defendants did not act on behalf of BoA or FIA in attempting to collect on Madden's debt. The defendants acted solely on their own behalves, as the owners of the debt.

*Id.* at 251. It also rejected the notion that applying New York's usury laws would interfere with national banking, noting the end-run around usury laws created when nonbank entities buy debt:

> Furthermore, extension of NBA preemption to third-party debt collectors such as the defendants would be an overly broad application of the NBA. Although national banks' agents and subsidiaries exercise national banks' powers and receive protection under the NBA when doing so, extending those protections to third parties would create an end-run around usury laws for non-national bank entities that are not acting on behalf of a national bank.

Here, the allegations state that PNC completely divorced itself of the loans, and that the Trusts never acted on its behalf, the precise facts leading to the Second Circuit's conclusion that preemption did not apply.

———————————

Several recent decisions deny motions to dismiss on the basis of preemption in "true lender" cases.[9] In *Commonwealth v. Think Finance, Inc.*, 2016 WL 183289 (E.D. Pa. 1/14/2016), the Court denied the defendants' motion to dismiss and found usury claims were not preempted. It was the same "rent-a-bank" scheme alleged here, and the court denied the motion because the facts alleged the defendants (not the national bank) to be the de facto lenders, as is the case here.[10] In *West Virginia v. Cashcall, Inc.*, 605 F. Supp. 2d 781 (S.D. W. Va. 2009), the court denied a Rule 12(b)(6) motion based on preemption, noting that the national banks had not been sued, that the defendants were completely separate entities from the national banks, and that the "*[c]omplaint is strictly about a non-bank's violation of state law.*" *Id.* at 788 (emphasis added). Those circumstances are present here. In *CFPB v. Cashcall, Inc.*, 2016 WL 4820635 (C.D. Calif. 8/31/2016), the court found that that the state chartered banks were not the true lender, because they had not placed their money at risk: "The key and most determinative factor is whether Western Sky placed its own money at risk at any time during the transaction, or whether the entire monetary burden and risk of the loan program was borne by Cashcall." *Id.*, at *6. The facts alleged here are that the Trusts—at all times—had the entire monetary risk and burden for these loans, and PNC never had any monetary risk (particularly because the loans were guaranteed against default by The Education Resources Institute). And finally, *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190 (N.D. Cal. 2/13/2012) involved a "forward purchase" agreement of student loans, and the court denied a

---

[9] Judge Young recently addressed the "true lender" doctrine in *Kaur v. World Business Lenders, LLC*, 2020 WL 888015 (D. Mass. 2/24/2020). His decision has a helpful analysis of the case law, but ultimately he did not rule on the issue because the defendant had a complete defense under Massachusetts law to the usury claims.

[10] "It strikes us that we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that 'form follows function.' Thus, an examination of the totality of the circumstances surrounding this type of business association must be used to determine who is the 'true lender,' with the key factor being 'who had the predominant economic interest' in the transactions." *People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del.*, 846 N.Y.S.2d 436, 438–39 (2007).

preemption motion to dismiss, noting: "At this early pleading stage, where Plaintiff contends that the national bank may have retained no significant interest in her student loan, presenting a factual dispute over the identity of the actual lender, the Court will permit Plaintiff to conduct discovery on this limited issue to determine whether her de facto lender theory has factual support." *Id.* at 203.[11] *See, also, Meade v. Marlette Funding, LLC*, 2018 WL 1417706 (D. Colo. 3/21/2018) (remanding case to state court because the plaintiff had alleged that the defendant nonbank entity was the true lender due to the fact that it provided the website through which people applied for the loans, developed the criteria for making the loans, decided which applicants would receive the loans, and then purchased the loans with days after they were made, all the same circumstances present here.).

C.   **Allowing Plaintiffs' Claims To Proceed Will Not Impair PNC's Ability To Charge Lawful Interest.**

The Trust Defendants are not national banks, and the "parade of horribles" that Defendants project (Defendants' Memorandum, p. 19) is unfounded.  Indeed, it is noteworthy that Defendants couch their argument almost entirely in terms of the rights of a third-party national bank, which has not intervened to assert its own rights here.  Allowing Plaintiffs' claims to proceed will not interfere with or impede PNC Banks' ability to exercise its powers under the NBA.[12]

---

[11] The cases cited by Defendants are distinguishable. For example, in *Krispin v. May Dep't Stores, Co.*, 218 F.3d 919, 924 (8th Cir. 2000), the national bank retained ownership of the accounts, leading the court to conclude that the "real party in interest is the bank." That is a hugely different fact than here. *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005) involved a claim against a company that specialized in collecting bad credit card debts, which is a far cry from the scheme here where the assignor of the loans never intended to keep the loans, and was in fact contractually obligated to sell those loans to the Trusts. And, although Defendants do not cite to *Petersen v. Chase Card Funding, LLC*, 2020 WL 613531 (W.D.N.Y. 1/22/2020), it is also inapposite. There, the court found that claims under New York's usury laws were preempted, because the national bank retained ownership of the credit card accounts and therefore retained the credit risk; the defendants had acted on behalf of the national bank; and there was not a complete sale of the loans to the defendants because the bank retained the receivables. Here, there was a complete sale of the loans and PNC retained no interest at all in the loans after the loans were securitized.

[12] In their brief, Defendants cite several times to a Notice of Proposed Rulemaking from the Office of the Comptroller of Currency.  But the proposed rule has nothing to do with the "true lender" issues here, and in fact the notice specifically disclaims that the proposed rule applies to situations such as this.  It states: "**This rule would not**

In defining the preemptive scope of statutes and regulations granting a power to national banks, the cases take the view that normally Congress would not want states to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 33 (1996). The NBA implicitly preempts a state law only if it prevents or significantly interferes with the national bank's exercise of its powers. *See, e.g., Hymes v. Bank of America, N.A.*, 408 F. Supp. 3d 171, 183 (S.D.N.Y. 9/30/2019). No prevention or interference is present here. As noted in *Madden*, "[n]o other mechanism appears on these facts by which applying state usury laws to the third-party debt buyers would significantly interfere with either national bank's ability to exercise its powers under the NBA." *Madden*, 786 F.3d at 251. Rather, such application would limit only activities of the third party that are otherwise subject to state control. *Id.* Here, the Trust Defendants are not national banks and are not protected by the NBA, and are therefore subject to the control of the states. *See SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 191 (2nd Cir. 2007) (finding that the Attorney General's claims were not preempted because enforcement of the state's law did not interfere with the national bank's ability to exercise its powers under the NBA: "Rather, it affects only the conduct of SPGGC, which is neither protected under federal law nor subject to the OCC's exclusive oversight."). The concept is simple: because the Trust Defendants are not national banks, and are not governed by the NBA, allowing these claims to proceed will not interfere with PNC's ability to act as lending national bank under the NBA. The Trust Defendants are third-party debt buyers, and enforcing Pennsylvania's usury laws will not interfere with PNC:

> Here, however, state usury laws would not prevent consumer debt sales by national
> banks to third parties. ***Although it is possible that usury laws might decrease the***

address which entity is the true lender when a bank makes as loan and assigns it to a third party. **The true lender issue, which has been considered by courts recently, is outside the scope of this rulemaking.**" OCC, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 84 Fed. Reg. 64,229 (Nov. 21, 2019), at page 64,232 (emphasis added). The proposed OCC rules can be disregarded.

> *amount a national bank could charge for its consumer debt in certain states (i.e., those with firm usury limits, like New York), such an effect would not "significantly interfere" with the exercise of a national bank power.*
>
> Furthermore, extension of NBA preemption to third-party debt collectors such as the defendants would be an overly broad application of the NBA. Although national banks' agents and subsidiaries exercise national banks' powers and receive protection under the NBA when doing so, extending those protections to third parties would create an end-run around usury laws for non-national bank entities that are not acting on behalf of a national bank.

*Madden*, 786 F.3d at 251-252 (emphasis added). And, as noted in *West Virginia v. Cashcall, Inc.*,

> The claims in this case are limited to CashCall's conduct and do not implicate the Bank's rights under the FDIA. The State does not dispute that the Bank, as a South Dakota-chartered bank, may make loans in West Virginia and charge interest rates permitted in South Dakota. Further, the Complaint does not target such loans and charges by the Bank. The Complaint does target, however, loans and interest charges allegedly made by CashCall. If CashCall is found to be a de facto lender, then CashCall may be liable under West Virginia usury laws. A contrary determination that CashCall is not a real lender will not result in the Bank's liability or regulation under state laws, but will merely relieve CashCall of liability under those laws. Thus, an adjudication of the usury claim in this matter will not affect the Bank's rights to make loans and charge FDIA-permitted interest rates in West Virginia.

605 F.Supp.2d at 787 (citations omitted). The same applies here.

Defendants' concerns about interference center around their supposition that applying state usury laws would interfere with the securitization process and harm the secondary market for the asset-backed securities that are mostly sold to institutional investors. They write, "[i]f usury caps operate to misalign the risk of return, investors will not purchase securities backed by such loans, and the market for such loans could tighten significantly." (Defendants' Memorandum, p. 19). Their concern, bluntly stated, is for the health of the institutional investors who are purchasing the asset-backed securities, and for the secondary market for securitized loans, but that is not a concern of the NBA. Indeed, one main thrust of Plaintiffs' allegations is that PNC was completely uninvolved with the loan origination process and never assumed any economic risk on the loans; as a matter of policy, if a national bank assumes more substantive duties in connection with the

lending process and retains some measure of risk, the NBA and its accompanying regulations would have more meaningful application. But, significant interference is not a matter of cost:

> [A]s the Supreme Court's precedents illustrate, "significant interference" is not a question of cost—it is not this Court's role to determine the bottom-line impact of escrow interest laws on the business operations of national banks, or to allocate the benefits of mortgage lending between borrower and lender. Such policy judgments are the domain of legislatures. The "significant interference" test is a question of law. It asks the Court, simply, to determine whether the power specifically authorized by Congress may be exercised relatively unimpaired and unhampered by the state law.

*Hymes*, 408 F. Supp. 3d at 195-196 (citing *Barnett Bank*, 517 U.S. at 33-34). The "cost" to the secondary securitization market and impact on institutional investors from enforcing Pennsylvania's usury laws should not be a concern to the Court.

To that point, the entire concerted scheme was that PNC would never hold the loans: they were sold to the Trusts days after funding. Enforcing the usury statutes will not interfere with PNC's other loan programs in which it originates or retains loans, will not interfere with the exportation doctrine for those owned loans, and will not interfere with its ability to validly assign loans. The entire thrust of this action is that these were not and are not PNC's loans, and this action does not impair PNC from acting in its own name and for its own loans in a manner consistent with the NBA. It does not bar PNC from originating loans that it owns and for which it can export Pennsylvania's interest rate to other states.

### III.    Plaintiffs Validly State A Breach Of Contract Claim.[13]

---

[13] Plaintiffs have also stated a claim for breach of the implied duty of good faith and fair dealing. An independent cause of action for breach of a duty of good faith and fair dealing is available in very limited circumstances. *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). There are sufficient facts alleged to show breach of the implied duty inherent in contract. But in any event, courts have utilized the good faith duty as an interpretive tool to determine the parties' expectations, *id.*, and violating state interest rate laws is certainly violative of parties' good faith expectations.

This claim—on the Complaint's allegations taken as true and with all reasonable inferences drawn in favor of maintaining the action, *Lee*, 958 F.3d at 74—is based largely on the statement contained in Plaintiffs' promissory note with the NCT 2006-2 Trust that: "*In no event* will the Variable Rate exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania." (emphasis added). The breach is very simple: The contract between Plaintiffs and the Trust Defendants unequivocally states ("in no event") that interest will not exceed 6%, but Defendants have collected excess interest anyway. Defendants move to dismiss based on the notion that the TILA disclosure says something different, and at the very least that is an issue for summary judgment after discovery. It is impossible to reconcile Defendants' argument that the TILA disclosure "reveals that the parties certainly did not intend for the contract to include a 6% interest cap" (Defendants' Memorandum, p. 23) with the plain wording of the contract specifically prohibiting interest over 6%.

There is direct contradiction between the terms of the contract and the TILA disclosure, not just "the specific over the general" argument that Defendants make (and they make no other arguments why there is no breach of contract claim). The Court would be required to determine that the TILA disclosure trumps the specific language of the promissory note in order to grant Defendants' Motion, thereby resolving the conflicting contractual terms, which is not the proper use of Rule 12(b)(6). Moreover, inconsistent contractual provisions may create ambiguity in a contract. A contract is ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. *Bontempo v. Wolpoff & Abramson, L.L.P.*, 2006 WL 3040905, *5 (W.D. Pa. 10/24/2006). A contract is ambiguous where there is contradictory or necessarily inconsistent language in different portions of the instrument. *Natt v. White Sands Condo.*, 943 N.Y.S.2d 231 (2012). Under Pennsylvania law,

22

any ambiguity will be construed against the drafter (Defendants here). *Clairton Slag, Inc. v. Dep't of General Servs.*, 2 A.3d 765, 773 (Pa. Cmwlth. 2010); *Belleville v. David Cutler Grp.*, 118 A.3d 1184, 1196 (Pa. Cmwlth. 2015). Resolving ambiguities and inconsistencies in contracts is not the Court's function on a motion to dismiss for failure to state a cause of action. *See, e.g., MassMutual Asset Fin. LLC v. ACBL River Operations, LLC*, 220 F. Supp. 3d 450, 454 (S.D.N.Y. 2016) ("Where a contract is ambiguous, however, a fact issue exists precluding dismissal under Fed. R. Civ. P. 12(b)(6)"); *Bank of N.Y., N.A. v. Franklin Advisors, Inc.*, 522 F. Supp. 2d 632, 637 (S.D.N.Y. 2007) ("The Court's role on a 12(b)(6) motion to dismiss is not to resolve contract ambiguities.").

## IV.   The Complaint States A Cause of Action For Defendants' Violation Of The Unfair Trade Practices And Consumer Protection Law.

Pennsylvania's Unfair Trade Practice and Consumer Protection Law, 73 Pa. Stat. §§ 201-1 to 201-9.2 (the "UTPCPL"), declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" as defined in the statute. 73 Pa. Stat. § 201-3. The statute defines 21 separate situations that comprise unfair methods of competition and unfair or deceptive acts or practices, including "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation or connection that he does not have," and "engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Stat. § 201-2(4)(v) and (xxi). While Defendants argue that a violation of Pennsylvania's usury statute does not constitute a per se violation of the UTPCPL, the case law is clear that a violation of a state statute can constitute a violation of the UTPCPL.

Defendants cite to *Pennsylvania Department of Banking v. NCAS of Delaware, LLC*, 995 A.2d 422 (2010), where the court did hold that a violation of Pennsylvania's usury statute did not amount to a per se violation of the UTPCPL. But Defendants ignore the very next section of the court's decision, in which it held that the Attorney General had adequately pled a violation of the UTPCPL based upon a violation of Pennsylvania's usury statute. The Attorney General alleged that the defendants' offering of a line of credit product to the consumer/borrowers at an excessive rate of interest was unfair and deceptive conduct in violation of the UTPCPL, and the court concluded:

> A fair reading of the Amended Complaint states that Advance America injured the economic health and well-being of the Pennsylvania consumer/borrower by illegally charging sham interest. The Attorney General's allegations strike at the core of Advance America's credit loan, i.e. that the monthly participation fee, as a matter of law, was tantamount to sham interest in excess of six percent. Therefore, this Court must overrule Defendants' preliminary objections to Count 3 of the Amended Complaint. This Court concludes that the Attorney General adequately pled a violation of the UTPCPL.

*NCAS*, 995 A.2d at 443. Other courts agree. *See, e.g., Gabriel v. O'Hara*, 368 Pa. Super. 383, n.20 (1987) ("Violations of several other state statutes constitute violations of the UTPCPL." (noting the decision in *NCAS* and the state's usury statute)); *Safeguard Investment Corp. v Commonwealth*, 44 Pa. Cmwlth. 417 (1979) (holding that the fact that the defendants had engaged in activities violating the usury statute did not render the UTPCPL inapplicable to such activities, noting that the current usury statute states that "[t]he remedies and penalties provided in this act shall be supplementary to and shall not repeal or otherwise effect the remedies and penalties provided in any other act;" (41 Pa. Stat. §507)); and *Pena v. Gonzalez*, 397 B.R. 566 (1st Cir. B.A.P. 2008) (a violation of Massachusetts' usury law is a per se violation of Massachusetts' unfair trade practices statute).

"We recognize, as we previously have, the wide range of conduct the [UTPCPL] was designed to address, including equalizing the bargaining power of the seller and consumer, ensuring the fairness of market transactions, and preventing deception and exploitation, all of which harmonize with the statute's broad underlying foundation of fraud prevention." *Danganan v. Guardian Prot. Servs.*, 179 A.3d 9, 16 (Pa. 2018). The purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices, and the statute is the principal means for doing so in the Commonwealth. *Feeney v. Disston Manor Pers. Care Home, Inc.*, 849 A.2d 590, 597 (2004). Given that a violation of Pennsylvania's usury statute can serve as the basis for a claim under the UTPCPL, and that the usury statute specifically states that its "remedies and penalties … shall be supplementary to and shall not … otherwise affect the remedies and penalties provided in any other act," there is ample reason not to dismiss the UTPCPL claim.

Defendants also posit that Plaintiffs' Complaint does not contain allegations supporting the UTPCPL claims, and that the allegations are directed to non-parties. The first is easily dismissed: The count containing the UTPCPL claims specifically incorporates all of Plaintiffs' 175 preceding allegations that Defendants collected interest in excess of that allowed by Pennsylvania law, in violation of the usury statute, and that is sufficient basis for allowing the UTPCPL claim to proceed. Second, the allegations are against Defendants themselves. There are allegations concerning FMC and other parties, which are designed to show that those other parties are not the true lenders, but the allegations are clear that Defendants themselves collected usurious interest, not those other parties mentioned in the Complaint.

## V.     Plaintiffs Are Entitled To Claim For Declaratory Judgment And Injunctive Relief.

There are three separate statutory bases for the Court to award injunctive relief prohibiting Defendants from collecting usurious interest.

First, the Pennsylvania usury statute specifically states that "[a]ny person affected by a violation of the act shall have the substantive right to bring an action on behalf of himself individually for damages by reason of such conduct or violation, together with costs including reasonable attorney's fees *and such other relief to which such person may be entitled under law.*" 41 Pa. Stat. § 504 (emphasis added). "Where the Department of Banking seeks to enforce our statutory maximum interest rate for unlicensed lenders, the consequence is a criminal one. *See* 7 P.S. § 6218. *Where, however, a civil litigant seeks to enforce our maximum interest rate, her remedy is equitable.*" *Snyder v. Bong Thi Ngo*, 2013 WL 11282816, *4 (Pa. Super. Ct. 3/20/2013) (emphasis added). Defendants cite to no statute or case that restricts the power of injunction to the Commonwealth of Pennsylvania, and as *Snyder* says, enforcing the maximum rate of interest is an equitable remedy available to private parties. Furthermore, a case under the Pennsylvania usury statutes can be brought as a class action, *Roethlein v. Portnoff Law Assocs., Ltd.*, 24 A.3d 1274 (2011), and the relief sought to stop the illegal collection of interest will apply to many, many student borrowers. Plaintiffs have the equitable remedy of injunction under the usury statute, on their own behalf and on behalf of others.

Second, the UTPCPL allows a private person to bring "a private action" to recover damages, and specifically states that the court may award damages "*and may provide such additional relief as it deems necessary or proper*." (emphasis added). Whether Plaintiffs are entitled to an injunction after trial will depend on the "irreparable harm" analysis the Court conducts, but a private party is allowed to pursue injunctive relief under the UTPCPL. *See, e.g., Grimes v. Enterprise Leasing Co. of Philadelphia*, 66 A.3d 330 (2013).

Third, the Court can enter a permanent injunction pursuant to Fed. R. Civ. P. 65. The perfect example is *Fogle v. THORN Americas, Inc.*, 95 F.3d 645 (8th Cir. 1996). The plaintiffs

brought a class action against a chain of "Rent-A-Centers" because their rental agreements amounted to usurious interest under Minnesota law. The Eighth Circuit affirmed summary judgment in favor of the class, and also affirmed the district court permanently enjoining the defendant from entering into usurious "rent-to-own" consumer contracts, stating:

> As demonstrated in this opinion, the plaintiff class has shown actual success on the merits. In addition, public interest overwhelmingly favors enjoining these contracts. The public policy of Minnesota is revealed in its consumer protection statutory scheme including the usury statute, the CCSA and the RPAA. The actions enjoined here violate the letter and spirit of this statutory scheme and are clearly against the public interest. To balance against this, the only harm to RAC is the loss of the usurious portion of its income.

> RAC contends that the plaintiff class has failed to show irreparable injury because the district court has established a formula for calculating money damages. However, this formula only compensates for past damages and only reaches class members who have been identified. Estimating future losses of similarly situated individuals if RAC continues its practices is virtually impossible, as is identifying those potential victims of their practices. Giving due weight to each of the four factors, we are satisfied that there has been no abuse of discretion by the district court [granting a permanent injunction].

*Fogie*, 95 F.3d at 654.

In addition to injunctive relief, Plaintiffs can pursue declaratory judgment. They seek declaratory judgment that the maximum allowable interest rate for the class members' loans is 6%, which is a form of relief akin to their request for injunctive relief. Fed. R. Civ. P 57, which in part "govern[s] the procedure for obtaining a declaratory judgment under § 28 U.S.C. 2201," states that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." A declaratory judgment "provides a remedy for disputes that have federal jurisdiction." *Lieberman v. MacMaster*, 2013 WL 4500573, *3 (D. Me. 8/21/2013). Indeed, many of Plaintiffs' causes of action are dependent on a declaration by the Court that the loan interest rates are usurious, making Declaratory Judgment particularly appropriate in this case.

Injunction and declaratory judgment are forms of equitable relief. Because Plaintiffs' substantive claims are sufficiently pled, the equitable remedies available to the Court include the power to declare that the maximum interest rate is 6%, and to stop Defendants' unlawful practice of charging interest in excess of that amount.

## VI.     Defendants' Statute Of Limitations Arguments Should Be Denied.

Defendants pay scant attention to their arguments on various statutes of limitations, and do not come close to meeting their burden for dismissal on timeliness grounds at the 12(b)(6) stage. "The statute of limitations is an affirmative defense upon which the defendant bears the burden of proof." *Roberts v. Islam*, 2015 WL 13286824, *2 (D. Mass. 5/20/2015). The "statute of limitations defense can be considered on a Rule 12(b)(6) motion" only "[t]o a limited extent." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004). "The key is whether the complaint and any documents that properly may be read in conjunction with it show ***beyond doubt*** that the claim asserted is out of time." *Id.* (emphasis added); *see also Kyle v. Linden Care, LLC*, 2020 WL 1853508, *5 (D.N.H. 4/13/2020) ("[A]s First Circuit law clearly recognizes, the only time when it is appropriate to enforce a statute of limitations defense when ruling on a Rule 12(b)(6) motion is when it is 'beyond doubt' that the claim is time-barred.").

When the Complaint alleges conduct that has occurred within the limitations period, the court "will not attempt to parse plaintiff's specific allegations, but will allow discovery to proceed on these claims." *Egan v. Wachovia Bank, N.A.*, 2006 WL 8459849, *1 n.5 (E.D. Pa. 6/28/2006). Here, the Complaint specifically alleges that the charging and incurring of interest in excess of 6% continued into 2019, conduct occurring within the various limitations periods. Complaint, ¶ 113.

Specifically as to the application of Pennsylvania's four-year limitations period for usury claims, "[t]here is little authority describing the operation of 41 P.S. § 502." *In re Kenderdine*, 118

28

B.R. 258, 265 (E.D. Pa. 1990). However, the *Kenderdine* court did note that in one Pennsylvania decision, the court applied the usury statute to excess interest "chargeable over the entire period of the loan." *Id.* (citing *Trent Fin. Corp. v. Church*, 1978 WL 299, *2 (Pa. Cmwlth. Ct. 6/21/1978)). And in the one case cited by defendants, the operative fact was that the debtor-plaintiff had "made *no* interest payment on the [loan] within four years of the commencement of th[e] action." *Christopher v. First Mut. Corp.*, 2007 WL 2972561, *4 (E.D. Pa. 10/10/2007) (emphasis added). Here, Plaintiffs clearly alleged usurious payments within four years of the commencement of the action. Complaint, ¶ 113.

Regarding the breach of contract claim, again, on the face of the Complaint Plaintiffs pleaded payments of interest in excess of 6% within four years of the commencement of the action. In addition, facts remain to be resolved regarding whether the breach of contract claim implicates the continuing contract doctrine under Pennsylvania law. *See Jodek Cheritable Trust, R.A. v. Vertical Net, Inc.*, 412 F. Supp. 2d 469, 475 (E.D. Pa. 2006); *Crispo v. Crispo*, 909 A.2d 308, 313 (Pa. Super. 2006). "The question of whether the continuing contract doctrine applies … is a factual question that cannot properly be decided from the face of the complaint." *Jodek*, 412 F. Supp. 2d at 475.

And as to Plaintiffs' UTPCPL claim, Pennsylvania courts have held that the UTPCPL's six-year limitations period begins when the cause of action accrues, which occurs "when the injury was inflicted." *Drelles v. Mfrs. Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. 2005). Here, again, the Complaint alleges that injury was inflicted through the incurring of interest beyond that represented in the contract and allowed under Pennsylvania law into 2019, well within six years of the commencement of the action.

Defendants have failed to show "beyond doubt" that Plaintiffs' claims are time-barred under applicable Pennsylvania law, and 12(b)(6) dismissal on these grounds should be denied.

## VII.    Plaintiffs Can Recover Treble Damages.

41 Pa. Stat § 502 does not vest a court with discretion to determine whether a party may recover treble damages for usurious interest, but instead provides for the mandatory recovery of damages under its provisions if the borrower's payments meet the definition of "excess interest." *In re Grigsby*, 127 B.R. 759, 763 (E.D. Pa. 1991). Defendants argue that § 502's limitation of treble damages "to a four-year period of the contract" limits treble damages to the first four years of the contract. They cite no case law supporting the argument, and there is nothing in the statute's text to suggest that it is the first four years of contract that controls. In *In re Dukes*, 1998 WL 124220 (Bankr. E.D. Pa. 1998), the court rejected the debtor's usury claims because it found that no violation of the Pennsylvania usury laws occurred, but it did note the meaning of the "four-year period of the contract" language:

> This sentence states: "Recovery of triple the amount of such excess interest or charges, but not the actual amount of such excess interest or charges, shall be limited to a four-year period *of the contract*." It is significant that the legislature did not simply limit the recovery of treble damages to a "four-year period." Instead, it limited such damages to a "four-year period of the contract." While I have not located any cases applying or discussing this limitation, it is logical that unless the excess interest or charges referred to in § 502 were paid during the tenure of the contract, which in this case is the mortgage, the words "of the contract" would be rendered superfluous. Accordingly, it would appear that § 502 was intended to apply to excess interest and charges **paid during the period of a contract.**

*Id.* at *7 n.10 (emphasis added). As such, it is the fact that excess interest is paid during the period of a contract that controls, and nothing in the statute limits that to the first four years of a contract.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion.

Dated: June 15, 2020

Respectfully submitted,

By: *Peter N. Freiberg*
Peter N. Freiberg (admitted *pro hac vice*)
Lynn E. Swanson (admitted *pro hac vice*)
Jones, Swanson, Huddell & Garrison, LLC
601 Poydras Street
Suite 601
New Orleans, Louisiana 70130
Telephone: 504-523-2500

Austin C. Smith (admitted *pro hac vice*)
Smith Law Group
3 Mitchell Place, Suite 5
New York, New York 10017
Telephone: 917-992-2121

Jason W. Burge (admitted *pro hac vice*)
Fishman Haygood L.L.P.
201 St Charles Avenue
46th Floor
New Orleans, Louisiana 70170
Telephone: 504-586-5252

Richard D. Gaudreau (Bar Number 187070)
395 Main Street
Salem, New Hampshire 03079
Telephone:  (603) 893-4300

**ATTORNEYS FOR PLAINTIFFS**
**TROY O. ROBINSON AND**
**ANTHONY W. SPEARS**

31

**<u>CERTIFICATE OF SERVICE</u>**

I, Peter N. Freiberg, hereby certify that a true copy of the foregoing Memorandum in

Opposition to Defendants' Motion to Dismiss was served upon the registered parties as identified

on the Notice of Electronic Filing on June 15, 2020.


*<u>Peter N. Freiberg</u>*