**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| TROY O. ROBINSON and ANTHONY W. SPEARS, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:20-cv-10203-ADB |
| v. | ) ) ) | (Motion for Enlargement of Page Limit granted April 10, 2020, ECF No. 30) |
| NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**REPLY IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ..............................................................................................................1

ARGUMENT .....................................................................................................................1

I.     PLAINTIFFS LACK STANDING TO SUE ALL BUT ONE
TRUST DEFENDANT.............................................................................................1

II.    FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS...................................................5

    A.    The Valid-When-Made Doctrine Applies And Plaintiffs' New
Argument That Their Loan Was Not Valid When Made Has No Merit ...............6

    B.    The True Lender Theory Cannot Apply In These Circumstances, Even
Under *Madden* ...........................................................................................9

    C.    The Contracts Establish that PNC's Funds Were At Risk ...................................11

III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT ..............12

IV.    PLAINTIFFS HAVE WAIVED THEIR CLAIM FOR BREACH OF AN IMPLIED
DUTY OF GOOD FAITH AND FAIR DEALING .........................................................14

V.    PLAINTIFFS FAIL TO STATE A UTPCPL CLAIM ....................................................14

VI.    PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE
RELIEF MUST BE DISMISSED ........................................................................16

VII.    TIME-BARRED CLAIMS MUST BE DISMISSED........................................................17

VIII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR TREBLE DAMAGES ........................19

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

CASE                                                                    Page(s)

*Abraham v. Ocwen Loan Servicing, LLC*,
    321 F.R.D. 125 (E.D. Pa. 2017) ...........................................................16, 17

*Akins v. Penobscot Nation*,
    130 F.3d 482 (1st Cir. 1997) .......................................................................16

*Aldahonda-Rivera v. Parke Davis & Co.*,
    882 F.2d 590 (1st Cir. 1989) .......................................................................17

*Allen v. Wright*,
    468 U.S. 737 (1984) .......................................................................................1

*Blyden v. Navient Corp.*,
    2015 WL 4508069 (C.D. Cal. July 23, 2015) ...............................................5

*Bontempo v. Wolpoff & Abramson, L.L.P.*,
    2006 WL 3040905 (W.D. Pa. Oct. 24, 2006) ..............................................13

*Christopher v. First Mut. Corp.*,
    2007 WL 2972561 (E.D. Pa. Oct. 9, 2007) ..................................................18

*Cooper v. Sirota*,
    37 F. App'x 46 (3d Cir. 2002) ...............................................................15, 18

*Crispo v. Crispo*,
    909 A.2d 308 (Pa. Super. Ct. 2006) ............................................................19

*Drelles v. Manufacturers Life Ins. Co.*,
    881 A.2d 822 (Pa. Super. Ct. 2005) ............................................................19

*Easter v. Am. W. Fin.*,
    381 F.3d 948 (9th Cir. 2004) .........................................................................5

*Fawcett v. Citizens Bank, N.A.*,
    919 F.3d 133 (1st Cir. 2019) .........................................................................6

*Forsythe v. Sun Life Fin., Inc.*,
    417 F. Supp. 2d 100 (D. Mass. 2006) ...........................................................2

*Frank v. PNC Bank, N.A.*
　2020 WL 1041187 (S.D. Ohio Mar. 4, 2020)......................................................7, 8

*Grimes v. Enterprise Leasing Co. of Phil.*,
　66 A.3d 330 (Pa. Super. Ct. 2013)..............................................................16

*Hudson v. Ace Cash Express, Inc.*,
　2002 WL 1205060 (S.D. Ind. May 30, 2002)......................................................11

*In re Dukes*,
　1998 WL 124220 (Bankr. E.D. Pa. Feb. 19, 1998).................................................20

*In re Eaton Vance Corp. Sec. Litig.*,
　220 F.R.D. 162 (D. Mass. 2004)..................................................................2

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
　2004 WL 532193 (D.N.H. Mar. 16, 2004) ........................................................7

*Jodek Charitable Tr., R.A. v. Vertical Net Inc.*,
　412 F. Supp. 2d 469 (E.D. Pa. 2006) ..........................................................19

*Johns v. Rozet*,
　141 F.R.D. 211 (D.D.C. 1992)..................................................................17

*Kaneff v. Del. Title Loans, Inc.*,
　587 F.3d 616 (3d Cir. 2009)....................................................................8

*Kowalski v. TOA PA V, L.P.*,
　206 A.3d 1148 (Pa. Super. Ct. 2019)..........................................................18

*La Mar v. H&B Novelty & Loan Co.*,
　489 F.2d 461 (9th Cir. 1973) ................................................................2, 4

*Lewis v. Casey*,
　518 U.S. 343 (1996)............................................................................3

*Madden v. Midland Funding, LLC*,
　786 F.3d 246 (2d Cir. 2015)......................................................6, 9, 10, 11

*Mahon v. Ticor Title Ins. Co.*,
　683 F.3d 59 (2d Cir. 2012)...............................................................2, 3, 5

*Mahoney v. Found. Med., Inc.*,
　342 F. Supp. 3d 206 (D. Mass. 2018) .......................................................14, 19

*Marquette National Bank of Minneapolis v. First of Omaha Service Corp.,*
  439 U.S. 299 (1978)................................................................................................7

*Natt v. White Sands Condo.,*
  95 A.D.3d 848 (2d Dep't 2012) ..........................................................................13

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
  693 F.3d 145 (2d Cir. 2012)..................................................................................4

*Nicola v. Nicola,*
  673 A.2d 950 (Pa. Super. Ct. 1996) ...................................................................20

*Pa. Dep't of Banking v. NCAS of Del., LLC,*
  995 A.2d 422 (Pa. Commw. Ct. 2010) ...............................................................15

*Payton v. Cty. of Kane,*
  308 F.3d 673 (7th Cir. 2002) ................................................................................4

*Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,*
  632 F.3d 762 (1st Cir. 2011)..............................................................................3, 4

*PNC Bank, N.A. v. Welsh Realty, LLC,*
  2013 WL 5494003 (E.D.N.C. Oct. 2, 2013) ........................................................8

*Raines v. Byrd,*
  521 U.S. 811 (1997)...............................................................................................3

*Rutherfoord v. Presbyterian-University Hosp.,*
  612 A.2d 500 (Pa. Super. Ct. 1992).....................................................................5

*Shea v. Millett,*
  2019 WL 184074 (D. Mass. Jan. 14, 2019) .........................................................7

*Smiley v. Citibank (South Dakota), N.A.,*
  517 U.S. 735 (1996)...............................................................................................6

*Snyder v. Bong Thi Ngo,*
  2013 WL 11282816 (Pa. Super. Ct. Mar. 20, 2013)...........................................17

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998).................................................................................................2

*Trent Fin. Corp. v. Church,*
  12 Pa. D. & C.3d 451 (Pa. Com. Pl. 1978) ........................................................18

*Trizechahn Gateway LLC v. Titus*,
  976 A.2d 474 (Pa. 2009) ....................................................................................................13

*Tuohig v. Principal Ins. Group*,
  134 F. Supp. 2d 148 (D. Mass. 2001) ...............................................................................16

*United States v. Williams*,
  630 F.3d 44 (1st Cir. 2010) ...............................................................................................14

*Wachovia Bank v. Schmidt*,
  546 U.S. 303 (2006) .............................................................................................................7

*Warth v. Seldin*,
  422 U.S. 490 (1975) .............................................................................................................1

*West Virginia v. Cashcall, Inc.*
  605 F. Supp. 2d 781 (S.D. W. Va. 2009) ..........................................................................10

*Winne v. Nat'l Collegiate Student Loan Tr.*
  *2005-1*, 2017 WL 3573813 (D. Me. Aug. 17, 2017) ......................................................4, 5

*Wong v. Wells Fargo Bank N.A.*,
  789 F.3d 889 (8th Cir. 2015) ..............................................................................................5

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
  854 A.2d 425 (Pa. 2004) ....................................................................................................15

*Young v. Reconstructive Orthopaedic Assocs., II, P.C.*,
  2005 WL 627796 (E.D. Pa. Mar. 16, 2005) ......................................................................17

## STATUTES

12 U.S.C. § 85 .......................................................................................................... *passim*

28 U.S.C. § 2201 .................................................................................................................16

Del. Code. Ann. Tit. 5 § 943 ................................................................................................8

Del. Code. Ann. Tit. 5 § 944 ................................................................................................8

Del. Code. Ann. Tit. 5 § 963 ................................................................................................8

Del. Code. Ann. Tit. 5 § 964 ................................................................................................8

7 Pa. Stat. Ann § 101 *et seq.* ..........................................................................................8

7 Pa. Stat. Ann. § 102 ......................................................................................................8

7 Pa. Stat. Ann. § 303 ......................................................................................................9

41 Pa. Stat. Ann. § 502 .............................................................................................18, 20

41 Pa. Stat. Ann. § 504 ..................................................................................................17

41 Pa. Stat. Ann. § 506 ..................................................................................................17

41 Pa. Stat. Ann. § 604 ..........................................................................................8, 9, 13

73 Pa. Stat. Ann. § 201-2(4) ..........................................................................................15

**OTHER AUTHORITIES**

12 C.F.R. § 7.4001 ........................................................................................................6, 9

85 Fed. Reg. 33530 (June 2, 2020) ..................................................................................6

## INTRODUCTION

Plaintiffs' claims in this case boil down to the contention that thirteen National Collegiate Student Loan Trusts (the "Trusts") violated state law by charging interest on student loans at a rate above 6%, even though Plaintiffs explicitly agreed to pay a higher initial interest rate—and acknowledged that the rate "may increase"—on the loan they took out more than fourteen years ago.  The Trusts already explained in their moving brief why Plaintiffs' claims fail:  among other problems, Plaintiffs lack standing to sue the Trusts that never injured them, their claims are preempted by federal law, they have failed to state the necessary elements of their causes of action, and many of their claims are time-barred.   Plaintiffs' opposition fails to address these problems— they instead try to improperly amend their theories of liability, attack arguments the Trusts never made, and ignore some of the Trusts' arguments altogether.  Their opposition therefore cannot avoid dismissal.

## ARGUMENT

### I.   PLAINTIFFS LACK STANDING TO SUE ALL BUT ONE TRUST DEFENDANT.

Plaintiffs admit they only ever paid interest to *one* of the thirteen Trust defendants.  ECF No. 1 ¶¶ 86–127 ("Compl.").  Indeed, they concede that they never were injured by, or had any type of relationship with, those additional twelve defendants ("Non-Holding Trusts").   As explained in the Trusts' motion, that means Plaintiffs lack constitutional standing to sue the Non-Holding Trusts.  ECF No. 35 at 5–10 ("Mot."); *see Allen v. Wright*, 468 U.S. 737, 751 (1984) (to demonstrate Article III standing, a plaintiff "must allege personal injury fairly traceable to *the defendant*'s allegedly unlawful conduct" (emphasis added)); *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (even in a class action, the named plaintiffs "must allege and show that they personally have been injured" by each named defendant, "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent").

1

Plaintiffs respond by relying entirely on the "juridical links" doctrine, but that doctrine has no application to Article III standing requirements, as the Trusts already explained. Mot. at 7–10. The juridical links doctrine stems from *La Mar v. H&B Novelty & Loan Co.*, where the Ninth Circuit, in dicta, mentioned a potential exception to Rule 23's adequacy requirement where "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." 489 F.2d 461, 466 (9th Cir. 1973); *see also* Mot. at 8 n.2.

Few courts have applied this doctrine outside the confines of Rule 23 and, in fact, several courts from within this circuit have explicitly rejected it as an exception to Article III's fairly-traceable-injury requirement. *See In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 170–71 (D. Mass. 2004) (holding that "the juridical link doctrine should be confined to an analysis of Rule 23(a)" because while the doctrine's "emphasis on expediency made sense in light of the fact that … Rule 23 is given liberal rather than restrictive construction," the "requirements of Article III … tend to be 'inflexible and without exception.'" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998))); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 119 n.19 (D. Mass. 2006) (juridical links doctrine inapplicable to Article III standing inquiry); *see also Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012) (same).

These cases are grounded in the fact that "standing is an inherent prerequisite to the class certification inquiry," and courts "cannot put aside the requirements of Article III simply because a plaintiff decides to file a motion seeking to represent a class." *Eaton Vance*, 220 F.R.D. at 165, 169; *see also Forsythe*, 417 F. Supp. 2d at 119 & n.18 (explaining that, absent "rare exceptions," courts "resolve[] questions of standing before reaching issues of class certification"). Indeed, "whether or not Rule 23 would permit a plaintiff to represent a class against non-injurious defendants cannot affect the plaintiff's Article III standing to sue the non-injurious defendants"

because "[a] federal rule cannot alter a constitutional requirement."  *Mahon*, 683 F.3d at 64; *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action adds nothing to the question of standing." (internal ellipses omitted)).  And "[d]emonstrating that the defendant's allegedly unlawful conduct caused injury to the plaintiff herself" constitutes "an essential component of Article III standing."  *Mahon*, 683 F.3d at 62.

Remarkably, Plaintiffs' opposition fails to address these principles and the Supreme Court precedent in which they are grounded.  *See* Mot. 5–10.  In fact, Plaintiffs make no argument as to *why* the juridical links doctrine *should* apply in the Article III context, instead simply *assuming* the doctrine applies.  Their opposition actually reads more like a motion for class certification— they recite a slew of factual allegations purporting to show that "[t]he purposes of the class action vehicle and judicial economy are best served by resolving all claims as to all related trusts in a single case" and that this case "will be resolved more expeditiously by way of a single proceeding." ECF No. 41 at 6–8 ("Opp'n").  But as explained above and in the Trusts' motion, Plaintiffs' arguments about expediency and judicial economy have no bearing on whether they have standing to bring claims against defendants that never injured them.  Mot. at 6–9; *see also Raines v. Byrd*, 521 U.S. 811, 819–20 (1997) (courts should not abandon the need for "strict compliance with this jurisdictional standing requirement" for "the sake of convenience and efficiency").

Plaintiffs also spend pages discussing the facts of *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768, 771 (1st Cir. 2011), but the Trusts already showed why that case, if anything, *supports* the Trusts' motion.  Mot. at 7–8.  The court there held that the plaintiffs lacked Article III standing under the rule that "named plaintiffs must themselves possess claims against each defendant."  *Plumbers' Union*, 632 F.3d at 770.  And though the court discussed the juridical links doctrine, it expressly "reserve[d] judgment" on

whether the doctrine applies in the context of Article III standing requirements. *Id.* Thus, *Plumbers' Union* does not support application of the juridical-links doctrine to evade established Article III standing requirements.

And Plaintiffs' citation to *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, is equally unpersuasive. 693 F.3d 145 (2d Cir. 2012). Unlike Plaintiffs, the named plaintiff there *had* Article III standing because it "personally suffered injury as a result of defendants'" conduct. *Id.* at 162. Thus, the case involved a "different" analysis of whether the named plaintiff had "class standing"—that is, "standing to assert claims on behalf of" other class members. *Id*. That inquiry, the Court explained, turned on whether the named plaintiff was injured by conduct that "implicate[d] the same set of concerns as the conduct alleged to have caused injury to other members of the putative class *by the same defendants*." *Id.* at 162 (emphasis added). Here, Plaintiffs lack Article III standing because they are attempting to sue defendants that did not injure them, and so *NECA*'s class-standing analysis provides them no help.

In short, then, Plaintiffs' failure to contest that twelve of the thirteen Trusts caused them no injury ends the inquiry as to those defendants.

In any event, even if the juridical links doctrine applied in the Article III context (it does not), it would not save Plaintiffs' claims. As already explained, this is not a situation where Plaintiffs are suing state actors for enforcing a single unconstitutional state statute. *See* Mot. at 9 (discussing *Payton v. Cty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002)). Indeed, the Trusts are in no sense "juridically linked"—they are "distinct entities made up of different assets." *Winne v. Nat'l Collegiate Student Loan Tr. 2005-1*, 2017 WL 3573813, at *6 (D. Me. Aug. 17, 2017). Nor have Plaintiffs plausibly alleged some type of "conspiracy or concerted scheme[]" between the Trusts. *La Mar*, 489 F.2d at 466. The complaint instead focuses on the actions of non-parties

PNC and/or FMC—the Trusts, by contrast, are alleged to simply have purchased student loans. *See Rutherford v. Presbyterian-University Hosp.*, 612 A.2d 500, 508 (Pa. Super. Ct. 1992) (conspiracy requires allegations that the defendants "combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means," had "an intent to injure" the plaintiff, and committed "some overt act . . . in pursuance of the common purpose or design"); *see also generally* Compl. (no allegations of a conspiracy between the Trusts to injure Plaintiffs).

Plaintiffs recite the facts of several cases cited in the Trusts' motion in an attempt to distinguish them. Opp'n at 8–9. In three of those cases, however, the courts held that the juridical links doctrine *did not even apply* to the Article III inquiry (an issue, again, Plaintiffs ignore). *Wong v. Wells Fargo Bank N.A.*, 789 F.3d 889, 896 (8th Cir. 2015); *Mahon*, 683 F.3d at 64–66; *Blyden v. Navient Corp.*, 2015 WL 4508069, at *9–12 (C.D. Cal. July 23, 2015). In the other two cases, the courts did not directly address that question because the doctrine did not apply on the facts— Plaintiffs had not shown that "their alleged injuries were the result of a conspiracy or concerted scheme between the Trust Defendants" or that "the Trust Defendants [were] related governmental entities." *Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004); *see also Winne*, 2017 WL 3573813, at *5 (dismissal where "Complaint's factual averments refer generally and collectively to all 17 Trusts" without providing "specific allegations" regarding the non-injurious Trusts). The same is true here. Accordingly, claims against the Non-Holding Trusts must be dismissed.

## II.    FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIMS.

Plaintiffs' claims are preempted and their arguments fail to demonstrate otherwise for three reasons. *First,* Plaintiffs' effort to avoid the valid-when-made doctrine by arguing that PNC was not authorized to charge above 6% interest constitutes an improper attempt to amend their pleading through their opposition and, in any event, is wrong on the law and facts. *Second*, application of the true-lender theory would impermissibly interfere with the exercise of PNC's powers under the

National Bank Act ("NBA").  *Third*, Plaintiffs fail to respond to the Trusts' arguments that PNC did, in fact, bear meaningful economic risk with respect to Plaintiffs' loan.

### A.   The Valid-When-Made Doctrine Applies and Plaintiffs' New Argument That Their Loan Was Not Valid When Made Has No Merit.

Longstanding federal law provides that a loan, valid-when-made, cannot become usurious by virtue of some subsequent assignment.  *See* Mot. at 11–12.  The OCC recently finalized a rule "clarifying and reaffirming" this "longstanding" doctrine following the erroneous result in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  *See* 12 C.F.R. § 7.4001 ("Interest on a loan that is permissible under 12 U.S.C. 85 shall not be affected by the sale, assignment, or other transfer of the loan."); Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred ("Permissible Interest"), 85 Fed. Reg. 33530 (June 2, 2020) (noting that the rule's purpose is to "clarify[] and reaffirm[] the longstanding understanding that a bank may transfer a loan without affecting the permissible interest term").  The OCC's interpretation of the NBA is entitled to deference.  *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 739 (1996); *Fawcett v. Citizens Bank, N.A.,* 919 F.3d 133, 134 (1st Cir. 2019).  Thus, under the plain language of the regulation and as the Trusts argued in the moving brief, the *only* requirement for assessing whether a loan is "valid-when-made" is whether it is permitted by Section 85.  In their Complaint, Plaintiffs conceded that PNC was authorized under Section 85 to charge interest in excess of 6%.  *See e.g.*, Compl. at 1–2, ¶ 28, ¶ 38.  Therefore, the loan cannot be usurious as to any subsequent assignee. Plaintiffs' usury claim and all other claims relying on this same set of facts are thus preempted.

Plaintiffs' *only* response to the valid-when-made doctrine is to argue—for the first time— that the loan was *not* valid when made because PNC was "located" in Pennsylvania and subject to its 6% interest cap.  Opp'n at 11–12.  Plaintiffs' assertion fails for at least two reasons, and Plaintiffs' loan was valid-when-made whether PNC is "located" in Delaware or Pennsylvania:

**_First,_** the Complaint is devoid of a single allegation that PNC's "main office" was "located" in Pennsylvania for Section 85 purposes or that Pennsylvania's usury cap applied to PNC.  Plaintiffs, of course, cannot change their pleading through arguments raised for the first time in their opposition.  *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 2004 WL 532193, at *1 (D.N.H. Mar. 16, 2004); *Shea v. Millett*, 2019 WL 184074, at *3 (D. Mass. Jan. 14, 2019).

In any event, their new argument does not help them.  To support this assertion, Plaintiffs claim that the Supreme Court in *Wachovia Bank v. Schmidt*, 546 U.S. 303, 313 (2006) "recognized the interest-exportation provision of § 85" as a provision in which the term "located" "unquestionably refers to a single place" which is the bank's "main office." Opp'n at 12 (emphasis omitted).  In fact, the Supreme Court unequivocally reached the *opposite* conclusion:

> **_In some provisions_**, ["located"] unquestionably refers to a single place: the site of the banking association's **_designated main office_**…. In **_other provisions_**, "located" apparently refers to or includes branch offices. *See, e.g.,* …*§ 85* (limiting interest rate charge by national bank to "rate allowed by the laws of the State, Territory, or District where the bank is located.")

*Schmidt*, 546 U.S. at 313 (emphasis added) (other citations omitted).  *Schmidt* involved the use of the term "located" in § 1348 of the NBA for purposes of diversity jurisdiction, and thus has no application here.  If anything, *Schmidt* recognized that "located" as used in Section 85 may encompass more than one location, not solely a national bank's "main office."  *Id.*  And the Court in *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, held that, for purposes of Section 85, a bank is "located" in the state named in the bank's organization certificate. 439 U.S. 299, 309 (1978).  As described in the brief, based on publicly-available information, that location currently appears to be Delaware.  Mot. at 12 n.3.  In any event, courts have concluded that PNC's "main office" is in Delaware for purposes of diversity jurisdiction.  *See Frank v. PNC*

*Bank, N.A.* 2020 WL 1041187 at *2 (S.D. Ohio Mar. 4, 2020); *PNC Bank, N.A. v. Welsh Realty, LLC*, 2013 WL 5494003, at *1 (E.D.N.C. Oct. 2, 2013).

Thus, even if one applied the *Schmidt* test to determine where a bank is "located" for purposes of Section 85, PNC appears to be located in Delaware and, therefore, can charge above 6% interest.  *See* Del. Code. Ann. Tit. 5 §§ 943, 963 (permitting a bank to charge interest "as the agreement governing … the loan provides"); *id.* §§ 944, 964 (permitting a bank to charge variable interest rates); *see also Kaneff v. Del. Title Loans, Inc.*, 587 F.3d 616, 622 (3d Cir. 2009) ("Delaware has no usury law."); *see also* ECF No. 36-3 at "Note Disclosure Statement" (Plaintiffs' credit agreement setting an initial rate of 9.368%).

**<u>Second</u>**, even accepting Plaintiffs' new argument that PNC is "located" in Pennsylvania, Section 85 still preempts Pennsylvania's 6% usury limitation.  When a state sets a different rate applicable to "banks organized under State laws," Section 85 permits national banks "organized or existing in any such State" to charge the same rate.  12 U.S.C. § 85.   In Pennsylvania, an "institution" subject to the Banking Code may "lend money [and] extend credit … at any interest, finance charge, rate or terms permitted *for any other financial institution or any other lender regulated by any Federal or State supervisory authority on the specified class of loan*."  7 Pa. Stat. Ann. § 303(b)(i); *see also* 7 Pa. Stat. Ann. § 102(f), (g), (q), (r) (an "institution" includes a bank that "exists under the laws of the Commonwealth" of Pennsylvania); 41 Pa. Stat. Ann. § 604 ("Banks . . ., subject to [7 Pa. Stat. Ann § 101 et seq.], may charge a maximum rate of interest as authorized by that act or other applicable Federal or State law.").  These types of provisions are intended to put Federal and State banks on equal footing.  Thus, because a Federally-supervised national bank located in a state with a higher usury limit than Pennsylvania—such as Delaware— can charge in Pennsylvania "any interest rate set forth in a contract" as permitted in Delaware, any

Pennsylvania state bank can also.  12 U.S.C. § 85.  And, because a Pennsylvania state bank can charge such a rate, so too can a national bank "located or existing" in Pennsylvania.  *Id.*; 7 Pa. Stat. Ann. § 303; *see also* 41 Pa. Stat. Ann. § 604 ("[i]f any maximum lawful rate of interest provided for in this act is inconsistent with the provision of any other act establishing, permitting or removing a maximum interest rate, or prohibiting the use of usury as a defense, *then the provision of such other act shall prevail*." (emphasis added)).  Thus, even accepting Plaintiffs' new argument that PNC is a national bank "organized or existing" in Pennsylvania, PNC is entitled under Section 85 to charge the same interest rates as Pennsylvania state banks, which are not subject to the 6% interest cap.  7 Pa. Stat. Ann. § 303(b)(i); 41 Pa. Stat. Ann. § 604.  Accordingly, the loan was valid when made.  And Plaintiffs' failure to offer any other argument against the valid-when-made doctrine ends the inquiry.

> **B.    The True Lender Theory Cannot Apply In These Circumstances, Even Under *Madden*.**

Plaintiffs continue to rely on a true-lender theory, but that theory does not save their claims, as explained in the Trusts' motion.  Mot. at 14–20.  Plaintiffs reference a statement in the OCC's proposed rulemaking that the "true lender issue, which has been considered by courts recently, is outside the scope of this rulemaking" and by arguing that its application would not impair PNC's ability to charge "permissible interest."  These arguments miss the mark.

Plaintiffs confuse the OCC's statement that it is not espousing a rule regarding the "true lender" doctrine with the OCC's endorsement of the same.  However, the OCC did not promulgate a regulation regarding the identity of the true lender, though it could, subject to the requirements of the Administrative Procedure Act.  Instead, for the specific purpose of countering *Madden*, the OCC provided that an interest rate valid under Section 85 is not affected by a subsequent transfer.  *See* 12 C.F.R. § 7.4001(e).  This only underscores the Trusts' arguments in the moving brief: no

federal rule or law conditions the terms on which a bank may exercise its powers under Section 24, including the sale of loans, or Section 85, regarding the interest rate a national bank may charge, on the national bank retaining an economic stake in the loan or it being the "true lender." *See* Mot. at 11–13.   The court should not read such limitations into the text of the NBA.  *See id*.

Moreover, Plaintiffs fail to rebut the Trusts' arguments that application of the *Madden* rule or the true-lender doctrine would significantly interfere with a national bank's ability to exercise its statutorily specified powers under Sections 24 and 85 of the NBA.  Mot. at 17–20.  Instead of addressing the Trusts' arguments regarding the importance of originating and transferring loans as part of the securitization process, or the necessity of protecting a national bank's ability to engage with non-bank third-party vendors, Plaintiffs argue that increased costs of lending and precluding non-bank assignees from enforcing the original terms of a loan do not constitute significant interference.  *See* Opp'n at 19–20 (citing *Madden*, 786 F.3d at 251–52; *West Virginia v. Cashcall, Inc.* 605 F. Supp. 2d 781, 787 (S.D. W. Va. 2009)).

Plaintiffs are wrong.  Plaintiffs' cases do not involve securitizations.  *See id.*  The OCC specifically recognized securitization as crucial tool for banks to "access alternative funding sources, manage concentrations, improve financial performance ratios and more efficiently meet consumer needs."  *See* Mot. at 18-19.  Further, the OCC noted that securitization would be "significantly weakened if the permissible interest on assigned loans were uncertain or if assignment of the permissible interest were limited only to third parties that would be subject to the same or higher usury caps."  *Id.*  Critically, the OCC made these statements in support of its rule that *Madden* was wrong.  *See id.*; *see also* ECF No. 36-4, Solicitor General's Brief at 12–13 (arguing that *Madden's* application of preemption was "unduly narrow" because "the federal power conferred by Section 85 (reinforced by Section 24(Seventh)) includes the power to convey

to an assignee the right to charge the maximum interest allowed by the national bank's home State."); Mot. at 14–17 (cases applying true lender doctrine or *Madden* do not address, and cannot be reconciled with, binding federal precedent).

Plaintiffs also fail to respond to the Trusts' arguments that application of the true-lender theory would significantly interfere with a national bank's statutory powers by limiting (i) the manner in which a national bank may engage third parties and (ii) the terms on which it can extend credit. *See* Mot. at 17–20. Plaintiffs' theory would require the Court to draw "uncertain and unpredictable" boundaries regarding the "precise extent of financial risk accepted by the national bank." *Hudson v. Ace Cash Express, Inc.*, 2002 WL 1205060, at *4–6 (S.D. Ind. May 30, 2002); Mot. at 15–16. Moreover, Plaintiffs gloss over the study cited in the moving brief, which, contrary to Plaintiffs' argument, does not simply address the negative impact of the *Madden* rule on investors, but also found "clear evidence" that *Madden* "reduced the flow of credit" to *consumers*. *See* Mot. at 19.

In sum, Plaintiffs' claims depend on rejection of the longstanding, now formally codified, valid-when-made doctrine and application of case law that does not implicate the securitization process or apply the proper legal framework for a Section 85 analysis. The court should reject Plaintiffs' true-lender theory.

## C.     The Contracts Establish That PNC's Funds Were At Risk.

Even if the true-lender framework applied, Plaintiffs fail to establish plausibly that PNC is not the true lender. In support of their argument, Plaintiffs refer generally to provisions of the contract showing that PNC contracted to sell the loans, as characterized in their own Complaint. Opp'n at 12–15. However, Plaintiffs also refer to the limited "liquidated damages" that FMC was required to pay if it "or its designee *does not complete the purchase of the loans*." Opp'n at 13–14. This demonstrates, as argued in the moving brief, that the contract contemplates that PNC

could keep loans originated through its engagement with FMC.  Mot. at 15–17, 20–22.  Plaintiffs also fail to acknowledge the myriad other provisions from the Note Purchase Agreement, cited by Trusts, showing that PNC did in fact bear economic risk in entering the transaction.  *Id.*  Plaintiffs gloss over the fact that the period for loans to become seasoned could be in excess of two hundred forty days, if extended by FMC, during which time PNC owned the loans outright.  *Id.*  Plaintiffs also fail to address provisions raised by the Trusts noting that PNC assumed contractual responsibility for approving credit criteria and making loans in accordance with the agreed-upon underwriting guidelines, and further made representations and warranties regarding the origination of the loans and the satisfaction of underwriting criteria.  Mot. at 20–22.

In their opposition, Plaintiffs assert that *the Trusts* are the true lenders, rather than PNC or FMC.  Opp'n at 12.  But the Trust Agreement[1] applicable to NCSLT 2006-2—the only Trust that holds Plaintiffs' loan—is dated June 8, 2006, and references an Interim Trust Agreement, dated May 23, 2006, pursuant to which the Trust was created.  Plaintiffs' credit agreement is dated March 22, 2006.  ECF No. 36-3.  Thus, Plaintiffs' loan predates the existence of the applicable Trust by at least two months, making it impossible for the Trust to have been Plaintiffs' "true lender."

In the end, all of Plaintiffs' claims are preempted and must therefore be dismissed.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.

Plaintiffs allege the Trusts breached the credit agreement by charging above 6% interest.  As explained, however, the credit agreement *expressly permits* the Trusts to charge an interest rate of 9.368% or higher.  Mot. at 22.  Plaintiffs' breach-of-contract claim therefore fails.

Plaintiffs' only response is to mischaracterize the agreement.  They say "[t]he contract between Plaintiffs and the Trust Defendants unequivocally states ('in no event') that interest will

---

[1] https://www.sec.gov/Archives/edgar/data/1223029/000089968106000402/national-ex9915_061206.htm

not exceed 6%." Opp'n at 22. But that is not what the contract says. Instead, it states that the interest rate will not "exceed the maximum interest rate allowed by the laws of the Commonwealth of Pennsylvania" and, additionally, that the agreement is governed by "Federal Law and the Laws of the Commonwealth of Pennsylvania." Mot. at 22. It also specifically provides for an interest rate of 9.368% or higher, *id.*, something Plaintiffs appear to admit, Opp'n at 22.

Grasping at straws, Plaintiffs argue that the 9.368% provision is in "direct contradiction" to the "laws of the Commonwealth of Pennsylvania" provision and thus the contract is ambiguous. *Id.* That is not so. For a contract to be ambiguous, it must be "subject to more than one reasonable interpretation when applied to a particular set of facts." *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009).[2] "The 'reasonabl[e]' qualifier is important: there is no ambiguity if one of the two proffered meanings is unreasonable." *Id.* Indeed, courts will not "resort to a strained contrivance in order to find an ambiguity." *Id.* And determining whether a contract is ambiguous, and interpreting an unambiguous contract, are matters of law for the court to decide. *Id.*

Here, the contract is not contradictory and is not subject to more than one reasonable interpretation when it comes to the agreed-upon interest rate. The "laws of the Commonwealth of Pennsylvania" do—and, pursuant to the NBA, must—allow PNC (and thus the Trusts as assignees) to charge interest as permitted under the NBA. Mot. at 10–22; *supra* at § II. Pennsylvania's usury statute itself makes this explicit. *See* 41 Pa. Stat. Ann. § 604 (stating that "[i]f any maximum lawful rate of interest provided for in this act is inconsistent with the provision of any other act

---

[2] Plaintiffs' cited cases did not apply Pennsylvania contract law and, in any event, confirm this principle. *See Bontempo v. Wolpoff & Abramson, L.L.P.*, 2006 WL 3040905, at *5 (W.D. Pa. Oct. 24, 2006) (Delaware law) ("A contract is ambiguous 'when the provisions in controversy are *reasonably or fairly susceptible* of different interpretations or may have two or more different meanings.'" (emphasis added)); *Natt v. White Sands Condo.*, 95 A.D.3d 848, 849 (2d Dep't 2012) (New York law) ("Contract language is ambiguous when it is '*reasonably susceptible* of more than one interpretation'" (emphasis added)).

establishing, permitting or removing a maximum interest rate, or prohibiting the use of usury as a defense, *then the provision of such other act shall prevail*" (emphasis added)).  And, as described above, a 6% usury limit would be inconsistent with the NBA.  *Supra* at § II.  Thus, nothing in the contract contradicts the clear and specific provision permitting the Trusts to charge 9.368% or more in interest.  Indeed, if the parties intended to include a 6% interest cap, they would have so stated—they instead agreed upon an interest rate above 6%.  Accordingly, Plaintiffs' interpretation of the contract is not "reasonable," there is no ambiguity, and the contract claim must be dismissed.

## IV.   PLAINTIFFS HAVE WAIVED THEIR CLAIM FOR BREACH OF AN IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING.

The Trusts' motion described the multiple reasons why Plaintiffs' claim for breach of the implied good-faith duty fails.  Mot. at 23–24.  Plaintiffs' opposition addresses the implied-duty claim in only a single footnote, simply arguing that "[t]here are sufficient facts alleged to show breach of the implied duty inherent in contract" without actually addressing any of the Trusts' arguments.  Opp'n at 21.  Such cursory treatment of the claim waives it.  *See United States v. Williams*, 630 F.3d 44, 50 (1st Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Mahoney v. Found. Med., Inc.*, 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (because plaintiff "fail[ed] to respond to Defendants' arguments that [a] claim should be dismissed," plaintiff "waived" that claim).

## V.   PLAINTIFFS FAIL TO STATE A UTPCPL CLAIM.

The Trusts moved to dismiss the UTPCPL claim because Plaintiffs "do not clarify which of the 21 UTPCPL sections the Trusts allegedly violated" and do not "identify any deceptive, misleading, or fraudulent act committed by the Trusts, not to mention how Plaintiffs relied on and were damaged by such conduct."  Mot. at 24.  Plaintiffs' opposition does not even attempt to address these deficiencies.  Plaintiffs insist that the Trusts violated the UTPCPL merely by

"collect[ing] interest in excess of that allowed by Pennsylvania law." Opp'n at 25. Yet they again fail to explain how this in any way constitutes "fraudulent or deceptive conduct" or qualifies as a false "representation" about "goods or services." 73 Pa. Stat. Ann. §§ 201-2(4)(v) and (xxi); *see also Cooper v. Sirota*, 37 F. App'x 46, 48 (3d Cir. 2002) (affirming dismissal of UTPCPL claim where the plaintiff "failed to identify any misrepresentation" by the defendant). Nor do Plaintiffs say how they "justifiably relied" on any such deceptive or misleading conduct. *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 438 (Pa. 2004).

Plaintiffs instead devote most of their response to attacking an argument the Trusts never made—that conduct violating the usury statute cannot also separately violate the UTPCPL. The Trusts' point was that a violation of the usury statute does not, in and of itself, constitute a *per se* violation of the UTPCPL, Mot. at 26, a point Plaintiffs appear to concede, Opp'n at 24. Of course, if a plaintiff properly pleads the elements of a UTPCPL claim—including "fraudulent or deceptive conduct" and "reliance and causation," Mot. at 24—their claim may proceed regardless of whether the conduct also violates the usury statute. The *NCAS* case, cited by Plaintiffs, illustrates this point nicely. *See Pa. Dep't of Banking v. NCAS of Del., LLC*, 995 A.2d 422, 441 (Pa. Commw. Ct. 2010). There, the court held that a violation of the usury statute did not constitute a *per se* violation of the UTPCPL. *Id.* But the court nonetheless refused to dismiss the UTPCPL claim because the Attorney General had alleged that the defendant charged "sham" interest in the form of a "phony monthly participation fee," which constituted "deceptive" conduct. *Id.* at 444 & n.29.[3] As already explained, however, Plaintiffs here *have not* pleaded the fraud or deception necessary to state a UTPCPL claim, let alone the justifiable reliance and causation elements required for private

---

[3] Plaintiffs' contention that the Trusts' moving brief "ignore[d]" this section of the *NCAS* decision (Opp'n at 24) is disingenuous at best—the Trusts explicitly discussed, and distinguished, that aspect of the opinion. *See* Mot. at 26 n.7.

plaintiffs.  *See* Mot. at 26 n.7.  In fact, any allegations of fraud, deception, and/or justifiable reliance (even if included in the complaint) would be implausible—the contract explicitly and accurately states the applicable interest rate.  Thus, Plaintiffs have failed to plead a UTPCPL claim.

## VI.    PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF MUST BE DISMISSED.

Plaintiffs rely on several "statutory bases" for the Court to award declaratory and injunctive relief, but the Trusts' already explained why those bases are insufficient.  Mot. at 26–27.

Plaintiffs' citation to Federal Rule of Civil Procedure 65 and the Declaratory Judgment Act (28 U.S.C. § 2201) can be easily discarded.  Rule 65 merely "sets forth the procedure for obtaining a preliminary injunction."  *Tuohig v. Principal Ins. Group*, 134 F. Supp. 2d 148, 151 (D. Mass. 2001).  "The substantive basis and jurisdictional authority for resort to that procedure must be sought elsewhere."  *Id.*  And where the substantive cause of action fails, so too does the request for an injunction.  *Id.* at 151–52.  The same is true for the Declaratory Judgment Act.  *See Akins v. Penobscot Nation*, 130 F.3d 482, 490 n.9 (1st Cir. 1997) (Declaratory Judgment Act does not "create[] a substantive cause of action").

Plaintiffs' reliance on the UTPCPL is equally meritless.  Injunctive and declaratory relief are not "available to private litigants under the UTPCPL" because "[t]he plain statutory language authorizes only the Pennsylvania Attorney General or a district attorney to seek [such] relief."  *Abraham v. Ocwen Loan Servicing, LLC*, 321 F.R.D. 125, 169 (E.D. Pa. 2017).  Completely ignoring the above authority, Plaintiffs cite *Grimes v. Enterprise Leasing Co. of Phil.*, 66 A.3d 330 (Pa. Super. Ct. 2013) for the proposition that "a private party is allowed to pursue injunctive relief under the UTPCPL."  Opp'n at 26.  But *Grimes* said nothing of the sort.  In fact, the court there held that the plaintiff had "alleged a viable claim" under the UTPCPL but then affirmed *dismissal* of the plaintiff's request for injunctive relief with respect to that claim.  *Grimes*, 66 A.3d at 341.

And the outcome is the same for the usury statute.  *See* Mot. at 27.  Plaintiffs do not contest that, while the usury statute specifically permits the Attorney General to seek "injunctive relief," 41 Pa. Stat. Ann. § 506, no similar authorization is granted to private litigants, 41 Pa. Stat. Ann. § 504.  That the statute allows for "relief to which [a private litigant] may be entitled to *under law*" does not help Plaintiffs—an injunction is an equitable, not a legal, remedy.  *See* Mot. at 27; *cf. Young v. Reconstructive Orthopaedic Assocs., II, P.C.*, 2005 WL 627796, at *15 (E.D. Pa. Mar. 16, 2005) (damages "recoverable *under law*" referred to "legal damages, not equitable damages" (emphasis added)); *Johns v. Rozet*, 141 F.R.D. 211, 220 (D.D.C. 1992) ("equitable defenses have no application in this action brought *under law*" (emphasis added)).  Indeed, if the legislature intended to give private litigants the right to seek an injunction, it would have explicitly authorized such relief, as it did for the Attorney General.  *Cf. Abraham*, 321 F.R.D. at 169 (even where the UTPCPL permitted private litigants to obtain "such additional relief as it deems necessary or proper," that did not include injunctive or declaratory relief, which was expressly reserved only for the Attorney General).[4]  And, finally, Plaintiffs' assertion that "a case under the Pennsylvania usury statutes can be brought as a class action" (Opp'n at 26) is perplexing: they don't explain how that grants them a right to relief not authorized by the statute.

Thus, Plaintiffs' request for declaratory and injunctive relief must be dismissed.

## VII.    TIME-BARRED CLAIMS MUST BE DISMISSED.

Courts can and do dismiss claims as untimely where, as here, the defense appears "on the face of the pleadings."  *Aldahonda-Rivera v. Parke Davis & Co.*, 882 F.2d 590, 592 (1st Cir. 1989).

---

[4] Plaintiffs cite *Snyder v. Bong Thi Ngo*, 2013 WL 11282816, at *4 (Pa. Super. Ct. Mar. 20, 2013), but the court there never discussed whether injunctions were available to private litigants under the usury statute.

***Usury Claim***.  The usury statute states: "no action to recover such excess shall be sustained in any court of this Commonwealth unless the same shall have been commenced *within four years from and after the time of such payment*."  41 Pa. Stat. Ann. § 502 (emphasis added).  Thus, under the plain language of the statute, any claim for excess interest paid prior to February 3, 2016 must be dismissed.  *See* Mot. at 29; *see also Christopher v. First Mut. Corp.*, 2007 WL 2972561, at \*5 (E.D. Pa. Oct. 9, 2007) (dismissing claims for interest paid outside limitations period).[5]

Plaintiffs respond that they "clearly alleged usurious payments within four years of the commencement of the action."  Opp'n at 29.[6]  But that is entirely beside the point—the Trusts moved to dismiss claims based on payments made *outside* of the four-year period.  Plaintiffs make no attempt to salvage those claims.

***Contract Claim***.  Plaintiffs repeat the same argument with respect to their contract claim, but it does them no good.  "In a contract case, the cause of action accrues when there is an existing right to sue based on the breach of contract."  *Cooper*, 37 F. App'x at 48.  The fact that a defendant continues to suffer *damages* within the statute-of-limitations period does not render the claim timely.  *See Kowalski v. TOA PA V, L.P.*, 206 A.3d 1148, 1156–58 (Pa. Super. Ct. 2019) (rejecting the argument that because the plaintiff suffered "damages resulting from . . . the serial breach of contract occur over and over again" the plaintiff's claim was timely—"there [was] an existing right to sue forthwith on the breach of contract" at the time the defendant first breached the contract, which occurred outside the limitations period).  Here, Plaintiffs claim that the Trusts breached the

---

[5] Plaintiffs try to distinguish *Christopher* by suggesting that the plaintiff there had made no interest payment on the loan within the four years prior to the complaint.  Opp'n at 29.  That is simply not true.  For one of the at-issue loans, the plaintiff *did* make some payments after the four-year cut-off date, and so the court denied the motion only with respect to "interest paid on or after" that date.  *Christopher*, 2007 WL 2972561, at \*5.

[6] Plaintiffs' reliance on *Trent Fin. Corp. v. Church* fails to persuade.  That case had nothing to do with the usury statute's statute of limitations.  12 Pa. D. & C.3d 451, 453 (Pa. Com. Pl. 1978).

contract back in 2006 when they collected interest in excess of 6% from Plaintiffs.  Thus, fourteen years ago, Plaintiffs had all the facts they needed to assert their contract claim.  Plaintiffs' only retort is that "facts remain to be resolved" regarding whether the "continuing contract doctrine" applies to their claims.  Opp'n at 29.  As Plaintiffs' own cases demonstrate, however, that doctrine applies only where the contract "does not fix any certain time for payment," *Jodek Charitable Tr., R.A. v. Vertical Net Inc.*, 412 F. Supp. 2d 469, 475 (E.D. Pa. 2006); *see also Crispo v. Crispo*, 909 A.2d 308, 313–14 (Pa. Super. Ct. 2006) (contract "included no specific deadline by which those debts would be paid"), which is not the case here, *see* ECF No. 36-3 at 4 (payments made on the 20th day of each month for a total of 240 payments).

> ***UTPCPL Claim***.  For their UTPCPL claim, Plaintiffs again argue that they made some payments within the statute-of-limitations period.  As Plaintiffs' own case states, however, "the relevant statute of limitations begins to run *as soon as the right to institute and maintain a suit arises*, which generally is when the injury was inflicted."  *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822, 831 (Pa. Super. Ct. 2005) (emphasis added).  Plaintiffs' UTPCPL claim rests entirely on the fact that the Trusts collected interest above 6%, which (again) occurred back in 2006.  The "right to institute" the lawsuit (under Plaintiffs' own theory) thus arose at that time, making their UTPCPL claim untimely.

## VIII.   PLAINTIFFS FAIL TO STATE A CLAIM FOR TREBLE DAMAGES.

As an initial matter, Plaintiffs fail to defend their claim for treble damages under the UTPCPL, necessitating dismissal of that claim.  *Mahoney*, 342 F. Supp. 3d at 217.[7]  Plaintiffs thus seek treble damages only under the usury statute, but the Trusts previously showed why that claim fails.  Mot. at 30.  While the excess interest recoverable under the usury statute is limited to "four

---

[7] Plaintiffs also have abandoned their request for rescission of the debt.  *See* Opp'n at 1 n.1.

years from and after the time of such payment," a plaintiff can treble those excess interest payments only if made during the "four-year period of the contract."  41 Pa. Stat. Ann. § 502.  Plaintiff interprets this to mean that excess payments can be trebled if made within *any* time during the "period of the contract."  Opp'n at 30.  But that reading renders the "four-year" proviso meaningless.  *See Nicola v. Nicola*, 673 A.2d 950, 951 (Pa. Super. Ct. 1996) ("When construing a statute we are to give effect to every word and to presume that the legislature avoided a mere surplus of words.").[8]  Thus, the only reasonable interpretation is that trebled damages are only recoverable for excess payments made within the first *four years* of the contract.[9]  Accordingly, none of the excess payments for which Plaintiffs may be entitled to recover—payments made after February 3, 2016—qualify for treble damages.

## CONCLUSION

For these reasons, the Court should dismiss Plaintiffs' Complaint in its entirety.

---

[8] The case cited by Plaintiffs accords with the Trusts' interpretation.  There, the court held that because "the excess amount which Plaintiff paid to [defendant] was not paid during the period of the contract"—it was paid after the contract had already "ceased"—the plaintiff could not treble those amounts.  *In re Dukes*, 1998 WL 124220, at *3 n.10 (Bankr. E.D. Pa. Feb. 19, 1998).

[9] Though Plaintiffs do not so argue, the statute also cannot be interpreted to cover *any given* four-year period of the contract.  Excess interest payments are recoverable only for the four years prior to the complaint.  Thus, under the "any four-year period" reading, *all* recoverable excess interest payments made during the contract period could *always* be trebled.  In other words, there would have been no need for a separate treble damages period—the legislature would have simply said that all recoverable excess interest payments can be trebled if made during the contract period.  The Trusts' interpretation is therefore the only reasonable reading of the statute.

Dated: July 15, 2020                 Respectfully submitted,

                                      */s/ Anthony M. Masero*
                                      Anthony M. Masero (BBO #694276)
                                      JONES DAY
                                      100 High Street, 21st Floor
                                      Boston, MA 02110
                                      Telephone: (617) 960-3939
                                      Facsimile: (617) 449-6999
                                      amasero@jonesday.com

                                      Albert J. Rota (*pro hac vice*)
                                      JONES DAY
                                      2727 North Harwood Street
                                      Dallas, Texas 75201
                                      Telephone: (214) 220-3939
                                      Facsimile: (214) 969-5100
                                      ajrota@jonesday.com

                                      *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I, Anthony M. Masero, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing on July 15, 2020.


Dated: July 15, 2020                    */s/ Anthony M. Masero*                    
                                        Anthony M. Masero