UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TROY O. ROBINSON and ANTHONY W. SPEARS, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2, *et al.*,<br><br>Defendants. | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | Civil Action No. 20-cv-10203-ADB |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

BURROUGHS, D.J.

Plaintiffs Troy O. Robinson and Anthony W. Spears (collectively "Plaintiffs") bring this proposed class action against thirteen statutory trusts ("Defendants"), alleging violations of Pennsylvania state law in connection with the interest rates charged on student loans held by the trusts.  [ECF No. 1 ("Compl.")].  Currently before the Court is Defendants' motion to dismiss. [ECF No. 34].  For the reasons set forth below, Defendants' motion is <u>GRANTED</u>.

I.      **BACKGROUND**

        A.      **Factual Background**

The following facts are taken from the complaint, [Compl.], the factual allegations of which are assumed to be true when considering a motion to dismiss, <u>Ruivo v. Wells Fargo Bank, N.A.</u>, 766 F.3d 87, 90 (1st Cir. 2014).  In addition, "[w]hile 'a district court is generally limited to considering "facts and documents that are part of . . . the complaint,"' it may also consider 'documents incorporated by reference in [the complaint] . . . .'"  <u>Newton Covenant Church v.</u>

Great Am. Ins. Co., 956 F.3d 32, 35 (1st Cir. 2020) (citations omitted) (first quoting Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008); then quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)).

First Marblehead Corporation ("FMC") designs and markets student loan programs and facilitates those programs for banks.  [Compl. ¶¶ 24, 26].  In 2001, FMC acquired a loan processing facility run by The Education Resources Institute, Inc. ("TERI"), as well as 75% of the facility's employees.  [Id. ¶ 33].  FMC arranged and marketed student loans, and dealt directly with borrowers, [id. ¶¶ 58–60, 89–90], while TERI guaranteed those loans, [id. ¶¶ 36, 39].

PNC Bank, N.A. ("PNC") is one of FMC's clients and is a national bank regulated by the National Bank Act ("NBA"), 12 U.S.C. § 1, et seq.  [Compl. ¶¶ 28, 38].  PNC and FMC entered into an agreement (the "Note Purchase Agreement") whereby PNC would sell FMC, or FMC's "designee Purchaser Trust," certain loans.  [Id. ¶¶ 39, 41–42, 48; ECF No. 36-1 (copy of Note Purchase Agreement)].  Per the terms of the Note Purchase Agreement, PNC originated the loans described therein, [ECF No. 36-1 at 27], owned the loans "free and clear" and had the right to transfer them, [id. at 29], and warranted that the loans were "in compliance with any applicable usury laws at the time made and as of the time of its sale and assignment by [PNC] to FMC or a Purchaser Trust," [id. at 28].[1]  In connection with the Note Purchase Agreement, FMC created national collegiate student loan trusts to buy the loans from PNC.  [Compl. ¶ 45].  The trusts

---

[1] Plaintiffs allege that FMC actually originated the loans and that PNC had no economic interest in the loans, [Compl. ¶ 99], but this is inconsistent with the terms of the Note Purchase Agreement (indicating that PNC originated and owned the loans) and the credit agreement between Plaintiffs and PNC (indicating that PNC was the lender on Plaintiffs' loan), see [ECF Nos. 36-1, 36-3].  The terms of these agreements are discussed in more detail infra, Section III.B.2.

have no employees and no offices.  [Id. ¶ 85].  Once the trusts purchased the loans, they obtained

all right, title, and interest in the loans, [id. ¶ 52], though FMC retained a residual interest in the

trusts, [id. ¶ 63].  Defendants and FMC are not nationally chartered banks and are therefore not

subject to the NBA.  [Id. ¶ 23].

In 2006, Robinson took out a loan for $21,000, co-signed by Spears, to help cover his

tuition at the University of Phoenix.  [Compl. ¶¶ 87, 91, 92].  PNC made the loan, which was

disbursed on March 29, 2006 (the "Loan").  [Id. ¶ 87].  The credit agreement between Plaintiffs

and PNC (the "Credit Agreement") set out an annual interest rate of 9.368% and indicated that

the rate was variable and would be adjusted quarterly.  [ECF No. 36-3 at 4 (copy of the Credit

Agreement); Compl. ¶¶ 93, 94, 109 (referencing the Credit Agreement and its terms)].  Over

time, the interest rate on the Loan varied from a low of 6.580% to a high of over 9%.  [Compl.

¶ 113].  The Credit Agreement included the following provision: "I understand that [PNC] [is]

located in Pennsylvania and that this Credit Agreement will be entered into in the same state.

CONSEQUENTLY, THE PROVISIONS OF THIS CREDIT AGREEMENT WILL BE

GOVERNED BY FEDERAL LAW AND THE LAWS OF THE COMMONWEALTH OF

PENNSYLVANIA, WITHOUT REGARD TO CONFLICT OF LAW RULES."  [ECF No. 36-3

at 6 (emphasis in original); Compl. ¶ 94].  In addition, the Credit Agreement provides that PNC

"may assign this Credit Agreement at any time."  [ECF No. 36-3 at 6].

The Loan was later assigned to one of the thirteen trusts named as defendants in this

dispute, the National Collegiate Student Loan Trust 2006-2 (the "NCT 2006-2 Trust").  [Compl.

¶¶ 97, 115].  FMC created the NCT 2006-2 Trust, which is not affiliated in any way with PNC.

[Id. ¶¶ 125, 128].  After the Loan was sold to the NCT 2006-2 Trust, PNC no longer had any

involvement with the Loan.  [Id. ¶ 122].

**B.      Procedural Background**

Plaintiffs filed their complaint on February 3, 2020.  [Compl.].  On April 30, 2020, Defendants moved to dismiss the complaint, [ECF No. 34], which Plaintiffs opposed, [ECF No. 41].  Defendants then filed a reply brief.  [ECF No. 42].  On November 20, 2020, Defendants filed a notice of supplemental authority, [ECF No. 43], which led to additional briefing by both parties, [ECF Nos. 44, 45, 48].   In response to a request from the Court, [ECF No. 51], the parties submitted additional materials on April 1, 2021, [ECF No. 52, 53].

## II.      LEGAL STANDARD

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face."  Id. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability."  Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (1st Cir. 2012) (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard

invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013) (citing Grajales, 682 F.3d at 45). First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Morales-Cruz, 676 F.3d at 224).

In evaluating a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the Court must determine whether the facts as alleged in the complaint, "taken at face value," support subject matter jurisdiction. Gordo-González v. United States, 873 F.3d 32, 35 (1st Cir. 2017). The Court "appl[ies] a standard of review 'similar to that accorded to a dismissal for failure to state a claim' under subsection 12(b)(6)." Rodriguez v. Mass. Parole Bd., No. 16-cv-11113, 2017 U.S. Dist. LEXIS 24705, at *5–6 (D. Mass. Feb. 22, 2017) (quoting Menge v. N. Am. Specialty Ins. Co., 905 F. Supp. 2d 414, 416 (D.R.I. 2012)). The Court must "accept the factual averments of the complaint as true, and construe those facts in the light most congenial to [Plaintiffs'] cause." Royal v. Leading Edge Prods., 833 F.2d 1, 1 (1st Cir. 1987). "Dismissal can be justified only if it clearly appears that no colorable hook exists upon which subject matter jurisdiction can be hung." Id. Even so, "a plaintiff who seeks to bring her suit in a federal forum bears the burden of establishing that the federal court has subject-matter jurisdiction." Klimowicz v. Deutsche Bank Nat'l Tr. Co., 907 F.3d 61, 64 (1st Cir. 2018).

## III.    DISCUSSION

Plaintiffs bring the following claims against Defendants: unlawful interest in violation of Pennsylvania law, 41 Pa. Stat. Ann. § 201 (Count One); breach of contract (Count Two); breach

5

of the duty of good faith and fair dealing (Count Three); and violation of Pennsylvania's Unfair

Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq.* (Count Four).

[Compl. ¶¶ 164–77].  In addition, Plaintiffs seek injunctive and declaratory relief, as well as

restitution, treble damages under the relevant statutes, and attorneys' fees.  [Id. ¶¶ 178–81, 183].[2]

Plaintiffs' theory is that FMC structured loans through PNC, thereby taking advantage of PNC's

status as a nationally chartered bank to avoid interest rate caps imposed by state usury laws.

[Compl. at 2–3].  If PNC was not the true lender, under Plaintiffs' theory, then the interest rate

charged by the NCT 2006-2 Trust (which is not a national bank) violated Pennsylvania law,

which governs the Credit Agreement and sets a maximum interest rate of 6% on loans of under

$50,000.  [Id.].

### A.      Whether Plaintiffs Have Standing As to All Defendants

Defendants move to dismiss Plaintiffs' claims under Rule 12(b)(1) for lack of subject

matter jurisdiction, arguing that Plaintiffs lack standing as to all but the NCT 2006-2 Trust.

[ECF No. 35 at 15].  Plaintiffs maintain that, in the context of a class action, they may represent

other, unnamed plaintiffs who have been injured by those trusts.  [ECF No. 41 at 11, 17].

"Article III of the Constitution confines 'the judicial power' of federal courts to 'cases

and controversies of the sort traditionally amenable to, and resolved by, the judicial process,' that

is, 'concrete, living contest[s] between adversaries' . . . ."  Amrhein v. eClinicalWorks, LLC, 954

F.3d 328, 330 (1st Cir. 2020) (citations omitted) (first quoting Steel Co. v. Citizens for a Better

Env't, 523 U.S. 83, 102 (1998); then quoting FEC v. Akins, 524 U.S. 11, 20 (1998)).  "To show

their dispute qualifies, the named plaintiffs must establish standing, meaning they must plausibly

---

[2] In their opposition brief, Plaintiffs concede dismissal of their request for rescission of their
loans.  [ECF No. 41 at 8 n.1; Compl. ¶ 183].

allege '(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, and (3) likely to be redressed by a favorable judicial decision.'" Id. (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)).

"'That a suit may be a class action . . . adds nothing' to all this; 'even named plaintiffs who represent a class "must allege and show"' a past or threatened injury to them, and not just to 'other, unidentified members of the class to which they belong . . . .'" Amrhein, 954 F.3d at 331 (quoting Spokeo, 136 S. Ct. at 1547 n.6).

> The usual rule in class actions is that to establish subject matter jurisdiction one looks only to the named plaintiffs and their claims.  This, with occasional modest qualifications, is the rule in determining whether diversity of citizenship exists, whether amount in controversy is established, whether a plaintiff has standing and whether the controversy has become moot.

Pruell v. Caritas Christi, 645 F.3d 81, 83–84 (1st Cir. 2011).  As a result, "[w]hen a class action is filed, it 'includes only the claims of the named plaintiff or plaintiffs.  The claims of unnamed class members are added to the action later, when the action is certified as a class under [Federal Rule of Civil Procedure] 23.'"  Jalbert v. SEC, 945 F.3d 587, 594 (1st Cir. 2019) (quoting Pruell, 645 F.3d at 84).

Plaintiffs allege that after disbursement, the Loan was immediately transferred to the NCT 2006-2 Trust, which has owned the Loan since transfer.  [Compl. ¶¶ 97, 115–17].  As to the other trust defendants, Plaintiffs acknowledge that they did not harm Plaintiffs, but may have harmed other purported class members.  [Id. ¶¶ 145–46, 156; ECF No. 41 at 11].  "[H]ere certain defendants . . . are not liable to the named plaintiffs on any claims.  In these circumstances [the First Circuit] ha[s] refused to allow the case to proceed—whether as a class action or not— against defendants not implicated in any of the wrongs done to the named plaintiffs."  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 769 (1st Cir. 2011) (affirming dismissal of certain defendants where putative class members, but not

named plaintiffs, had claims against those defendants).  Having alleged harm caused by the NCT

2006-2 Trust only, Plaintiffs have established standing as to the NCT 2006-2 Trust, but not as to

the other trust defendants.  "If a plaintiff's standing does not adequately appear from all materials

of record, including amendments to the complaint or affidavits, the complaint must be

dismissed."  Comfort v. Lynn Sch. Comm., 150 F. Supp. 2d 285, 294 (D. Mass. 2001) (citing

Warth v. Seldin, 422 U.S. 490, 501–02 (1975)).  Given that Plaintiffs have alleged that only the

NCT 2006-2 Trust caused them harm, Plaintiffs' claims against the remaining twelve trust

defendants are dismissed.[3]

**B.      Whether Plaintiffs' Usury Claim Is Preempted by Federal Law[4]**

Defendants' primary argument is that Plaintiffs' state law claims, particularly the claim

regarding the violation of Pennsylvania's usury law, are preempted by the NBA.  [ECF No. 35 at

20].  Plaintiffs disagree and maintain that the NCT 2006-2 Trust was the "true lender" on the

Loan and was not a national bank subject to protection under the NBA.  [ECF No. 41 at 23–24].

---

[3] Plaintiffs ask the Court to extend dicta from the First Circuit's 2011 opinion in Plumbers'
Union.  In that case, however, the First Circuit opined on a possible scenario without suggesting
an outcome.

> The qualification, *on which we reserve judgment*, is one where the claims of the
> named plaintiffs necessarily give them—not just their lawyers—essentially the
> same incentive to litigate the counterpart claims of the class members because the
> establishment of the named plaintiffs' claims necessarily establishes those of other
> class members.  The matter is one of identity of issues not in the abstract but at a
> ground floor level.  In such a case, . . . the substance of the Article III concern may
> vanish even if in form it might seem to persist.

Plumbers' Union, 632 F.3d at 770 (emphasis added).  Given that the First Circuit has not
provided clear guidance regarding how to deal with this scenario, the Court declines to depart
from more recent precedent.  See Amrhein, 954 F.3d at 331; Jalbert, 945 F.3d at 594.

[4] "The preemption issues raised are ones of law, not of fact, and are amenable to resolution by a
motion to dismiss the complaint."  Fitzgerald v. Harris, 549 F.3d 46, 52 (1st Cir. 2008).

There are two doctrines at issue here: the "valid-when-made" doctrine and the "true lender" doctrine.

        1.        <u>Whether the Loan Was Valid When Made</u>

Defendants argue that the Loan was valid when made and remained valid after transfer to the NCT 2006-2 Trust.  [ECF No. 35 at 21–22].  Plaintiffs claim that the Loan was not valid when made because it had an interest rate above the 6% maximum rate allowed under Pennsylvania's usury law, which Plaintiffs say governs the Loan.  [ECF No. 41 at 18].

"Under the 'valid when made' doctrine, 'if the interest rate in the original loan agreement was non-usurious, the loan cannot become usurious upon assignment—so, the assignee lawfully may charge interest at the original rate.'"  <u>Kaur v. World Bus. Lenders, LLC</u>, 440 F. Supp. 3d 111, 121 (D. Mass. 2020) (quoting <u>In re Rent-Rite Superkegs W., Ltd.</u>, 603 B.R. 41, 66 (Bankr. D. Colo. 2019)).  "This theory is based on long-standing case-law holding that a loan cannot become usurious due to subsequent assignment."  <u>Id.</u>; <u>see</u> <u>Nichols v. Fearson</u>, 32 U.S. 103, 106 (1833) ("[T]he rule of law is every where acknowledged, that a contract, free from usury in its inception, shall not be invalidated by any subsequent usurious transactions upon it."); <u>Gaither v. Farmers' & Mechs. Bank of Georgetown</u>, 26 U.S. (1 Pet.) 37, 43 (1828) ("[I]f a note [is] free from usury, in its origin, no subsequent usurious transactions respecting it, can affect it with the taint of usury.").

> The [NBA] governs the business activities of national banks . . . .  The Office of the Comptroller of the Currency [("the OCC")], the agency Congress has charged with implementing the NBA, oversees national banks' operations and interactions with customers.  The NBA allows a national bank to charge "interest at the rate allowed by the laws of the State . . . where the bank is located."

<u>Fawcett v. Citizens Bank, N.A.</u>, 919 F.3d 133, 134 (1st Cir. 2019) (citations omitted) (quoting 12 U.S.C. § 85).  Under the NBA, "[a]ny association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest

at the rate allowed by the laws of the State, Territory, or District where the bank is located . . . ." 12 U.S.C. § 85; see 12 C.F.R. § 7.4008(d) ("A national bank may make non-real estate loans without regard to state law limitations concerning . . . . [r]ates of interest on loans.").

"[T]here is no doubt that § 85 [of the NBA] pre-empts state law . . . .  [I]mpair[ment of] the ability of States to enact effective usury laws . . . has always been implicit in the structure of the [NBA] . . . .'" Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 744 (1996) (quoting Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp., 439 U.S. 299, 318–19 (1978)). "[F]ederal law . . . completely defines what constitutes the taking of usury by a national bank, referring to the state law only to determine the maximum permitted rate." Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 10 (2003) (quoting Evans v. Nat'l Bank of Savannah, 251 U.S. 108, 114 (1919)).  "In defining the pre-emptive scope of statutes and regulations granting a power to national banks, these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." Barnett Bank, N.A. v. Nelson, 517 U.S. 25, 33 (1996); see Monroe Retail, Inc. v. RBS Citizens, N.A., 589 F.3d 274, 283 (6th Cir. 2009) ("[T]he level of 'interference' that gives rise to preemption under the NBA is not very high.").

In addition to establishing a preemptive effect under § 85 with regard to state limits on interest rates, § 24 of the NBA allows national banks "[t]o exercise . . . subject to law, all such incidental powers as shall be necessary to carry on the business of banking . . . ." 12 U.S.C. § 24 (seventh); id. at § 24 (third) (giving national banks the power to make contracts).  Federal regulation makes more explicit that these powers include the power to purchase and sell loans subject to federal law.  12 C.F.R. § 7.4008(a) ("A national bank may make, sell, purchase, participate in, or otherwise deal in loans and interests in loans that are not secured by liens on, or

interests in, real estate, subject to such terms, conditions, and limitations prescribed by the [OCC] and any other applicable Federal law.").

In 2020, the OCC, which regulates national banks like PNC, issued a new regulation designed to align the NBA with longstanding Supreme Court precedent under Gaither and Nichols.  OCC, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 85 Fed. Reg. 33,530 (June 2, 2020).  This was, in part, an effort to resolve ambiguity caused by decisions, including a 2015 decision from the Second Circuit, Madden v. Midland Funding, LLC, 786 F.3d 246 (2d Cir. 2015), which suggested that the NBA did not preempt state usury claims in certain circumstances.  See Permissible Interest, supra, at 33,531 ("As noted in the proposal, the OCC is undertaking this rulemaking to clarify that a bank may transfer a loan without impacting the permissibility or enforceability of the interest term in the loan contract, thereby resolving the legal uncertainty created by the Madden decision.").  The new regulation, effective August 3, 2020, states that "[i]nterest on a loan that is permissible under 12 U.S.C. 85 shall not be affected by the sale, assignment, or other transfer of the loan." 12 C.F.R. § 7.4001(e).  Essentially, the new regulation joins §§ 24 and 85, as well as Gaither and Nichols, in confirming that a national bank (a) may set an interest rate based on the state in which it is chartered, (b) may then sell or transfer a loan with that interest rate to an individual or entity within another state, and (c) the loan will remain valid after transfer—even if the interest rate on the loan conflicts with a usury law in the transferee state.  See Permissible Interest, supra, at 33,532 ("[T]he OCC continues to conclude that it is appropriate to resolve the silence in section 85 by providing that when a bank transfers a loan, interest permissible before the transfer continues to be permissible after the transfer.").

The Supreme Court has held that the OCC is due deference in interpreting the NBA.

Fawcett, 919 F.3d at 134 (citing Smiley, 517 U.S. at 739).

> It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes that they are charged with administering. . . .  [T]hat practice extends to the judgments of the Comptroller of the Currency with regard to the meaning of the banking laws.  "The Comptroller of the Currency," . . . "is charged with the enforcement of banking laws to an extent that warrants the invocation of [the rule of deference] with respect to his deliberative conclusions as to the meaning of these laws."

Smiley, 517 U.S. at 739 (last alteration in original) (citations omitted) (quoting NationsBank of

N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256–57 (1995)).  Plaintiffs do not

dispute the validity of the new regulation, but instead argue that it does not apply here because

PNC is located in Pennsylvania and is therefore subject to the interest rate cap set by

Pennsylvania's usury law.  [ECF No. 41 at 18–19].[5, 6]

"Section 85 was originally enacted as § 30 of the [NBA] . . . .  The congressional debates

surrounding the enactment of § 30 were conducted on the assumption that a national bank was

'located' for purposes of the section in the State named in its organization certificate."

---

[5] Several states are challenging the new regulation in federal court.  See California, et al. v. The Office of the Comptroller of the Currency, et al., No. 20-cv-05200 (N.D. Cal.).  Cross-motions for summary judgment are pending in that matter.  The OCC's position is that the new regulation merely clarifies existing law.  See Defendants' Notice of Motion for Summary Judgment, Memorandum of Points and Authorities in Support Thereof, and Opposition to Plaintiffs' Motion for Summary Judgment at 17, California, et al. v. The Office of the Comptroller of the Currency, et al., No. 20-cv-05200 (N.D. Cal. Jan. 14, 2021) ("[T]he OCC possesses clear authority to interpret § 85 to resolve the silence and issue a final rule clarifying the effect of a national bank's sale, assignment, or transfer of a loan on the interest term of the loan contract."); see also Liquilux Gas Corp. v. Martin Gas Sales, 979 F.2d 887, 890 (1st Cir. 1992) ("[T]he amendment was not a change at all, but a clarification that did not alter the law, and merely explicated it.  Clarification, effective ab initio, is a well recognized principle.")

[6] In their complaint, Plaintiffs did not allege that Pennsylvania usury law applied to PNC, but said only that it applied to the trust defendants.  See [Compl.]; see also [ECF No. 42 at 14 (Defendants' reply brief, noting the omission)].  In their opposition brief, Plaintiffs stated for the first time that PNC was "[u]nquestionably" located in Pennsylvania.  [ECF No. 41 at 19].

Marquette, 439 U.S. at 310 (finding that the location in bank's charter, Nebraska, was its location for purposes of § 85).  The Court must therefore determine where PNC is located, or chartered, for purposes of § 85.

"In passing upon a motion to dismiss for failure to state a claim, the reviewing court's focus on the well-pleaded facts is more expansive than might first be thought.  Within that rubric, the court may consider matters fairly incorporated within the complaint and matters susceptible of judicial notice."  Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008).  "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Using the OCC website's financial institution search function, results for "PNC Bank" show that both "PNC Bank, N.A." and "PNC Bank, National Association" have the same OCC charter number, 1316, which is registered in both Pennsylvania and Delaware.  Institution Search, OCC, https://www.occ.treas.gov/institution-search-final/index-results.html?query=PNC%20Bank (last visited Apr. 6, 2021).  It is unclear, however, whether PNC was chartered in Delaware in 2006, when it entered into the Credit Agreement with Plaintiffs.  In their supplemental briefing on this issue, the parties agree that PNC was chartered in Pennsylvania in 2006, but the record is unresolved as to whether it was also chartered in Delaware at that time.  See [ECF Nos. 52, 53].

The Court will assume without deciding that PNC was chartered only in Pennsylvania in 2006.  At that time, as today, Pennsylvania law set a 6% maximum interest rate on loans of $50,000 or less.  41 Pa. Stat. Ann. § 201 (2006).  That same statute, however, provided that "[i]f any maximum lawful rate of interest provided for in this act is inconsistent with the provision of any other act establishing, permitting or removing a maximum interest rate, . . . then *the*

*provision of such other act shall prevail*."  Id. § 604 (2006) (emphasis added).[7]  Other acts, therefore, can set different interest rate maximums, or remove them entirely.  Consistent with this, and "in an effort to allow . . . state institutions to effectively compete in the financial services marketplace," the Pennsylvania legislature enacted separate laws to allow its state banks "to make loans at alternative rates of interest or finance charge."  ¶ 11-450 Interest—Usury, St. Bank. L. Rep. Pa. 11-450, 2015 WL 6316171 (2018) (citing 7 Pa. Stat. Ann. §§ 318, 319).

One such provision, titled "Alternate basis for interest charges by institutions," allowed state banks to

> make a charge for a loan at a rate, for the term of the loan, not in excess of the discount rate in effect, at the time the loan is made, at the federal reserve bank of the federal reserve district in which the institution is located plus five percent.  The basis for charging interest under this section is an optional alternative to other provisions of this act and other statutes authorizing rates of interest or charges for credit and is not limited by any of such other provisions.

7 Pa. Stat. Ann. § 318 (2006).  Another provision, titled "Charging interest at rates permitted [by] competing lenders," similarly offered another alternative to the state interest rate cap by providing that

> [a]ny loans authorized by this act, other than loans secured by a first lien mortgage on residential real estate, may be made at such interest, finance charge, rate or terms herein authorized or at any interest, finance charge, rate or terms permitted by Pennsylvania law for any other financial institution or any other lender regulated by any State or Federal supervisory authority on the specified class of loan.

7 Pa. Stat. Ann. § 319 (2006).[8]

---

[7] This provision was revised in 2012 but remains essentially unchanged: "If any maximum lawful rate of interest provided for in this act is inconsistent with the provision of any other act establishing, permitting or removing a maximum interest rate, . . . then the provision of such other act shall prevail."  41 Pa. Stat. Ann. § 604 (2021).

[8] These two provisions, §§ 318 and 319, were repealed in 2012 and replaced with a similar provision:

These two provisions allow Pennsylvania banks to charge interest above the rate set in the state's usury statute.  Under the NBA, "where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this title."  12 U.S.C. § 85; see 12 C.F.R. § 7.4001(b) ("A national bank located in a state may charge interest at the maximum rate permitted to any state-chartered or licensed lending institution by the law of that state.").  Therefore, as a nationally chartered bank with its location in Pennsylvania, PNC was allowed to charge the same interest rates as Pennsylvania's state-chartered banks, including rates allowed under 7 Pa. Stat. Ann. §§ 318 and 319.

Under § 318, the maximum interest rate allowed was 5% over the rate "at the federal reserve bank of the federal reserve district in which the institution is located."  7 Pa. Stat. Ann. § 318.  As Defendants note, that rate was between 5.50% and 6% at the time that PNC and

---

An institution may, subject to any applicable restriction under other provisions of this act, lend money, extend credit and discount or purchase evidences of indebtedness and agreements for the payment of money at such interest, finance charge, rate or terms authorized under this section or at any interest, finance charge, rate or terms permitted for any other financial institution or any other lender regulated by any Federal or State supervisory authority on the specified class of loan.

7 Pa. Stat. Ann. § 303(b)(i) (2021).  A 2012 letter from Pennsylvania's Department of Banking and Securities explained the change as follows:

By virtue of amended Sections 303 and 506 of the Banking Code, interest rate and fee restrictions regarding lending activity by Pennsylvania state-chartered banks and savings banks have been removed, *thus statutorily putting in place what has largely been the existing state of law regarding the lending authority for Pennsylvania state-chartered banks* and savings banks.

Letter from Glenn E. Moyer, Secretary of Department of Banking and Securities, to Pennsylvania Banks at 2 (Nov. 14, 2012) (emphasis added), available at: http://www.dobs.pa.gov/Documents/Secretary%20Letters/Banks/11.14.12%20Secretary_s%20Letter%20Re_%20Banking%20Law%20Modernization%20Package.pdf.

Plaintiffs entered into the Credit Agreement.[9]  PNC was thus able to charge an initial variable interest rate of over 9% on the Loan because it was less than the allowable 10.50% (5.50% + 5%).[10]   The Loan, with its initial interest rate of over 9%, was therefore valid when made, and could not be invalidated by a subsequent transfer to the NCT 2006-2 Trust.[11]

Even accepting the complaint's factual allegations as true, Plaintiffs have failed to state a plausible claim that the NCT 2006-2 Trust, in collecting interest payments, violated Pennsylvania usury law where the Loan was valid under federal law when made.  Elsevier, Inc., 732 F.3d at 80.

        2.       Whether PNC or the NCT 2006-2 Trust Was the True Lender

As an alternative theory, Plaintiffs argue that, under the true lender doctrine, PNC was never the true lender on the Loan, and that FMC and the trusts merely used PNC to avoid state usury laws.  [ECF No. 41 at 19].  Defendants contend that the true lender theory is preempted by

---

[9] See [ECF No. 53 at 5 n.7 (citing https://www.frbdiscountwindow.org/pages/discount-rates/historical-discount-rates)]; see also Interest Rates, Discount Rate for United States, Federal Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/INTDSRUSM193N (last visited Apr. 6, 2021).

[10] The interest rate on the Credit Agreement was also allowed under § 319.  For example, a national bank located in Nevada, which has no usury laws, could charge Pennsylvania residents interest on a loan at any rate per 12 U.S.C. § 85 (allowing national banks to charge interest as allowed under the state in which they are located).  Section 319 allowed a Pennsylvania state bank to charge the same rate set by the Nevada bank.  7 Pa. Stat. Ann. § 319.  By operation of a separate provision of 12 U.S.C. § 85, because Pennsylvania law allowed its state banks to offer such rates, PNC—as a bank located in Pennsylvania, could charge the same rate.

[11] If PNC were also chartered in Delaware in 2006, the result would be the same.  "Delaware has no usury law."  Kaneff v. Del. Title Loans, Inc., 587 F.3d 616, 622 (3d Cir. 2009).  Therefore, under § 85, "as long as Delaware law would allow the interest charged, it cannot be made unlawful, as a 'penalty' or otherwise, by the law of another State."  Shaner v. Chase Bank, USA, N.A., 570 F. Supp. 2d 195, 201 (D. Mass. 2008); see Marquette, 439 U.S. at 313 ("Since Omaha Bank and its BankAmericard program are 'located' in Nebraska, the plain language of § 85 provides that the bank may charge 'on any loan' the rate 'allowed' by the State of Nebraska.").

federal law and that even if it could be applied here, the facts do not support Plaintiffs' theory. [ECF No. 35 at 24, 30].

Under the "true lender" doctrine, "[i]f the national bank is not the 'true lender,' some courts have ruled, the partner non-bank entity does not gain the benefit of federal preemption." Kaur, 440 F. Supp. 3d at 122. "In determining the true lender, courts have looked to which institution had the 'predominant economic interest,' for which '[t]he key and most determinative factor' is which entity 'placed its own money at risk at any time during the transactions.'" Id. (quoting Consumer Fin. Prot. Bureau v. CashCall, Inc., No. 15-cv-07522, 2016 U.S. Dist. LEXIS 130584, at *6 (C.D. Cal. Aug. 31, 2016)). Plaintiffs have not identified binding authority that requires this Court to apply the true lender doctrine. See generally [ECF No. 41 at 23–25 (describing the Second Circuit's holding in Madden as well as other district court decisions)].

In any case, Plaintiffs' theory—that PNC never intended to own the loans and never had an economic interest in the loans—fails. [ECF No. 41 at 21–22]. Their theory is contradicted by the Note Purchase Agreement between FMC and PNC, incorporated by reference in the complaint, see, e.g. [Compl. ¶¶ 39–42, 50–54], which reflects that PNC did have an economic interest in the loans. As Defendants observe, [ECF No. 35 at 13, 30], the Note Purchase Agreement required PNC to fund and fully disburse the loans, [ECF No. 36-1 at 23 (§ 3.07), 26 (§ 5.02(d)(iii))], provided that PNC might hold the loans for eight months or longer, [id. at 12–13 (§§ 2.02(b), (d))], allowed FMC or the trusts to not purchase the loans upon payment of 1% in liquidated damages, [id. at 14 (§ 2.02(e))], and required PNC to repurchase any loans sold to FMC or the trusts if PNC breached any representations or warranties, [id. at 30 (§ 5.04)]. In addition, PNC is named as the lender on the Credit Agreement, indicating that PNC originated and disbursed the loan consistent with the terms of the Note Purchase Agreement. [ECF No. 36-

3 at 1, 4, 5 (listing PNC as the lender)].  PNC therefore placed its own money at risk at various

times throughout the loan transaction.  Kaur, 440 F. Supp. 3d at 122.  Thus, even assuming that

the true lender doctrine were applicable, in light of the Note Purchase Agreement and the Credit

Agreement, Plaintiffs have failed to plausibly allege that PNC was not the true lender.  See

Grajales, 682 F.3d at 44.[12]

### C.    Plaintiffs' Remaining Claims

Defendants assert that Plaintiffs' remaining claims are likewise preempted by federal law

and otherwise fail.  [ECF No. 35 at 32].

### 1.    Breach of Contract and Duty of Good Faith and Fair Dealing

Plaintiffs claim that the NCT 2006-2 Trust is in breach of the Credit Agreement and the

covenant of good faith and fair dealing because it collected interest in excess of the rate allowed

under Pennsylvania law.  [Compl. ¶¶ 171, 175].

Under Pennsylvania law, "[t]o successfully maintain a cause of action for breach of

contract the plaintiff must establish: (1) the existence of a contract, including its essential terms,

---

[12] In 2020, the OCC issued a new regulation setting forth its interpretation of the true lender doctrine.  National Banks and Federal Savings Associations as Lenders, 85 Fed. Reg. 68,742 (Oct. 30, 2020) (codified at 12 C.F.R. §7.1031).  Under the OCC's new rule, PNC would be considered the true lender on the Loan.  See id. ("This final rule establishes a clear test for determining when a bank makes a loan, by interpreting the statutes that grant banks their authority to lend.  Specifically, the final rule provides that a bank makes a loan when it, as of the date of origination, (1) is named as the lender in the loan agreement or (2) funds the loan.").  Plaintiffs argue that the new rule, effective December 29, 2020, cannot be applied retroactively.  [ECF No. 44 at 2].  Unlike the OCC's recent "valid when made" regulation, its interpretation of the true lender doctrine is not based on longstanding precedent, though the OCC does state that its new regulation clarifies ambiguity in the law.  Supra, National Banks at 68,743 ("The rule interprets statutes that authorize banks to lend—12 U.S.C. 24, 371, and 1464(c)—and clarifies how to determine when a bank exercises this lending authority.").  Several states are challenging this new rule.  See Complaint, New York, et. al. v. The Office of the Comptroller of the Currency, No. 21-cv-00057 (S.D.N.Y. Jan. 5, 2021).  Given the Court's conclusions above, it is unnecessary to resolve the parties' dispute about the applicability of the new rule.

(2) a breach of a duty imposed by the contract, and (3) resultant damages." Hart v. Arnold, 884 A.2d 316, 332 (Pa. Super. Ct. 2005). "Pennsylvania does not recognize an independent cause of action for breach of a covenant of good faith and fair dealing." McCabe v. Marywood Univ., 166 A.3d 1257, 1261 n.2 (Pa. Super. Ct. 2017). Instead, "the duty to act in good faith and deal fairly infuses the parties' performance of their express contractual obligations." Hanaway v. Parkesburg Grp., LP, 132 A.3d 461, 471–72 (Pa. Super. 2015), aff'd in part and rev'd in part on other grounds, 168 A.3d 146 (Pa. 2017). Accordingly, the Court considers Plaintiffs' separate claims as a unified claim for breach of contract.

The Credit Agreement, per its terms, is governed by federal and Pennsylvania law, see [ECF No. 36-3 at 6], both of which, as discussed above, allowed PNC to charge a rate of interest above 6%. Further, the terms of the Credit Agreement clearly recite an initial interest rate of over 9%. Plaintiffs cannot now claim a breach based on that rate when it is allowed by law and specifically set forth in the Loan documentation. See [id. at 1]. If Plaintiffs objected to the interest rate, under these circumstances, that needed to be negotiated prior to entering into the contract and not after Plaintiffs received the benefit of the bargain. Plaintiffs have thus not plausibly alleged that PNC or its assignee, the NCT 2006-2 Trust, breached the Credit Agreement or the covenant of good faith and fair dealing based on the interest rate charged on the Loan, or that Plaintiffs were harmed by any alleged breach. See Twombly, 550 U.S. at 570.

### 2.   Violation of Pennsylvania's Unfair Practices Law

Plaintiffs allege that Defendants "engaged in unfair and deceptive acts and practices in the conduct of trade or commerce prohibited by the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"). [Compl. ¶ 177]. Defendants claim that Plaintiffs have not pled the elements required to support a claim under the UTPCPL. [ECF No. 35 at 34]. In

their opposition brief, Plaintiffs focus on the NCT 2006-2 Trust's imposition of an interest rate above the Pennsylvania maximum as the basis for their UTPCPL claim.  [ECF No. 41 at 30–32].

The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  73 Pa. Stat. Ann. § 201-3.  "To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."  Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004).  "The Supreme Court of Pennsylvania has consistently interpreted the [UTPCPL's] private-plaintiff standing provision's causation requirement to demand a showing of justifiable reliance, not simply a causal connection between the misrepresentation and the harm."  Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222 (3d Cir. 2008).

Plaintiffs have failed to show that they justifiably relied on any misrepresentation or action taken by the NCT 2006-2 Trust.  For example, Plaintiffs fail to demonstrate justifiable reliance on the NCT 2006-2 Trust charging an interest rate on the Loan at or below 6% where the Credit Agreement expressly set out an interest rate of over 9%, which was allowed under Pennsylvania law.  [ECF No. 36-3 at 4].  In addition, the Credit Agreement was between PNC— a national bank subject to the NBA—and Plaintiffs, and identified both Pennsylvania and federal law as governing its provisions.  [Id. at 6].  As the Court has already found, see supra, Section III.B.1, the Loan was valid when made and the NCT 2006-2 Trust was therefore entitled to continue charging the variable interest rate as set forth in the Credit Agreement.

The bulk of Plaintiffs' complaint alleges actions taken by PNC or FMC, not the NCT 2006-2 Trust.  See, e.g., [Compl. ¶¶ 31, 35, 58–60, 89–90, 100–06 (alleging actions taken by FMC, not the NCT 2006-2 Trust or the other trust defendants)].  Even if the Court were to

interpret the deceptive or unfair acts alleged to be the means by which PNC and FMC structured the loan transfers to the trusts, neither PNC nor FMC is a party to this lawsuit. See Stoudt v. Alta Fin. Mortg., No. 08-cv-02643, 2009 U.S. Dist. LEXIS 19297, at *5 (E.D. Pa. Mar. 10, 2009) (citing "ample authority that holds affirmative claims of fraud and violations of consumer protection laws, including Pennsylvania's, are inappropriate to assert against an assignee where there are no allegations that the assignee had any contact with the [borrower] or made any representations to the [borrower] and the factual basis for the claims occurred prior to assignment of the . . . loan."); Morilus v. Countrywide Home Loans, Inc., 651 F. Supp. 2d 292, 309 (E.D. Pa. 2008) (dismissing UTPCPL claim where plaintiffs failed to show that defendants "made any representations to them").

Plaintiffs have therefore failed to plausibly allege justifiable reliance on any act or practice taken by the NCT 2006-2 Trust. See Hunt, 538 F.3d at 222; Grajales, 682 F.3d at 44.

### 3.   Requested Relief

Because the Court concludes that Plaintiffs' claims are preempted and/or fail to state a claim for relief, Plaintiffs' requests for relief, [Compl. ¶¶ 178–81, 183], are likewise denied.

## IV.   CONCLUSION

Accordingly, Defendants' motion to dismiss, [ECF No. 34], is GRANTED.

**SO ORDERED.**

April 7, 2021                                            /s/ Allison D. Burroughs
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE